**FILED**
HARRISBURG, PA

AUG 2 8 2015

MARIA E. ELKINS, CLERK
Per_____

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| ex rel. CATHY HOLSPOPPLE, | : | CIVIL ACTION NO. 1:15-CV-1671 |
| Plaintiffs, | : | COMPLAINT AND |
| | | |
| v. | : | DEMAND FOR JURY TRIAL |
| | | |
| KEYSTONE HEARING INSTITUTE,: | | FILED IN CAMERA AND UNDER |
| | | |
| Defendant, and | : | SEAL PURSUANT TO |
| | | |
| ANTHONY FOWLER, Au.D, | : | 31 U.S.C. § 3730(b)(2) |
| | | |
| Defendant, and | : | |
| | | |
| JACQUELINE PRICE, Au.D, | : | |
| | | |
| Defendant, and | : | |
| | | |
| SONOVA HOLDING AG, | : | |
| | | |
| Defendant, and | : | |
| | | |
| PHONAK LLC, | : | |
| | | |
| Defendant. | : | |

1

## COMPLAINT INDEX

I.      INTRODUCTION p.5
II.      PARTIES p.8
III.   JURSIDICTION / VENUE p.12
IV.      APPLICABLE LAWS p.15

A. FCA p.15
B. ANTIKICKBACK ACT p.18
C. ANTI KICKBACK STATUTE p.18
D. STARK LAW p. 20
E. EXCLUSION STATUTE p. 21
F. CIVIL MONETARY PENALTIES LAW p. 22
G. CRIMINAL FALSE CLAIMS ACT p. 23
H. PA MEDICAID FRAUD AND ABUSE CONTROL ACT p. 23

V.      HEALTHCARE / INSURANCE BILLING p. 25

A. MEDICARE p. 25
B. MEDICAID p. 26
C. TRICARE/CHAMPUS p. 27
D. FEDERAL EMPLOYEE HEALTH BENEFITS PROGRAM p. 29
E. BILLING INSURANCE PROGRAMS p. 29

VI.      FALSE CLAIMS ACT & FRAUD ALLEGATIONS p. 33

A. THE PRACTICE OF AUDIOLOGY p. 33
B. DEFENDANT PRICE p. 35
C. BILLED WRONG PLACE OF SERVICE p. 37
D. SPLIT BILLING / WRONG DATE OF SERVICE p. 41
E. MARKETING / SALES FRAUD p. 43
    1. Falsely Advertised As Stocking Many Brands Of Hearing Aids p. 45
    2. Falsely Advertised p. 49

F. FAILED TO HAVE PATIENT SIGN UPDATED HIPAA POLICY p. 51

G. UPCODING VIOLATIONS p. 4953

1. <u>Billing For More Expensive Services Than Were Provided p. 53</u>
   *a. FAILED TO USE OR INAPPROPRIATE USE OF MODIFIERS p. 53*
   *b. FAILED TO HAVE APPRORIATE TEST AREA p.55*
   *c. FAILED TO CALIBRATE EQUIPMENT p.57*

2. <u>Billing For More Expensive Product Than Was Provided p. 60</u>
   *a. BILLING HEARING AIDS AT AN INCREASED PRICE p.60*
   *b. SELLING USED / WORN / DIRTY HEARING AIDS AS NEW p. 66*
   *c. SELLING HEARING AIDS THEY OBTAINED FOR FREE p.74*
   *d. FRAUDULENTLY BILLING FOR RECEIVERS p. 76*

3. <u>Billing For A Service Not Actually Rendered p. 77</u>
   *a. FITTING HEARING AIDS WITHOUT REQUIRED TESTS p.77*
   *b. FAILED TO USE REAL EAR PROBE TEST p. 80*
   *c. FAILED TO CONDUCT A COMPREHENSIVE OFFICE EXAM p.83*

4. <u>Billing For Services Not Medically Necessary p. 93</u>
   *a. SCHEDULED YEARLY EXAMS / SENT REMINDER CARDS p. 94*
   *b. FAILED TO SECURE A REFERRAL OR CLEARANCE p. 98*
   *c. FAILED TO HAVE COMPLETE PATIENT CHART p. 108*
      *i. Failed To Receive Disclosure Agreement p. 114*
      *ii. Failed To Secure Medical Waiver Signatures p. 118*

5. <u>Services Performed By An Unqualified Employee p. 120</u>
   *a. RELATOR p.122*
   *b. SECRETARY HENSON p. 125*

6. <u>Billing For Services That Were Performed By An Employee Not Credentialed For Participation In FIP p. 127</u>

7. <u>Billing Unbundled Services Already Billed For In A Bundled Price p. 132</u>

H. SLIDING SCALE PRICES p. 137
I.  WAIVER OF CO-PAY p. 140
J.  DOUBLE BILLING p. 142
K. KICKBACKS / REBATES p. 145
L.  DISREGARDED SAFETY AND HYGIENIC PROTOCOL p. 153
M. FAILED TO SECURE BUSINESS ASSOCIATES CONTRACT p. 155
N. FAILED TO RETURN MONEY TO FIP p. 156
O. TERMINATION p. 158

VII.   <u>CAUSES OF ACTIONS p.163</u>

<u>COUNT ONE - 31 U.S.C. § 3729(a)(1) Presentation of False Claim p.163</u>
<u>COUNT TWO - Act, 31 U.S.C. § 3729(A)(1)(G) Reverse False Claims p.164</u>
<u>COUNT THREE - 31 U.S.C. § 3729(a)(2) Making or Using False Record p.165</u>
<u>COUNT FOUR - 31 U.S.C. § 3729(a)(3) Conspiracy p. 167</u>
<u>COUNT FIVE - 41 U.S.C. §§ 52-53 Anti-Kickback Act p.169</u>
<u>COUNT SIX - 42 U.S.C. §§ 1320a-7a Anti-Kickback Statute p. 170</u>
<u>COUNT SEVEN 42 U.S.C. § 1395nn Stark Law p. 172</u>
<u>COUNT EIGHT - 42 U.S.C. § 1320a-7a Civil Monetary Penalties Law p. 173</u>
<u>COUNT NINE - 62 P.S. § 1401 et seq. PA Fraud & Abuse Control Act p. 174</u>
<u>COUNT TEN - 18 U.S.C. § 287 Criminal False Claims Act p. 175</u>
<u>COUNT ELEVEN - 31 U.S.C. § 3730(h) Wrongful Discharge p. 176</u>

VIII. <u>REQUEST FOR TRIAL BY JURY p. 177</u>

## COMPLAINT

1    RELATOR CATHY HOLSPOPPLE ("Relator") on her own behalf, by and

2    through her attorney, Rebecca Lyttle, Esquire, and on behalf of the United States of

3    America ("United States") against KEYSTONE HEARING INSTITUTE

4    ("Defendant Keystone"), ANTHONY FOWLER, Au.D ("Defendant Fowler"),

5    JACQUELINE PRICE, Au.D ("Defendant Price"), SONOVA HOLDING AG

6    ("Defendant Sonova"), and PHONAK LLC ("Defendant Phonak").  Based upon her

7    personal knowledge, relevant documents and upon information and belief, as

8    follows:

## I.    INTRODUCTION

9    This is a civil action to recover damages, civil penalties, and other relief

10   owed to the United States and Relator arising from false and/or fraudulent records,

11   statements and claims made, used, and caused to be made, used or presented and

12   continues to be made, used or presented by Defendants, Keystone Hearing Institute;

13   Anthony W. Fowler; Jacqueline Price; Sonova Holdings, AG; and Phonak and/or

14   their agents, employees and co-conspirators in violation of the Federal Civil False

15   Claims Act, 31 U.S.C.§ 3729, et seq., as amended (the "False Claims Act" or

16   "FCA"); the Medicare/Medicaid Fraud & Abuse Anti-Kickback Statute, 42 U.S.C.

17   §§ 1320a-7a & 7b(b) *et seq.*; The Stark Law, 43 U.S.C. § 1395nn; The Anti-

18   Kickback Act of 1986, 41 U.S.C. §§ 51 *et seq.*; Pennsylvania Fraud and Abuse

19    Control Act, 62 P.S. § 1401 et seq.; Exclusion Statute, 42 U.S.C. § 1320 A-7;

20    Criminal False Claims Act, 18 U.S.C. § 287; and the Civil Monetary Penalties Law,

21    42 U.S.C. § 1320 A7-A.

22        Defendants Keystone, Fowler, and Price defrauded the United States through

23    a systemic pattern and practice of improper billing, providing inadequate services,

24    and other violations of Medicare and other Federal Insurance Program ("FIP")

25    Conditions of Participation; including but not limited to several violations of the

26    Anti-Kickback Laws.

27        Defendants Sonova and Phonak did not directly submit claims for

28    reimbursement of hearing aids to Federal Insurance Programs; however, they knew

29    that their illegal marketing practices towards and/or with Defendant Keystone

30    through Defendants Fowler and Price would cause the submission of thousands of

31    hearing aid claims that were not eligible for program reimbursement.

32        Defendants Keystone, Fowler, Sonova, Phonak and Price in connection with

33    submitting claims to and then receiving reimbursement from the Federal Health

34    Care programs, including but not limited to, the United States Department of Health

35    and Human Services ("HHS")  and the Centers for Medicare and Medicaid Services

36    ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"),

37    committed fraud against the Medicare Program, Title XVIII of the Social Security

38    Act, 42 U.S.C. §§ 1395-1395ccc and 42 C.F.R. Parts 400-1004, (a) knowingly

39    presenting, and causing to be presented to an officer and employee of the United

40    States Government false and fraudulent claims for payment and approved by the

41    Government, in violation of 31 U.S.C. §§ 3729(a)(1) and (2); and (b) knowingly

42    making, using, and causing to be made and used, false records and statements to get

43    false and fraudulent claims paid and approved by the Government, in violation of

44    31 U.S.C. §§ 3729(a)(1) and (2).

45         As used in this Complaint, the term Federal Insurance Programs ("FIP") shall

46    have the same meaning as defined in 42 U.S.C. § 1320a-7b(f), and it therefore

47    includes, but not limited to, Medicare, Medicaid, TRI~CARE (administered by the

48    Department of Defense through its component agency, Champus), CHAMPUS'VA

49    (administered by the Department of Veterans Affairs), the Federal Employee Health

50    Benefits Program (administered by the United States Office of Personnel

51    Management), the Railroad Retirement Medicare program (administered by the

52    Railroad Retirement Board), The Federal Workers Compensation Program and the

53    Indian Health Service (administered by the Department of Health and Human

54    Services).

55         Relator alleges that Defendants committed fraud against some or all of the

56    above Federal Insurances.  Defendants have the supporting documentation.

## II.   <u>PARTIES</u>

57      Plaintiff / Relator CATHY HOLSOPPLE ("Relator") is an adult individual

58  residing in York in the Commonwealth of Pennsylvania.  She was employed by

59  Defendant Keystone from on or about March 1, 2006 until her termination on or

60  about September 24, 2014.  Beginning in or around the year 2006 through in or

61  around May of 2011, Relator physically worked at Defendant Keystone's Lemoyne,

62  PA location one day a week and at its Hanover, PA location three days a week.

63  Starting in or around May of 2011, Relator began only working at Defendant

64  Keystone's Hanover, PA location; working five days a week.  At all times relevant,

65  Relator's direct supervisor was Defendant Anthony Fowler.

66      Relator received her Pennsylvania License "Certification of Registration" as

67  a hearing aid fitter on October 28, 2005, and her Associate's Degree in Medical

68  Administrative Assistance in 2001.

69      During her employment with Defendant Keystone and at all times material

70  hereto, Relator acted within the course and scope of her employment and agency

71  relationship. Relator has personal knowledge of all of the Defendants' practices as a

72  result of her duties from March 1, 2006 through September 2014 as a PA licensed

73  hearing aid fitter and from in or around May 2011 through September 2014 as both

74  a hearing aid fitter and as a medical insurance biller for Defendant Keystone.

75  Relator's billing duties included receiving billing codes from Defendant Fowler

76   and/or Price, entering said codes into the practice management system for the

77   hearing care industry, 'sycle.net', creating claims to bill FIP, and then reviewing the

78   ERAs (electronic remittance advice / payments).

79        Defendant THE KEYSTONE HEARING INSTITUTE (hereinafter also

80   known as "Defendant Keystone" and which does encompass the actions of

81   Defendant Fowler) is a Pennsylvania company owned by Defendant Anthony W.

82   Fowler, started in the year 2000, upon information and belief, with its principle

83   place of business located at 5418 Locust Lane, Bldg. 2 Harrisburg, PA 17109-0.

84   From at least the years 2004 through 2011, Defendant Keystone had three locations

85   located in the following areas: Lemoyne, PA; Harrisburg, PA, location NPI

86   #1730210246; and in Hanover, PA, location NPI#: 1922138445.   In or about the

87   year 2011, Defendant Keystone closed its Lemoyne, PA location; all of the patient

88   files from this location were combined with the Harrisburg office files.

89        Defendant Keystone, through Defendants Anthony W. Fowler and Jacqueline

90   Price also serviced patients off site at nursing homes in the local area. Upon

91   information and belief, Medicare and Medicaid and other Federal Health Care

92   Insurance Programs comprise over 90% of Defendant Keystone's payor source.

93   Defendant Keystone's Department of Health Dealer Registration Number is

94   #D00776-01.

95       Defendant ANTHONY W. FOWLER, Au.D (hereinafter also known as

96 "Defendant Fowler" and does so encompass the actions of Defendant Keystone) is

97 an adult individual residing in New Cumberland in the Commonwealth of

98 Pennsylvania.  Defendant is a board-certified audiologist and the owner, sole

99 proprietor, managing agent and does so conduct the business of all of Defendant

100 Keystone locations and at all times material hereto, was the servant, workmen and

101 employee of Defendant Keystone and at all times material hereto, acting within the

102 course and scope of his employment and agency relationship and was acting on

103 Defendant Keystone's behalf as well as individually in all actions described in the

104 Complaint. Defendant Fowler's PA Medical License is #AT001146L, PA Medicaid

105 Provider Number: #001822982, Medicare UPIN: # P10140, and PA Medicare

106 UPIN 039625, NPI #: 1841365061 with an enumeration date of 2006, and a

107 Medicare PECOS ID #6103098892.

108       Defendant JACQUELINE PRICE, Au.D (hereinafter also known as

109 "Defendant Price") is an adult individual residing in Harrisburg, Dauphin County in

110 the Commonwealth of Pennsylvania. She is an audiologist with a Pennsylvania

111 State Medical License of #AT001047L.  Defendant Price was hired by and worked

112 at Defendant Keystone's Harrisburg Location starting in or around May of 2011.

113 At all times relevant she worked under the direct direction of Defendant Fowler.

114 She was at all times material hereto, the agent, servant, workmen and employee of

115   Defendant Keystone and at all times material hereto, acted within the course and

116   scope of her employment and agency relationship. Her individual Medical

117   Insurance NPI # is 1952351868 with an enumeration date of 2006.

118      Defendant SONOVA HOLDING AG, (hereinafter sometimes referred to as

119   "Defendant Sonova" and does so encompass the actions of Defendant Phonak) is an

120   international corporation with its principal place of business at Laubisrutistrasse 28,

121   8712 Stafa, in the Country of Switzerland.  Defendant Sonova is a manufacturer of

122   Phonak brand hearing aids and distributes Phonak hearing aids though Defendant

123   Phonak to Defendant Keystone and at all times material hereto, acted by and

124   through its authorized agents, servants, workmen and employees and within the

125   course and scope of their employment and agency relationship.

126      Defendant PHONAK LLC (Hereinafter also known as "Defendant Phonak"

127   and does so encompass the actions of and direction of Defendant Sonova) is an

128   Illinois corporation with its principle place of business located at 4520 Weaver

129   Parkway, Warrenville, Illinois.  Defendant Phonak is a member of Sonova Group

130   which is owned by Defendant Sonova Holding AG.  From at least the years 2008

131   through 2014, Defendant Phonak sold hearing aids to all Defendant Keystone

132   locations in Pennsylvania through Defendant Fowler and at all times material

133   hereto, acted by and through its authorized agents, servants, workmen and

134   employees and within the course and scope of their employment and agency

135   relationship.

136       All Defendants are jointly and/or severally liable to the Federal Government.

### III.   JURISDICTION / VENUE

137       Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. §§

138   1391(b) and (c), and 31 U.S.C. § 3732(a), because Defendants can be found in

139   and/or transact(s) business within this District.

140       This Court has subject matter jurisdiction over the claims alleged in this

141   Complaint under 28 U.S.C. §§ 1331 (Federal Question), 1345 (United States as

142   plaintiff) and 31 U.S.C. § 3732(a) (False Claims Act).

143       This Court has supplemental jurisdiction over the state claim pursuant to 31

144   U.S.C. § 3732 (b) because Defendants' Pennsylvania law violations and their

145   violations of the FCA arise from the same transactions or occurrences.  The Court

146   also has pendant jurisdiction over Defendants' Pennsylvania Law violations

147   because these state violations and their violations of the FCA arise out of the same

148   nucleus of operative facts.

149       This Court has personal jurisdiction over all of the Defendants pursuant to 31

150   U.S.C. §3732(a) because all of the Defendants can be found, resides, and/or

151   transacts business in the Middle District of Pennsylvania and because an act

152   proscribed by 31 U.S.C. § 3729 occurred within this District. Title 31, United States

153   Code, § 3732(a) further provides for nationwide service of process.

154        Upon further information and belief, there has been no "public disclosure" of

155   the matters alleged herein and this action is not "based upon" any such disclosure,

156   within the meaning of 31 U.S.C. § 3730(e)(4)(A).  Notwithstanding the foregoing,

157   Relator is an "original source" of this information as defined by 31 U.S.C. §

158   3730(e)(4)(B) of the False Claims Act, and as such, she is expressly excepted from

159   its public disclosure bar.  *See* 31 U.S.C. § 3730(e)(4)(A) (providing that the public

160   disclosure bar does not apply if "the person bringing the action is an original source

161   of the information").  As pertinent here, an original source is someone "[1] who has

162   knowledge that is independent of and materially adds to the publicly disclosed

163   allegations or transactions, and [2] who has voluntarily provided the information to

164   the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B) (emphasis

165   added).

166        Relator voluntarily informed the F.B.I. of the below allegations and again on

167   or about March 12, 2015, Relator, with the undersigned counsel present, voluntarily

168   disclosed the below information to Federal Bureau of Investigation, Susan E.

169   Steinberg, Special Agent of the Harrisburg, Pennsylvania location. Ms. Steinberg

170   was informed of the upcoming Qui Tam filing under seal.

171     On or about April 30, 2015, Relator, with the undersigned counsel present,

172     voluntarily disclosed the information in this Complaint to Assistant United States

173     Attorney of the Criminal Division, Joseph Terz.  Mr. Terz was informed of the

174     upcoming Qui Tam filing under seal.  It is unknown if the DOJ has proceeded with

175     criminal charges against any of the above named Defendants.

176     Relator filed a complaint concerning some of the healthcare violations that

177     are subject to this Complaint to the Pennsylvania Department of State who in turn

178     forwarded her complaint to the PA Dept. of Health. On April 3, 2015, the

179     Department of Health contacted Relator and stated it found the following:

180     "Deficiencies were found in the areas relating to the complaint under record

181     keeping and paperwork requirements."

182     Upon information and belief, this Complaint is not based upon allegations or

183     transactions that are the subject of a civil suit or an administrative civil money

184     penalty proceeding in which the United States is already a party. 31 U.S.C. §

185     3730(e)(3). 31 U.S.C. § 3730(b)(5).

186     Pursuant to 31 U.S.C. § 3730(b)(2) contemporaneous to filing this

187     Complaint, Relator provided the Attorney General of the United States and the

188     United States Attorney for the Middle District of Pennsylvania with a copy of the

189     Complaint and a written Disclosure Statement attaching substantially all material

190     evidence and information then in Relator's possession.

191       Defendants' actions, as detailed throughout this Complaint, resulted in

192 numerous violations of the FCA that occurred over a long period of time and upon

193 information and belief, continues to occur. Further evidence of Defendants' specific

194 violations of the FCA resides within each of the Defendant's exclusive possession

195 and/or control.

196       In accordance with 31 U.S.C. § 3730(b)(2), the original Complaint has been

197 filed in camera and will remain under seal for a period of at least 60 days and shall

198 not be served on the Defendants until the Court so orders.

## IV.   APPLICABLE LAWS

### A. THE FEDERAL FALSE CLAIMS ACT  (31 U.S.C. § 3729)

199       The False Claims Act (FCA) was originally enacted in 1863, and was

200 substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-

201 562, 100 Stat. 3153. Congress enacted the 1986 amendments to enhance and

202 modernize the Government's tools for recovering losses sustained by frauds against

203 it after finding that federal program fraud was pervasive. The amendments were

204 intended to create incentives for individuals with knowledge of Government frauds

205 to disclose the information without fear of reprisals or Government in-action and to

206 encourage the private bar to commit resources to prosecuting fraud on the

207 Government's behalf. Congress amended relevant provisions of the FCA in 2009

208 and again in 2010. See Patient Protection and Affordable Care Act, Pub. L. 111-148

209   § 10104(j)(2), 124 Stat. 119, 901-02 (March 23, 2010) (amending 31 U.S.C. §

210   3730(e)); Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21 § 4, 123

211   Stat. 1617, 1621-25 (May 20, 2009) (amending 31 U.S.C. §§ 3729-33). The 2009

212   Act provided that it "shall take effect on [May 20, 2009] and shall apply to conduct

213   on or after the date of enactment"—except for § 3729(a)(1)(B), which "shall take

214   effect as if enacted on June 7, 2008, and apply to all claims under the False Claims

215   Act … that are pending on or after that date." Pub. L. 111-21 § 4(f), 123 Stat. 1625

216   (emphases added).

217       The Act provides that any person who presents, or causes to be presented,

218   false or fraudulent claims for payment or approval to the United States Government,

219   or knowingly makes, uses, or causes to be made or used false records and

220   statements to induce the Government to pay or approve false and fraudulent claims,

221   is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim,

222   plus three times the amount of the damages sustained by the Federal Government.

223   …. (b) For purposes of this section, the terms "knowing" and "knowingly" mean

224   that a person, with respect to information… (1) has actual knowledge of the

225   information; (2) acts in deliberate ignorance of the truth or falsity of the

226   information; or (3) acts in reckless disregard of the truth or falsity of the

227   information, and no proof of specific intent to defraud is required.

228      The Act allows any person having information about false or fraudulent

229 claims to bring an action for herself and the Government, and to share in any

230 recovery. The Act requires that the complaint be filed under seal for a minimum of

231 60 days (without service on the defendant during that time). Based on these

232 provisions, Relator seek through this action to recover all available damages, civil

233 penalties, and other relief for the State and Federal violations alleged herein.

234      Although the precise amount of the loss from each of the Defendants'

235 misconduct alleged in this action cannot presently be determined, it is estimated that

236 the damages and civil penalties that may be assessed against the Defendants under

237 the facts alleged in this Complaint amounts to over a million dollars.

238      Federal Law specifically prohibits providers from making "any false

239 statement or representation of a material fact in any application for any ... payment

240 under a Federal Health Care Program." *See* 42 U.S.C. §1320-a-7b(a)(l). Similarly,

241 Federal Law requires providers who discover material omissions or errors in claims

242 submitted to Medicare, Medicaid, or other Federal Health Care Programs to

243 disclose those omissions or errors to the Government. *See* 42 U.S.C. § 1320-a-

244 7b(a)(3). The requirement that providers be truthful in submitting claims for

245 reimbursement is a precondition for participation in the Medicare program, the

246 Medicaid program, and other Federal and State funded health care programs. *See,*

247 *e.g.,* 42 CFR §§ 1003.l05, 1003.102(a)(l)-(2).

## B. ANTI- KICKBACK ACT   "AKA" (41 U.S.C. §§ 52-53)

248         Parties who contract or subcontract with the Federal Government are subject

249   to the provisions of the Anti-Kickback Act.  The law renders it impermissible for

250   any person "To provide, attempt to provide, or offer to provide any kickback," and

251   defines 'kickback' to mean "any money, fee, commission, credit, gift, gratuity,

252   thing of value, or compensation of any kind which is provided, directly or indirectly

253   to any prime contractors, prime contractor employee, subcontractor, or

254   subcontractor employee for the purpose of improperly obtaining or regarding

255   favorable treatment in connection with a prime contractor in connection with a

256   subcontract relating to a prime contract.

## C. ANTI KICKBACK STATUTE "AKS" (42 U.S.C. § 1320 *et. seq.*)

257         The Anti-Kickback Statute legally prohibits any person or entity from

258   making or accepting payment to induce or reward any person for referring,

259   recommending or arranging for the purchase of any item for which payment may be

260   made under a federally-funded health care program. 42 U.S.C. § 1320a-7b(b). The

261   Statute not only prohibits outright bribes and rebate schemes, but also prohibits

262   offering inducements or rewards that has as one of its purposes inducement of a

263   physician to refer patients for services that will be reimbursed by a federal health

264   care program. The Statute ascribes liability to both sides of an impermissible

265   kickback relationship.

266        The Federal Health Care Anti-Kickback Statute, arose out of Congressional

267    concern that payoffs to those who can influence health care decisions will result in

268    goods and services being provided that are not medically necessary, of poor quality,

269    or even harmful to a vulnerable patient population. To protect the integrity of FIP

270    from these difficult to detect harms, Congress enacted a prohibition against the

271    payment of kickbacks in any form, regardless of whether the particular kickback

272    actually gives rise to overutilization or poor quality of care.

273        Compliance with the Anti-Kickback Statute is a precondition to participation

274    as a health care provider under the Medicaid, CHAMPUS/TRICARE, CHAMPVA,

275    Federal Employee Health Benefit Program, and other FIP. Accordingly, claims for

276    reimbursement for inpatient or outpatient services under these programs that were

277    the result of referrals tainted by kickbacks, are false claims and are not entitled to

278    reimbursement. Providers who participate in a FIP generally must certify that they

279    have complied with the applicable Federal Rules and Regulations, including the

280    Anti-Kickback Law.

281        Any party convicted under the Anti-Kickback Statute must be excluded (i.e.,

282    not allowed to bill for services rendered) from FIP for a term of at least five years.

283    42 U.S.C. § 1320a-7(a)(1). Even without a conviction, if the Secretary of HHS finds

284    administratively, that a provider has violated the Statute, the Secretary may exclude

285    that provider from the FIP for a discretionary period (in which event the Secretary

286   must direct the relevant State Agency (ies) to exclude that provider from their State

287   health program), and may consider imposing administrative sanctions of $50,000

288   per kickback violation. 42 U.S.C. § 1320a-7(b).

289       Violation of the Anti-Kickback Statute subjects the violator to civil monetary

290   penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§ 1320a-

291   7(b)(7), 1320a-7a(a)(7).  Any person that commits an act described in 42 U.S.C. §

292   1320a-7b(b)(1) or (2) is also liable for damages of not more than three times the

293   total amount of remuneration offered, paid, solicited, or received, without regard to

294   whether a portion of such remuneration was offered, paid, solicited, or received for

295   a lawful purpose. 42 U.S.C. § 1320a-7a(a)(7).

## D. STARK LAW (42 U.S.C. § §1395nn *et seq.*)

296       The Stark Law prohibits a physician from making a referral to an entity for

297   the furnishing of "designated health services" if the physician has a "financial

298   relationship" with that entity. 42 U.S.C. § 1395nn(a)(1).  Moreover, "[n]o payment

299   may be made under [Medicare] for a designated health service which, is provided in

300   violation of subsection (a)(1) of this section." 42 U.S.C. § 1395nn(g)(1).

301       Pursuant to the Stark Law, the phrase "designated health services" is defined

302   to the phrase "financial relationship" includes a "compensation arrangement," which

303   is defined to include any arrangement involving any remuneration between the

304   entity and physician. 42 U.S.C. §§1395nn(a)(2)(B) and (h)(1).

305      Under the Stark Law, a "referral" by a "referring physician" includes the

306  request by a physician for the item[,]" 42 U.S.C. § 1395nn(h)(5)(A), and "the

307  request or establishment of a plan of care by a physician which includes the

308  provision of the designated health service ...." 42 U.S.C. § 1395nn(h)(5)(B).

309      Compliance with the Anti-Kickback Statute and the Stark Law is a

310  precondition to participation as a health care provider under FIP.

311      With regard to Medicaid, each physician must sign a provider agreement with

312  his or her State. Although there are variations of the agreements among the states,

313  the agreement typically requires the prospective Medicaid provider to agree that he

314  or she will comply with all Medicaid requirements, which include the Anti-

315  Kickback provisions.  In a number of states, the Medicaid claim form itself contains

316  an express certification by the provider that the provider has complied with all

317  aspects of the Medicaid program, including compliance with Federal Laws.

318      When physicians submit bills for purchases and services under Federal

319  Insurance, the physicians also implicitly certify that those purchases and services

320  were not improperly influenced by illegal financial inducements.

### E.  EXCLUSION STATUTE (42 U.S.C. § 1320A-7)

321      Office of Inspector General (OIG) is legally required to exclude from

322  participation all FIP individuals and entities convicted of the following types of

323  criminal offenses: (1) Medicare or Medicaid fraud, as well as any other offenses

324   related to the delivery of items or services under Medicare or Medicaid. .. (3) felony

325   convictions for other health-care-related fraud, theft, or other financial misconduct;

326   ...OIG has discretion to exclude individuals and entities on several other grounds,

327   including misdemeanor convictions related to health care fraud other than Medicare

328   or Medicaid fraud or misdemeanor convictions in connection with the unlawful

329   manufacture, distribution, prescription, or dispensing of controlled substances;

330   suspension, revocation, or surrender of a license to provide health care for reasons

331   bearing on professional competence, professional performance, or financial

332   integrity; provision of unnecessary or substandard services; submission of false or

333   fraudulent claims to a FIP and engaging in unlawful kickback arrangements.

### F. CIVIL MONETARY PENALTIES LAW (42 U.S.C. § 1320A-7A)

334        OIG may seek civil monetary penalties and sometimes exclusion for a wide

335   variety of conduct and is authorized to seek different amounts of penalties and

336   assessments based on the type of violation at issue. Penalties range from $10,000 to

337   $50,000 per violation.

338        Some examples of CMPL violations include: presenting a claim that the

339   person knows or should know is for an item or service that was not provided as

340   claimed or is false or fraudulent; presenting a claim that the person knows or should

341   know is for an item or service for which payment may not be made; violating the

342   AKS; …and making false statements or misrepresentations on applications or

343   contracts to participate in the FIP.

## G. CRIMINAL FALSE CLAIMS ACT (18 U.S.C. § 287)

344   Whoever makes or presents to any person or officer in the civil, military, or

345   naval service of the United States, or to any department or agency thereof, any

346   claim upon or against the United States, or any department or agency thereof,

347   knowing such claim to be false, fictitious, or fraudulent, shall be "fined not more

348   than $10,000 or imprisoned not more than five years, or both".

349   Although this is a criminal statue, Relator is entitled to a percentage of the

350   monetary recovery through fines etc., under the alternative remedies provision of

351   the FCA.

## H. PENNSYLVANIA'S MEDICAID "FRAUD AND ABUSE CONTROL ACT" (62 P.S. § 1401, *et seq.)*

352   There can also be liability under the State of Pennsylvania for false or

353   fraudulent claims with respect to Medicaid program expenditures. The statute in

354   question prohibits false claims and statements as follows:

355   It shall be unlawful for any person to: Knowingly or intentionally present for
356   allowance or payment any false or fraudulent claim or cost report for
357   furnishing services or merchandise under medical assistance, or to knowingly
358   present for allowance or payment any claim or cost report for medically
359   unnecessary services or merchandise under medical assistance, or to
360   knowingly submit false information, for the purpose of obtaining greater
361   compensation than that to which he is legally entitled for furnishing services
362   or merchandise under medical assistance, or to knowingly submit false
363   information for the purpose of obtaining authorization for furnishing services

or merchandise under medical assistance. Soliciting or receiving or to offer or pay any remuneration, including any kickback, bribe or rebate, directly or indirectly, in cash or in kind from or to any person in connection with the furnishing of services or merchandise for which payment may be in whole or in part under the medical assistance program or in connection with referring an individual to a person for the furnishing or arranging for the furnishing of any services or merchandise for which payment may be made in whole or in part under the medical assistance program. *Submitting duplicate claims for services, supplies or equipment for which the provider has already received reimbursement. *Submitting claims for services, supplies or equipment which were never provided; * Submitting a claim for services, supplies or equipment which includes costs or charges not related to the services provided to the recipient. *Submitting a claim or referring a recipient to another provider for services, supplies or equipment which are not documented in the record, are of little or no benefit to the recipient, are below the accepted medical treatment standards, or are unneeded by the recipient. *Submitting a claim which misrepresents the description of services, the dates of services, the identity of the recipient or the attending physician or the identity of the referring or actual provider; * Submitting a claim for reimbursement for a service or item at a charge higher than the provider's usual and customary charge to the general public for the same; *Providing a service or item without a practitioner's written order or the consent of the recipient, except in emergency situations. *Except in emergency situations, providing a service or item to a patient claiming to be a recipient without making a reasonable effort to verify a current medical assistance identification card, that the person is, in fact, a recipient who is eligible. *Entering into an agreement or conspiracy to obtain to obtain reimbursement or payments for which there is not entitlement.  And *Making a false statement in the application for enrollment as a provider.

**Penalties for Violating Pennsylvania's Medicaid False Claims Act**
With one exception, violations of the Pennsylvania law constitute a felony of the third degree. For each violation there is a maximum penalty of $15,000 and up to seven years imprisonment. If an individual is convicted in any other state court or Federal court for actions that would constitute a violation of Pennsylvania's law, they may be prosecuted under Pennsylvania law for a second degree felony as well as payments of a maximum penalty of $25,000 and up to 10 years' imprisonment. Individuals convicted under Pennsylvania's law will also be required to repay the excess benefits or payments they received plus interest on the amount. Convictions also result

403  in preclusion of a provider from participating in the medical assistance
404  program for a period of five (5) years from the date of conviction.

## V.   HEALTHCARE & INSURANCE BILLING

405  As a direct, proximate and intended result of the conduct of the Defendants'

406  alleged herein in violation of the FCA, the Federal Insurance Programs (otherwise

407  sometimes known as "FIP") including but not limited to the below, have been

408  damaged.

### A. MEDICARE

409  In 1965, Congress enacted Title XVIII of the Social Security Act, known as

410  the Medicare program. Medicare is a federally-funded health insurance program

411  primarily benefitting the elderly. See 42 U.S.C. §§1395c-1395i-4.

412  The Medicare program is administered through the Department of Health and

413  Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS").

414  To assist in the administration of Medicare Part A, CMS contracts with

415  "fiscal intermediaries." 42 U.S.C. § 1395h.  Fiscal intermediaries, typically

416  insurance companies, are responsible for processing and paying claims and auditing

417  cost reports.

418  An audiologist can receive a Medicare provider number (and payment) by

419  applying to the local Medicare carrier.  There should be no barrier to receiving a

420  provider number as long as the audiologist is licensed or certified by ASHA.

## B. MEDICAID

421     In 1965, Congress enacted Title XIX of the Social Security Act to expand the

422     nation's medical assistance program for the needy and the medically needy, aged,

423     blind, disabled, and families with dependent children. 42 U.S.C. §§ 1396-1396v.

424     This became known as the "Medicaid Program." The Medicaid Program is funded

425     by both Federal and State monies, collectively referred to as "Medicaid Funds,"

426     with the federal contribution computed separately for each state. 42 U.S.C. §§

427     1396b; 1396d(b).

428     Each state is permitted, within certain parameters, to design its own medical

429     assistance plan, subject to approval by the Department of Health and Human

430     Services ("HHS"); HHS is an agency of the United States and is responsible for the

431     administration, supervision and funding of the Federal Medicaid Program. The

432     Centers for Medicare & Medicaid Services ("CMS") is the division of HHS that is

433     directly responsible for administering the Federal Medicaid Program. Prior to 2001,

434     CMS was known as the Health Care Finance Administration, or "HCFA."

435     Defendant Keystone participated with both Gateway Medicaid and Gateway

436     Medicare Assured.

## C. TRICARE/CHAMPUS

437    In 1967, the Department of Defense created the Civilian Health and Medical

438    Program of the Uniformed Services ("CHAMPUS"), which is a federally funded

439    medical program created by Congress. 10 U.S.C. § 1071. CHAMPUS beneficiaries

440    include active military personnel, retired personnel, and dependents of both active

441    and retired personnel. *Id.*

442    In 1995, the Department of Defense established TRICARE, a managed

443    healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R.

444    §§ 199.4, 199.17(a). Since the establishment of TRICARE in 1995, both programs

445    are frequently referred to collectively as TRICARE/CHAMPUS, or just

446    "TRICARE." The purpose of the TRICARE program is to improve healthcare

447    services to beneficiaries by creating "managed care support contracts that include

448    special arrangements with civilian sector health care providers." 32 C.F.R. §

449    199.17(a)(1). The TRICARE Management Activity ("TMA") oversees this

450    program.

451    The TRICARE managed healthcare programs are created through contracts

452    with managed care contractors in three geographic regions: North, South, and West.

453    TRICARE health services are provided through both network, and non-network,

454    participating providers. Providers who are Medicare-certified providers are also

455    considered TRICARE-authorized providers. TRICARE-authorized providers are

456    either "Network Providers" or "Non-Network Providers."

457            "Network Providers" include hospitals, other authorized medical facilities,

458    doctors and healthcare professionals, all of whom enter into an agreement with the

459    region's managed care contractor, and provide services for an agreed

460    reimbursement rate. 32 C.F.R. § 199.14(a). "Non-Network Participating Providers"

461    include hospitals, other authorized medical facilities, doctors and healthcare

462    professionals who do not enter an agreement with the region's managed care

463    provider, and are reimbursed at rates established by TRICARE regulations. *Id.*

464            TRICARE's governing regulations, like Medicare's and Medicaid's

465    requirements also are based upon "medical necessity." TRICARE's governing

466    regulations require that services provided be "furnished at the appropriate level and

467    only when and to the extent medically necessary," and such care must "meet[]

468    professionally recognized standards of health care [and be] supported by adequate

469    medical documentation . . . to evidence the medical necessity and quality of

470    services furnished, as well as the appropriateness of the level of care." 32 C.F.R. §

471    199.6(a)(5). In this respect, similar to Medicare and Medicaid, services provided at

472    a level higher than are medically necessary are improper and violations of

473    TRICARE. *Id.*

## D. FEDERAL EMPLOYEE HEALTH BENEFITS PROGRAM

474      The Federal Employee Health Benefits Program ("FEHBP") is a federally

475      funded medical insurance program for federal employees, retirees, their spouses and

476      unmarried dependent children under age 22, administered by the Office of

477      Personnel Management ("OPM") pursuant to 5 U.S.C. §§ 8901, *et seq.* Through the

478      OPM, the Government contracts with private health plans or "carriers" to deliver

479      health benefits to its employees.

480      Federal Agencies and their employees contribute to the Health Fund to cover

481      the total cost of health care premiums. 5 U.S.C. § 8906. The monies from the

482      Health Fund are used to reimburse the carriers for claims they pay on behalf of

483      FEHBP beneficiaries. Like Medicare Part B and TRICARE, FEHBP will not cover

484      any treatment that is not medically necessary. 5 U.S.C. § 8902(n)(1)(A).

## E. BILLING FEDERAL INSURANCE PROGRAMS "FIP"

485      HIPAA first was created for standard transaction and code sets; meaning

486      Payors, Medicare or other FIP, need to use the same coding system and that they

487      could not make up their own billing codes. The vast majority of payors in this

488      Country use Current Procedural Terminology (CPT) coding or the '92 Codes' to

489      represent the testing or procedures the audiologists provide, ICD-9 to represent

490      diagnoses and symptoms (ICD-10 in 2014), and HCPCS Codes to represent hearing

491      aid related or implantable device services and product. These are the coding

492   systems that are required to be used across all claims. The Healthcare Common

493   Procedure Coding System (HCPCS) starts with the letter "V" and is used for billing

494   devises such as hearing aids, fitting and dispensing fees, and other hearing related

495   services.

496        When a patient was seen at Defendant Keystone, the rendering audiologist,

497   Defendants Fowler or Price, filled out a Master Billing Code Sheet ("Super Bills")

498   and/or they listed the codes on a sticky note on the patient's chart and gave it to

499   Relator or another staff member to enter into Sycle.net which would later be used to

500   create a claim to send to the FIP for reimbursement.

501        From at least the years 2006 through 2011, Defendant Keystone employed

502   Vivian Wenerick, who worked at Defendant Keystone's Lemoyne, PA office.  She

503   was in charge of billing the FIP.  Upon information and belief Defendant Keystone

504   was also fraudulently billing the FIP during this time frame.

505        In 2011, Defendant Keystone's Lemoyne office was closed and Ms.

506   Wenerick stopped working for Defendant Keystone. Before Ms. Wenerick left

507   Defendant Keystone's employ, she briefly trained Relator on billing procedures; at

508   that time Relator began doing the billing for Defendant Keystone's two remaining

509   office locations.

510        Defendant Keystone secretary, Cheryl Henson was located in the Hanover

511   office and her duties included sometimes entering patient services and hearing aid

512   information into the database 'Sycle.net' (otherwise sometimes known as "Sycle"),

513   collecting copays, faxing authorizations to FIP, and scheduling patients for both of

514   Defendant Keystone locations.

515        Both Cheryl Henson and Relator worked in the Hanover office, Monday

516   through Thursdays from 9:00 to 5:00, and Fridays from 9:00 to 12:00.

517        At all times relevant to this Complaint, Defendant Keystone used and

518   continues to use an electronic data management, calendar and electronic billing

519   system entitled "Sycle.net."  This is a database system where services are entered

520   and claims are created to send to FIP. When information was entered into Sycle

521   correctly, all the information would populate over to the claim to be submitted.

522        Defendant Keystone's employees, including but not limited to Relator, would

523   enter information into the Sycle.net system such as date patient seen, who referred

524   the patient, who treated patient, record of hearing aid sales, any discounts given,

525   etc.  When the data was still in Sycle, prior to submission to the FIP, the fields

526   could be altered or information could be added before being electronically

527   submitted to a FIP for reimbursement.  This is where Relator would check the

528   claims to be sure the information was entered correctly because the claims could be

529   rejected, even before they actually went to the payer (FIP),  if something required

530   was missing on that claim.  The claims that were created in Sycle.net would then be

531  transferred to "Emdeon," (an electronic data interchange for electronic remittance

532  advice or ERA's).

533      The claims would electronically be sent by Emdeon to the FIP payors, and

534  then once processed, Defendant Keystone's employees, including but not limited to

535  Relator, would view the payments Defendant Keystone received.  On certain days

536  of the week, Relator would open Emdeon, print out payments, check that the

537  services were paid/not paid, then usually jot down a note on the printed-out

538  payment for Defendant Keystone's secretary; indicating whether the patient needed

539  billed for a copay and/or deductible, or if they were responsible for the balance of

540  the hearing aids.  Then the secretary or Relator would enter the payment into Sycle,

541  print out a summary, and the secretary would bill the patient, if needed.

542      The NPI # of the treating "*rendering*" provider is required by FIP to be on the

543  claim form as well as the name of the "*referring*" primary care physician.

544      In the event of an audit or review, the licensed provider is held responsible

545  for the appropriateness of all claims submitted to Medicare and FIP.  42 CFR §

546  1001.901.

## VI.   FALSE CLAIMS ACT ALLEGATIONS

## A. THE PRACTICE OF AUDIOLOGY

547      49 Pa Code § 45.2 defines the 'practice of audiology' as the evaluation,

548   counseling, habilitation, and rehabilitation of individuals whose communication

549   disorders center in whole or in part in the hearing function, including the

550   prevention, identification, examination, diagnosis, and treatment of conditions of

551   the human auditory system, and including the examination for, and adapting and

552   fitting of amplification or assistive devices.

553      The American Academy of Audiology (AAA), American Speech-Language

554   Hearing Association (ASHA), and the Academy of Doctors of Audiology (ADA)

555   provide guidance to their members on the rules and regulations of Medicare and

556   other FIP.  Defendant Fowler belonged and, upon information and belief, continues

557   to belong to at least ASHA and AAA; as such, he was required to abide by their

558   rules, customs, ethics and directives.

559      The United States Supreme Court, in Heckler v. Cmty Health Servs., 467

560   U.S. §§ 51, 64 (1984), has found that participants in the FIP have a duty to

561   familiarize themselves with the legal requirements for cost reimbursement. The

562   Court held that "Protection of the public fisc requires that those who seek public

563   funds act with scrupulous regard for the requirements of law" therefore, Federal

564    Medical Insurance Programs holds health care providers "to the most demanding

565    standards in [their] quest for public funds."

566        49 Pa. Code § 45.102 *Code of Ethics* provides the following:

567        (a)   *General.* The Board is empowered by section 5(2) of the act (63 P.
568            S. § 1705(2)) to promulgate a Code of Ethics for speech-language
569            pathologists, audiologists and teachers of the hearing-impaired, and
570            the Board finds that the following rules are essential for
571            establishing and maintaining stringent standards of professional
572            conduct and for protecting the public interest, the Board has
573            established the following Code of Ethics. A violation of this code
574            constitutes unprofessional conduct under § 45.103 (relating to
575            unprofessional conduct) or, as applicable, fraud or deceit under
576            § 45.104 (relating to fraud or deceit), and subjects the violator to
577            appropriate disciplinary action. (b) *Preamble.* (1) The
578            preservation of the highest standards of integrity is vital to the
579            successful discharge of the professional responsibilities of speech-
580            language pathologists, audiologists and teachers of the hearing-
581            impaired. To this end, the Board has established this Code of Ethics
582            to safeguard the public health, safety and welfare and to assure that
583            speech-language and hearing services of the highest possible
584            quality are available to the people of this Commonwealth. A
585            violation of a provision of the Code of Ethics constitutes
586            unprofessional conduct subject to disciplinary action. Accordingly,
587            failure to specify a particular responsibility or practice in the code
588            should not be construed as a deliberate omission.

589        49 Pa. Code § 45.102(2)(h) *Principle of Ethics VI* provides the following:

590            (1) A licensee shall uphold the dignity of the profession and
591            freely accept its self-imposed standards.   (2) A licensee shall
592            inform the Board when he has reason to believe that a licensee
593            under the act may have violated this Code of ethics.
594            (3) Ethical proscriptions are as follows: (i) A licensee may not
595            engage in violations of this Code of Ethics or attempt in any
596            way to circumvent it. (ii)   A licensee may not engage in

597        dishonesty, fraud, deceit, misrepresentation or another form of
598        illegal conduct.

## B. DEFENDANT PRICE

599     49 Pa. Code § 45.203 provides that (a) A business entity may provide

600  services which require licensure, if the following conditions are met: ... (4) The

601  business entity executes a written contract with licensed employees providing for

602  the licensed employees' right to independent exercise of professional judgment.

603     At all times relevant to this Complaint, Defendant Price was a licensed

604  audiologist. It is not known if her employer, Defendant Keystone, by and through

605  Defendant Fowler, executed a contract with her that provided her with a right to

606  independent exercise of professional judgment. Regardless, Defendant Price knew

607  or should have known that she was entitled to such a right.

608     Defendant Price knew or should have known that Defendant Keystone, by

609  and under Defendant Fowler's direction and/or knowledge, was committing several

610  different and constant fraudulent actions against the FIP.  Upon information and

611  belief, Defendant Price failed to report these fraudulent actions to any government

612  agency or FIP; although she had complete access to view any claims that were

613  billed for her patients.

614      Defendant Keystone, by and through Defendants Price and Fowler, in

615   numerous ways listed throughout this Complaint violated Federal and State Law

616   and the Audiology Code of Ethics and was dishonest, deceitful  and committed

617   misrepresentations to both patients and the FIP.

618      Because of Defendant Price's actions and/or inactions, fraudulent claims to

619   the FIP were being submitted by Defendant Keystone and ultimately paid to

620   Defendant Keystone by the Federal Government. Once payments were received by

621   Defendant Keystone, it paid Defendant Price.

622      49 Pa. Code § 45.103 provides the following:

623   As used in section 10(5) of the act (63 P. S. § 1710(5)), the term
624   ''unprofessional conduct'' includes, but is not limited to, the following types
625   of conduct:  (19) Failing to comply with the act.  (20)  Failing to comply with
626   an order, rule or regulation issued or adopted by the Board, including its
627   Code of Ethics.  (21)  Violating a State or Federal statute or a regulation
628   promulgated thereunder in the *Pennsylvania Code* or the *Code of Federal*
629   *Regulations* by a State or Federal agency that imposes a standard for
630   practicing as a speech-language pathologist, an audiologist or a teacher of the
631   hearing-impaired in this Commonwealth. The Board, in reaching a decision
632   as to whether there has been a violation of a statute or regulation, will be
633   guided by adjudications of the agency or court that administers or enforces
634   the standard.

### C. BILLED WRONG PLACE OF SERVICE

635        Medicare establishes that for all services the Place of Service ("POS") code

636   to be used by the physician will be assigned as the same setting in which the

637   beneficiary received the face-to-face service. *CMS Centers for Medicare and*

638   *Medicaid #7631, p. 3 (2012).*

639        On the FIP claim form, there is a specific field to enter the location where the

640   patient services were provided; this was required to be entered correctly.

641        When Defendant Keystone moved its Hanover office, which was at 1157

642   Eichelberger Street, also in Hanover, in January of 2011, Vivian Wenerick (the

643   employee who had done the billing for Defendant Keystone) was contacting some

644   of the FIPs to let the insurances know of Defendant Keystone's new address.  All of

645   the claim forms Defendant Keystone used for the first half of 2011 still had the old /

646   wrong Eichelberger address listed. Once Relator agreed to help with the billing, she

647   learned that the wrong location of service was listed on the claims.

648        Approximately five months after Defendant Keystone moved its office,

649   Defendant Fowler finally filled out the correct documents which informed FIP of

650   his new office location; however, he listed the current date as the move date and not

651   the actual date; five month prior.  Upon information and belief, Defendant Fowler

652   failed to use the "actual" date the office moved because he knew he was in violation

653   for not informing Medicare and other FIP of the change within thirty (30) days.  At

654    this point Defendant Price had begun working for Defendant Keystone yet

655    Defendant Keystone failed to include her information on the Medicare forms when

656    filing the above documentation.

657        Defendant Keystone completed and submitted form CMS-8551 to Medicare

658    stating that it started seeing Medicare patients at its Hanover location on May 20,

659    2011; however, Relator was present at this location between in or around January

660    2011 through May 20, 2011, and she had first-hand knowledge that Medicare and

661    FIP patients were being treated at this office during that time frame.

662        The Pennsylvania Department of Health Bureau of Community Program

663    Licensure & Certification/Hearing Aid Program also requires an audiology practice

664    to register each branch location.

665        Defendant Price worked at Defendant Keystone's Harrisburg office on

666    Mondays and Tuesdays.  Defendant Fowler worked at this location on Wednesdays,

667    and Gail Burcat worked at this Harrisburg location as the office receptionist /

668    secretary Monday through Wednesdays.  The Harrisburg office was not open

669    Thursdays and Fridays.

670        Defendant Fowler also typically worked in the Hanover office Tuesday and

671    Thursdays; taking off most Mondays and Fridays.

672        Claims that are submitted to FIP are required to have the patient place of

673    service field completed indicating whether the services were provided in the office

674   or in another facility, including but not limited to, a nursing home.  Relator was

675   instructed by Defendant Fowler to always be sure that the "place of service" was

676   listed on the claim as 'office' and never the actual nursing home location.

677         Anthony Fowler was usually scheduled and would see patients at the

678   Brethren Home, in New Oxford, PA, on the first Friday of the month, over certain

679   periods of time. Defendant Fowler also went to other nursing homes in the Hanover

680   and Harrisburg PA areas to provide audiology services to its residents.  The claims

681   Defendant Keystone billed for these patients always had "office" as the place of

682   service on the claims, and often included an office visit that was billed in addition

683   to the diagnostic tests; which were never supported with documentation in the

684   patient charts.

685         The patients that were also seen at other nursing home facilities in the

686   Hanover and/or Harrisburg area including but not limited to the following patients:

687   RCB - 03/02/12; TMF - 08/03/12; and DBM - 06/28/12.

688         Because Defendant Keystone submitted to FIP all nursing home claims as if

689   Defendants Fowler or Price treated the patient's in their office, it is suspect if

690   Defendant Keystone ever registered with the PA Dept. of Health and/or FIP that

691   they were providing services to patients at the nursing homes.

692    Upon information and belief, Defendant Price knew that patients she

693    provided services for in nursing homes were being fraudulently billed to FIP as if

694    they were seen in Defendant Keystone's office.

695    Defendants Keystone, Fowler and Price did act and/or conspired to

696    intentionally and knowingly fail to meet the FIP conditions of participation and

697    knowingly falsified or failed to supervise the falsification of the certification that

698    they had met the conditions of participation (including each claim submitted), by

699    knowingly submitting and causing the submission and/or failing to supervise the

700    submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

701    therefore caused the submission of claims that were false and not eligible for

702    reimbursement to FIP.  By causing these claims that they knew were ineligible for

703    reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

704    Fowler and Price also made, used, or caused to be made or used, false records or

705    statements material to false or fraudulent claims. Had FIP known that these claims

706    were only approved for coverage as a result of such false and fraudulent statements,

707    they would not have reimbursed for those claims. Defendant Keystone accepted

708    payment for each false claim made with these faulty conditions, paid Defendants

709    Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

710    payments. Because FIP paid reimbursements for the resulting false claims, the FIP

711    incurred and continues to incur significant and material damages due to Defendants'

712   fraudulent actions.  Upon information and belief said Defendants' fraudulent

713   actions are continuing.

### D. SPLIT BILLING / WRONG DATE OF SERVICE

714        There were several occasions when a patient was seen at a Defendant

715   Keystone location and paid their co-pay for that particular day.  If the services for

716   that patient were entered into Sycle on a later date, sometimes this would cause two

717   separate dates to populate to the claim form.  If this happened, the FIP would then

718   often apply copays for each date of service causing the patient to be responsible for

719   two copays instead of one.  Defendant Keystone would collect this second copay

720   and keep it knowing it was receiving double copays for one date of actual service;

721   Relator brought this to Defendant Fowler's attention and he said "If the patient calls

722   to complain, then we will address it otherwise don't waste your time resubmitting

723   them."

724        On August 28, 2011, Defendant Fowler billed FIP that he saw patient CMB

725   on this date; however, this date is a Sunday and the office is closed.

726        On May 30, 2013, Defendant Fowler saw patient RAB who paid a $40.00

727   copay, however; the claim was populated with two dates of services as if the patient

728   was also seen on June 3rd, 2013; when Defendant Keystone entered the rest of the

729   patient information.  He billed CPT 92540 vestibular function test at $300.00 and

730   was paid $69.81 with a patient copay of $25.00.  Patient would not have been

731   required to pay the additional $25.00 if the claim would not have populated two

732   dates of service.

733        Other examples include, but not limited to, the following patients: CMB -

734   08/28/11 (this date is a Sunday); RAB - 05/30/13, 06/03/13; HB - 11/12/13,

735   11/14/13; DC - 08/06/13, 08/07/13; GJC - 06/11/13, 06/17/13; HH - 10/16/12,

736   10/17/12; GGM - 06/18/13, 06/19/13; DMM - 11/08/12, 11/12/12; TM - 05/21/13,

737   05/24/13; AMT - 03/12/13, 03/14/13; MLT - 06/07/11, 07/07/11; and ST- 11/19/13,

738   11/20/13.

739        Upon information and belief, Defendant Price knew that Defendant Keystone

740   was fraudulently billing second copays to patients that she treated.

741        Defendants Keystone, Fowler and Price did act and/or conspired to

742   intentionally and knowingly fail to meet the FIP conditions of participation and

743   knowingly falsified or failed to supervise the falsification of the certification that

744   they had met the conditions of participation (including each claim submitted), by

745   knowingly submitting and causing the submission and/or failing to supervise the

746   submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

747   therefore caused the submission of claims that were false and not eligible for

748   reimbursement to FIP.  By causing these claims that they knew were ineligible for

749   reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

750   Fowler and Price also made, used, or caused to be made or used, false records or

751   statements material to false or fraudulent claims. Had FIP known that these claims

752   were only approved for coverage as a result of such false and fraudulent statements,

753   they would not have reimbursed for those claims. Defendant Keystone accepted

754   payment for each false claim made with these faulty conditions, paid Defendants

755   Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

756   payments. Because FIP paid reimbursements for the resulting false claims, the FIP

757   incurred and continues to incur significant and material damages due to Defendants'

758   fraudulent actions.  Upon information and belief said Defendants' fraudulent

759   actions are continuing.

### E. MARKETING / SALES FRAUD

760   Defendant Keystone by and through Defendant Fowler knowingly committed

761   and continues to commit numerous acts of marketing fraud.

762   49 Pa. Code § 45.102 (f) *Principle of Ethics* IV (2) *Ethical proscriptions* are

763   as follows:  (ii) A licensee's public statements providing information about

764   professional services and products may not contain representations or claims that

765   are false, deceptive or misleading.

766    49 Pa. Code § 45.102 (2)(g)  *Principle of Ethics V.* provides the following:

767         (1)  A licensee shall maintain objectivity in all matters concerning
768    the welfare of a person served. Accordingly, a licensee who dispenses
769    products to a person served shall observe the following
770    standards:   (iii) A person served shall be allowed freedom of choice as
771    to the source of services and products, in accordance with the act of
772    May 26, 1988 (P. L. 403, No. 66) (35 P.S. §§ 449.21449.23.  (iv) Price
773    information about professional services rendered and products
774    dispensed shall be disclosed by providing to or posting for a person
775    served a complete schedule of fees and charges in advance of
776    rendering services. This schedule shall differentiate between fees for
777    professional services and charges for products dispensed.


778    49 Pa. Code § 45.103 provides: As used in section 10(5) of the act (63 P. S.

779    § 1710(5)), the term ''unprofessional conduct'' includes, but is not limited to, the

780    following types of conduct: (13) Advertising professional services and products in a

781    manner which is false, misleading or deceptive.


782    28 Pa. Code § 25.215 (26) provides: Advertising a particular model, type or

783    kind of hearing aid for sale when a purchaser or prospective purchaser responding

784    to the advertisement cannot purchase or is dissuaded from purchasing the advertised

785    model, type or kind, if it is established that the purpose of the advertisement is to

786    obtain prospects for the sale of a different model, type or kind than that advertised.


787         (i)   In determining whether there has been a violation of this
788    paragraph, consideration will be given to acts or practices indicating
789    that the offer was not made in good faith for the purpose of selling the
790    advertised product but was made for the purpose of contacting

791  prospective purchasers and selling them a product or products other
792  than that offered. Among acts or practices which will be considered in
793  making that determination are the following: (A) The creation, through
794  the initial offer or advertisement, of a false impression of the product
795  offered in a material respect. (B) The refusal to show, demonstrate or
796  sell the product offered in accordance with the terms of the offer.
797  (C) The disparagement, by acts or words, of the product offered or the
798  disparagement of the guarantee; credit terms; or availability of service,
799  repairs or parts or the disparagement in another respect, in connection
800  with it. (D)  The showing, demonstrating and in the event of sale,
801  delivery of a product which is unusable or impractical for the purpose
802  represented or implied in the offer.  (E)  The refusal, in the event of
803  sale of the product offered, to deliver the product to the purchaser
804  within a reasonable time thereafter.  (F)  The failure to have available a
805  quantity of the advertised product at the advertised price sufficient to
806  meet reasonably anticipated demands.

## 1.  Falsely Advertised As Stocking Many Brands Of Hearing Aids

807  In order to receive discounts and free hearing aids from Defendant Phonak,

808  Defendant Keystone through Defendants Fowler trained Defendant Price as well as

809  Relator to be hearing aid commissioned sales representatives and to make a series

810  of claims about Defendant Phonak hearing aids and accessories.

811  When patients would inquire into buying a different brand of hearing aid,

812  Defendants Keystone by and through Defendant Fowler would direct Relator and/or

813  Defendant Price to persuade the patient to purchase Defendant Phonak's products.

814  Beginning in 2008, Defendant Keystone only sold, except on a rare occasion,

815  one manufacturer of hearing aids; those by Defendant Phonak.  Defendant Keystone

816  advertised that he worked with not only Defendant Phonak hearing aids, but also

817  Widex, Oticon, Unitron, and Microtech hearing aids upon information and belief, to

818  try and lure patients to its facility; but, when the patient arrived, only Phonak

819  hearing aids were available and reviewed.

820  In many advertisements, Defendant Keystone advertised a discount on

821  Phonak products; it is not known if Defendant Phonak compensated Defendant

822  Keystone for these advertisements that highlighted its brand.

823  Although Defendant Keystone would falsely advertise it stocked several

824  different brands of aids, Relator was not given the pricing for any of these other

825  hearing aids except for Phonak's. Defendant Keystone only listed the pricing for

826  Phonak hearing aids in their database 'Sycle' except for a few Rexton and Oticon

827  aids only because 'Oticon' makes "high powered" instruments for kids.

828  Defendant Keystone did not keep any hearing aids in stock like he advertised,

829  except for Defendant Phonak's products.  Defendant Keystone would advertise as

830  follows: "We work with the world's leading manufacturers" and/or "We stock aids

831  from the leading manufacturers", but that was not the case.  Defendant Keystone

832  would only keep Defendant Phonak's hearing aids in stock, and nothing more.

833  When patients came in to Defendant Keystone's facility to have their hearing

834  aids adjusted and had aids from a manufacturer other than Phonak, it was often the

835  very first time Relator ever saw the brand; Defendant Keystone by and through

836   Defendant Fowler's direction, forced Relator to act like she was familiar with this

837   particular brand in front of the patients.

838       Because Defendant Keystone never kept up-to-date software for the other

839   manufacturers, Relator would often, after receiving the aid from a patient, have to

840   order the software and cables from that particular manufacturer.  If the hearing aid

841   was not Phonak, Relator would have to work her way through the software, without

842   receiving any training, and without Defendant Fowler's direction, to try and learn

843   how to adjust the patient's hearing aids properly.

844       Defendant Keystone subscribed to a magazine called "The Hearing Journal"

845   which was mailed to the office monthly.  This magazine would have just about

846   every manufacturer of hearing aids advertised with articles about the

847   features.  When Relator would see hearing aids in the magazine and mention to

848   Defendant Fowler that they should carry those manufacturers, he would always say

849   "they don't make good products" or "they're crappy products".  He'd also say that

850   "they'd be too expensive, and we'd have to charge the patients more than what we

851   do for Phonak."  Upon information and belief, Defendant Fowler would fail to earn

852   as great a "profit" if he used another manufacture other than Phonak due to the fact

853   he was able to buy Phonak hearing aids at extreme discounts up to 50%; although

854   he would bill FIP at Defendant Keystone's full or inflated bundled price.

855     Defendants Keystone and Fowler did act and/or conspired to intentionally

856     and knowingly fail to meet the FIP conditions of participation and/or healthcare

857     rules and regulations and did knowingly falsified or failed to supervise the

858     falsification of the certification that they had met the conditions of participation

859     (including each claim submitted), by knowingly submitting and causing the

860     submission and/or failing to supervise the submission of false and fraudulent

861     claims, said Defendants therefore caused the submission of claims that were false

862     and not eligible for reimbursement from Government Healthcare Programs. By

863     causing these claims that it knew were ineligible for reimbursement to be submitted

864     to and paid for by FIP, said Defendants also made, used, or caused to be made or

865     used, false records or statements material to false or fraudulent claims. Had FIP

866     known that these claims were only approved for coverage as a result of such false

867     and fraudulent statements, they would not have reimbursed for those claims.

868     Defendant Keystone accepted payment for each false claim made with these faulty

869     conditions, and it did not reimburse the FIP for these illegal payments. Because FIP

870     paid reimbursements for the resulting false claims, they incurred and continue to

871     incur significant damages due to Defendants' fraudulent actions.  Upon information

872     and belief said Defendants' fraudulent actions are continuing.

## 2. **Falsely Advertised**

873     Defendant Keystone by and through Defendant Fowler would falsely

874  advertise in the paper, online, and through delivery of brochures to different

875  doctor's offices that Defendant Keystone's practice had state of the art equipment;

876  which it did not as its equipment was several years old, and that he works with the

877  leading manufacturers; which he did not.  Defendant Keystone also often advertised

878  offering a Zoom Demo.

879     The hearing aid "Zoom" feature can focus on an individual voice in a

880  crowded room, just by the direction you are facing.  The "Zoom Demo" that was

881  offered, required speakers to be set up and to utilize certain "sound" files in the

882  computer software, so that you could simulate different difficult listening

883  environments so the patient could hear how much improvement it made.

884     Although Defendant Keystone received all the equipment it needed from

885  Phonak and although Defendant Keystone advertised that it performed the Zoom

886  Demo, neither of Defendant Keystone offices were set up with the speakers or

887  sound files needed to actually do the Demo.  Upon information and belief

888  Defendant Keystone advertised this Demo to entice patients to come in and use

889  Defendant Keystone's hearing aid services and products.

890     If a patient came into Defendant Keystone and wanted a Zoom Demo,

891     Defendants Fowler and Price as well as Relator would demonstrate this feature by

892     utilizing other ways (using different programs in the hearing aids) and not the

893     correct way and/or the way it was advertised to be performed.

894     Upon information and belief, Defendant Price failed to conduct the proper

895     Zoom Demo on her patients.

896     Defendants Keystone, Fowler and Price did act and/or conspired to

897     intentionally and knowingly fail to meet the FIP conditions of participation and

898     knowingly falsified or failed to supervise the falsification of the certification that

899     they had met the conditions of participation (including each claim submitted), by

900     knowingly submitting and causing the submission and/or failing to supervise the

901     submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

902     therefore caused the submission of claims that were false and not eligible for

903     reimbursement to FIP.  By causing these claims that they knew were ineligible for

904     reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

905     Fowler and Price also made, used, or caused to be made or used, false records or

906     statements material to false or fraudulent claims. Had FIP known that these claims

907     were only approved for coverage as a result of such false and fraudulent statements,

908     they would not have reimbursed for those claims. Defendant Keystone accepted

909     payment for each false claim made with these faulty conditions, paid Defendants

910     Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

911     payments. Because FIP paid reimbursements for the resulting false claims, the FIP

912     incurred and continues to incur significant and material damages due to Defendants'

913     fraudulent actions.  Upon information and belief said Defendants' fraudulent

914     actions are continuing.

### F.  FAILED TO HAVE PATIENT SIGN UPDATED HIPAA POLICY

915     HIPAA requires that all patients sign a privacy policy.  The patient will only

916     need to sign the privacy acknowledgment once unless the practice, including but not

917     limited to  an audiology practice, changes its privacy policy.

918     In or around 2013, Defendant Keystone changed its privacy policy.  Upon

919     information and belief, Defendant Keystone did not inform and/or have the current

920     patients sign this new policy and did not place said policy acknowledgement form

921     in the patients' charts.

922     HIPAA requires that all patients' files / charts be kept under lock. Defendant

923     Keystone failed to have locks on any of the patient files and/or storage.

924     Upon information and belief, Defendant Price failed to supervise her

925     secretary, Gail Burcat, to make sure Ms. Burcat had Defendant Price's current

926     patients sign the updated HIPAA privacy policy acknowledgement form nor did she

927     keep her patients' files under lock.

928   Defendants Keystone, Fowler and Price did act and/or conspired to

929   intentionally and knowingly fail to meet the FIP conditions of participation and

930   knowingly falsified or failed to supervise the falsification of the certification that

931   they had met the conditions of participation (including each claim submitted), by

932   knowingly submitting and causing the submission and/or failing to supervise the

933   submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

934   therefore caused the submission of claims that were false and not eligible for

935   reimbursement to FIP.  By causing these claims that they knew were ineligible for

936   reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

937   Fowler and Price also made, used, or caused to be made or used, false records or

938   statements material to false or fraudulent claims. Had FIP known that these claims

939   were only approved for coverage as a result of such false and fraudulent statements,

940   they would not have reimbursed for those claims. Defendant Keystone accepted

941   payment for each false claim made with these faulty conditions, paid Defendants

942   Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

943   payments. Because FIP paid reimbursements for the resulting false claims, the FIP

944   incurred and continues to incur significant and material damages due to Defendants'

945   fraudulent actions.  Upon information and belief said Defendants' fraudulent

946   actions are continuing.

## G. UPCODING VIOLATIONS

947        A common type of false claim is "up-coding," which refers to using billing

948   codes that reflect, including but not limited, to the following:

949        1.  Billing for a more expensive service than was provided;

950        2.  Billing for a more expensive product that was provided;

951        3.  Billing for services that were not actually rendered;

952        4.  Billing for services that were not medically necessary;

953        5.  Billing for services that were performed by an unsupervised or unqualified
954            employee;

955        6.  Billing for services that were performed by employees who were never
956            credentialed for participation in the Federal Health Care Program; and

957        7.  Billing for unbundled services that were already included in a bundled
958            price.

### 1.  **Billing For More Expensive Services Than Were Provided.**

#### a.  *FAILEDTO USE OR INAPPROPRIATE USE OF MODIFIERS*

959        An audiologist is required to use insurance code modifiers when a service is

960   modified up or down; such as an audiologist may use the '-52' modifier (i.e.)

961   reduced service for procedure code '92557' when they do not test both ears.

962        A CPT modifier provides additional information about the service rendered.

963   This information may help to get the procedure covered by FIP or it may result in a

964   specific payment increase or decrease.

965    Defendant Keystone through Defendant Fowler would instruct Relator and

966    other staff to enter CPT codes, often without the needed modifiers and/or added an

967    inappropriate modifier, into Sycle.net; upon information and belief Defendant

968    Fowler did so to increase the payment from the FIP.

969    An example of Defendant Keystone's actions would be it using the modifier-

970    25 at the same time with comprehensive office-exam codes in order to receive

971    payment for the visit plus a diagnostic service.

972    Upon information and belief, Defendant Price knew that Defendant Fowler

973    was coding, without the needed modifiers, the service to her patients and/or she

974    would provide a super bill to Relator which failed to document modified codes.

975    Defendants Keystone, Fowler and Price did act and/or conspired to

976    intentionally and knowingly fail to meet the FIP conditions of participation and

977    knowingly falsified or failed to supervise the falsification of the certification that

978    they had met the conditions of participation (including each claim submitted), by

979    knowingly submitting and causing the submission and/or failing to supervise the

980    submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

981    therefore caused the submission of claims that were false and not eligible for

982    reimbursement to FIP.  By causing these claims that they knew were ineligible for

983    reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

984    Fowler and Price also made, used, or caused to be made or used, false records or

985    statements material to false or fraudulent claims. Had FIP known that these claims

986    were only approved for coverage as a result of such false and fraudulent statements,

987    they would not have reimbursed for those claims. Defendant Keystone accepted

988    payment for each false claim made with these faulty conditions, paid Defendants

989    Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

990    payments. Because FIP paid reimbursements for the resulting false claims, the FIP

991    incurred and continues to incur significant and material damages due to Defendants'

992    fraudulent actions.  Upon information and belief said Defendants' fraudulent

993    actions are continuing.

### b. FAILED  TO HAVE APPROPRIATE  TEST AREA (SOUND LEVEL METER)

994    Pennsylvania State Code requires an audiology facility to have an appropriate

995    hearing test area, the ambient noise level of which shall have a documented readout

996    of 55 dB or lower on the A scale of a sound level meter. The test area shall meet at

997    all times the specifications detailed in the *Maximum Permissible Ambient Noise*

998    *Levels for Audiometric Tests Rooms* (ANSI S3.1-1999; American National

999    Standards Institute, 2003).

1000    When the air conditioner or heating system was on in a Defendant Keystone

1001    site, the dB was over the maximum allowed at some frequencies.

1002    Upon information and belief, Defendant Price also treated patients without an

1003    appropriate hearing noise level test area.

1004    Defendants Keystone, Fowler and Price did act and/or conspired to

1005    intentionally and knowingly fail to meet the FIP conditions of participation and

1006    knowingly falsified or failed to supervise the falsification of the certification that

1007    they had met the conditions of participation (including each claim submitted), by

1008    knowingly submitting and causing the submission and/or failing to supervise the

1009    submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

1010    therefore caused the submission of claims that were false and not eligible for

1011    reimbursement to FIP.  By causing these claims that they knew were ineligible for

1012    reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

1013    Fowler and Price also made, used, or caused to be made or used, false records or

1014    statements material to false or fraudulent claims. Had FIP known that these claims

1015    were only approved for coverage as a result of such false and fraudulent statements,

1016    they would not have reimbursed for those claims. Defendant Keystone accepted

1017    payment for each false claim made with these faulty conditions, paid Defendants

1018    Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

1019    payments. Because FIP paid reimbursements for the resulting false claims, the FIP

1020    incurred and continues to incur significant and material damages due to Defendants'

1021    fraudulent actions.  Upon information and belief said Defendants' fraudulent

1022    actions are continuing.

### c. FAILED TO CALIBRATE EQUIPMENT

1023   It is essential that audiometric equipment be calibrated, be functioning

1024   properly, and be used in an acceptable test environment to assure accurate test

1025   results.

1026   There were several occasions when a Defendant Keystone headphone would

1027   go bad during service to a patient.  Relator noticed several instances when

1028   Defendant Fowler replaced the broken headphone without first doing the required

1029   recalibration of the audiometer.

1030   28 Pa. Code § 25.209 *Facilities, procedures and instrumentation* provides:

1031   (a) *Facilities*. A registrant shall engage in the practice of fitting or selling a
1032   hearing aid only if the registrant provides: (1)  An appropriate test area, the
1033   ambient noise level of which shall have a documented readout of 55 dB or
1034   lower on the A scale of a sound level meter.  (2) A selection of hearing aid
1035   models, supplies and accessories to provide for the immediate needs of
1036   hearing aid users or prospective hearing aid users.  (b) *Procedures*. A
1037   registrant shall satisfy the following:  (1) The registrant shall sell a hearing
1038   aid only if within 6 months before the sale an examination of the prospective
1039   hearing aid user was conducted using pure tone air conduction, bone
1040   conduction and speech audiometry tests. This requirement does not apply
1041   when the registrant is replacing a hearing aid with another of the same make,
1042   model and response. The registrant shall sell a hearing aid replacing another
1043   of the same make, model and response only if within 12 months before the
1044   sale an examination of the prospective hearing aid user was conducted using
1045   pure tone air conduction, bone conduction and speech audiometry tests. The
1046   registrant shall verify that the tests were performed by an individual
1047   authorized by law to do so. The registrant may rely on a representation by the
1048   physician, audiologist or fitter who performed or supervised the tests that the
1049   individual who performed the tests was authorized to do so. (2) The registrant
1050   shall: (i) Perform air conduction tests for hearing level thresholds at
1051   frequencies of 250 Hz, 500 Hz, 1,000 Hz, 2,000 Hz, 4,000 Hz and 6,000 Hz

1052 or 8,000 Hz, with masking if necessary. (ii) Perform bone conduction tests
1053 for hearing level thresholds at frequencies of 500 Hz, 1,000 Hz, 2,000 Hz and
1054 4,000 Hz, with masking if necessary. (iii) Maintain records of the test results
1055 for each ear for 7 years. (iv) Perform a speech reception or speech awareness
1056 threshold test using an electronic speech audiometer with head or insert ear
1057 phones. (v)  Perform a word discrimination or other speech intelligibility test
1058 for conversational level speech using an electronic speech audiometer with
1059 head or insert ear phones. (3) The registrant shall sell a hearing aid only if
1060 the hearing aid is fitted to the wearer to ensure physical and operational
1061 comfort and improvement in hearing function is demonstrated and
1062 documented in at least one of the following areas: speech detection, speech
1063 awareness levels, speech intelligibility, orientation or speech reception
1064 threshold. (c) *Instrumentation.* A registrant shall satisfy the
1065 following: (1) All test instruments shall be calibrated once each year or more
1066 often if necessary to meet current American National Standards Institute
1067 standards for pure tone and speech audiometry as identified by 1996 A.N.S.I.
1068 standards or applicable succeeding A.N.S.I.   Standards. (2) Instruments
1069 transported to test sites shall be calibrated to the standard set forth in
1070 paragraph (1) every 6 months, or more frequently as needed. (3)  Calibration
1071 shall be performed by a qualified individual other than the owner. (4)  A
1072 signed certificate identifying the most recent date of calibration shall be
1073 maintained for inspection by the Department.

1074 Upon information and belief Defendant Fowler also failed to re-calibrate the

1075 equipment when the equipment moved to the Harrisburg office, a nursing home or

1076 back to the Hanover office.

1077 Upon information and belief, Defendant Price knew the equipment delivered

1078 by Defendant Fowler that she used on her patients was not calibrated as required.

1079 Defendants Keystone, Fowler and Price did act and/or conspired to

1080 intentionally and knowingly fail to meet the FIP conditions of participation and

1081 knowingly falsified or failed to supervise the falsification of the certification that

1082   they had met the conditions of participation (including each claim submitted), by

1083   knowingly submitting and causing the submission and/or failing to supervise the

1084   submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

1085   therefore caused the submission of claims that were false and not eligible for

1086   reimbursement to FIP.  By causing these claims that they knew were ineligible for

1087   reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

1088   Fowler and Price also made, used, or caused to be made or used, false records or

1089   statements material to false or fraudulent claims. Had FIP known that these claims

1090   were only approved for coverage as a result of such false and fraudulent statements,

1091   they would not have reimbursed for those claims. Defendant Keystone accepted

1092   payment for each false claim made with these faulty conditions, paid Defendants

1093   Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

1094   payments. Because FIP paid reimbursements for the resulting false claims, the FIP

1095   incurred and continues to incur significant and material damages due to Defendants'

1096   fraudulent actions.  Upon information and belief said Defendants' fraudulent

1097   actions are continuing.

## 2. **Billing For A More Expensive Product Than Was Provided**

### a. *BILLING FOR HEARING AIDS AT AN INCREASED PRICE*

1098   On or around September 5, 2014, Defendant Fowler requested his secretary

1099   Cheryl Henson to write down recent payments that Defendant Keystone received

1100   from each of the different FIPs to determine how much each would pay on hearing

1101   aid benefits; Defendant Keystone would routinely bill each FIP a different and/or

1102   inflated amount for a hearing aid depending on what that insurance was known to

1103   pay.

1104   There are several types of hearing aids; BTE-behind the ear, ITE- in the ear,

1105   CIC- completely in the canal, and RIC- receiver in canal.  To prescribe a certain

1106   type of hearing aid is sometimes a patient preference, but some patients can't wear

1107   certain styles because of previous surgeries, or size of canal, deformities, problems

1108   with excessive wax, or a hole in the eardrum etc.  It also depends on their hearing

1109   loss.  Smaller hearing aids will only have a certain amount of "gain" or "volume"

1110   that is available, so if someone has a moderate to severe loss, they will need to go

1111   with an aid such as a RIC that will be capable of giving them the volume that they

1112   need.  RIC hearing aids can fit a variety of hearing losses, from mild to moderately

1113   severe.  Patients that start with a CIC will usually at some point have to upgrade to

1114   something larger, once their hearing loss reaches a certain decibel level.

1115       Hearing aid prices vary depending on the circuits in them. There are typically

1116   four levels of technology for each hearing aid manufacturer. They all make an

1117   "Entry Level" or "Basic Level" product, which is the cheapest.  Then there is

1118   "Standard Level", which is a little more expensive, then "Advanced" which is even

1119   more expensive, and the most expensive level would be "Premium".  Each level of

1120   technology has different "features".  The more "features", the more expensive.  You

1121   can get any style of hearing aid in all different price levels.

1122       Defendant Fowler typically sold the cheaper models to his patients.   He

1123   seldom put patients in better technology; he would make the same profit either way.

1124   It is unknown at this time why Defendant Fowler would not offer a higher level

1125   hearing aid to some of his patients who would often benefit greatly from these

1126   increased features.

1127       Defendant Keystone often bill the FIP an increased price for whatever level

1128   model was sold or he would sell a certain model but bill for a different model

1129   knowing he would get a higher reimbursement; such as selling a BTE but billing for

1130   a CIC.

1131       Several of Defendant Fowler's patients came in to see Relator when they

1132   were having issues with their hearing aids and would question the type or level of

1133   hearing aid they bought from Defendant Keystone. Patients would say to Relator:

1134   "Tony told me these were the best ones"; and yet Relator would discover that the

1135   patient would only be wearing either a Basic or Standard Level product.

1136        When Defendant Keystone would bill hearing aids to the FIP, the insurance

1137   does not know what level of technology it is as the codes are categorized by the

1138   style (BTE, ITE, RIC, and CIC).

1139        Several of the FIP pay for a certain percentage of a hearing aid purchase and

1140   accompanying services.  Defendant Keystone would inflate the hearing aid prices at

1141   different amounts depending on the percentage that the particular Federal Insurance

1142   Program paid.  The same hearing aid and services would be billed one price for

1143   Tricare Insurance and perhaps a different price to Medicaid.

1144        The price of the hearing aids were not always billed at the prices quoted to

1145   the patient.  Below are examples; however, Relator knows of several other claims,

1146   not listed below, in which aids were quoted / purchased at a discounted price, only

1147   to be billed to FIP at the normal or an inflated cost:

1148        WC - 10/27/10, V5261- billed at $9000.00 (most expensive aids sold, are

1149   sold at $6000.00), V5110- billed at $795.00 (normally billed at $495.00), V5266-

1150   billed at $195.00 (normally billed at $60.00).

1151     KKH - 04/16/14, V5014-billed at $100.00 (this code is normally used for

1152 hearing aid repairs, when the aids need sent out, but was used for a tube change,

1153 which is normally a $10.00 fee charged for changing both tubes).

1154     RCJ - 02/03/11, V5261-billed at $7200.00 (normally these aids are

1155 $5800.00).

1156     KMK - 07/01/10, patient was fit with a new ear mold and billed a $475.00

1157 dispensing fee, in addition to the cost of the ear mold, which is normally billed at

1158 $75.00 only.

1159     SM - 02/21/11, hearing aids were billed at $3500.00 each, Relator is not sure

1160 what aids these were, but the most expensive ones listed at Defendant Keystone's

1161 facility are $3000.00 each.  V5090- dispensing fee was billed at $795.00, normally

1162 billed at $275.00, payment was $477.00. Hearing aid batteries- V5266, billed at

1163 $140.00, with payment of $84.00, batteries were free with hearing aid purchases for

1164 3 years at the time of this sale. Fitting fee -V5011, was also billed and is normally

1165 included with the bundled quote for the hearing aids.

1166     JJS - 10/15/13, 10/16/13, V5257 LT/RT-purchased aids that are normally

1167 $2100.00 each, billed to insurance at $2500.00 each.

1168     RS - 09/25/12, V5261 aids sold at $3000.00, billed to insurance at $4000.00.

1169        TT - 10/08/10, Hearing aids V5261, billed at $10,000.00, the most expensive

1170   set of hearing aids was $6000.00 on the price list at Defendant Keystone's facility.

1171   Batteries billed at $140.00, with payment of $84.00, when they were free for 3

1172   years with all hearing aid purchases at the time of sale.  Fitting fee --V5011, also

1173   billed and should have been included with the bundled amount charged for the

1174   hearing aids.

1175        RTr - 01/03/11, Hearing aids billed at $5000.00; Relator is not sure which

1176   aids these were.  V5090, dispensing fee billed at $795.00, normally is billed at

1177   $275.00.  Batteries, free for three (3) years at the time, were billed at $140.00, with

1178   payment of $84.00.  Fitting fee -V5011, also billed and should have been included

1179   in the bundled price quoted for the aids.

1180        There is a Male Patient noted that the payment received from Workers

1181   Compensation on 01/26/12was $6533.04.  He was fit with hearing aids that are

1182   normally priced at $4200.00.

1183        Claims were billed by Defendant Keystone to FIP with the CIC, CPT code

1184   V5258 (completely in the canal aid) instead of BTE, CPT code V5261 (behind the

1185   ear aid), when it was known that insurance reimbursement would be greater for the

1186   CIC code.  The patients listed below were not fit with CIC aids but billed for the

1187   CIC to the FIP: MPD - 03/01/11; PPK - 03/28/11; MJL - 03/02/11; BJL - 05/04/12;

1188   KP - 06/18/13; DLR - 11/07/12 (also discounted aid cost to patient, but was billed

1189   to insurance at higher cost); and FS - 08/16/12.

1190        Upon information and belief, Defendant Price knew or should have known

1191   that Defendant Keystone was billing FIP a higher amount for the hearing aids than

1192   the cost of what she quoted to her patients.

1193        Defendants Keystone, Fowler and Price did act and/or conspired to

1194   intentionally and knowingly fail to meet the FIP conditions of participation and

1195   knowingly falsified or failed to supervise the falsification of the certification that

1196   they had met the conditions of participation (including each claim submitted), by

1197   knowingly submitting and causing the submission and/or failing to supervise the

1198   submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

1199   therefore caused the submission of claims that were false and not eligible for

1200   reimbursement to FIP.  By causing these claims that it knew were ineligible for

1201   reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

1202   Fowler and Price also made, used, or caused to be made or used, false records or

1203   statements material to false or fraudulent claims. Had FIP known that these claims

1204   were only approved for coverage as a result of such false and fraudulent statements,

1205   they would not have reimbursed for those claims. Defendant Keystone accepted

1206   payment for each false claim made with these faulty conditions, paid Defendants

1207   Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

1208   payments. Because FIP paid reimbursements for the resulting false claims, the FIP

1209   incurred and continues to incur significant and material damages due to Defendants'

1210   fraudulent actions.  Upon information and belief said Defendants' fraudulent

1211   actions are continuing.

### b.  SELLING USED / WORN / DIRTY HEARING AIDS AS NEW

1212   Audiologists have been enjoined from violating a provision of the Unfair

1213   Trade Practices and Consumer Protection Law (73 P. S. §§ 201-1—209-6) or being

1214   subject to a final order of the Federal Trade Commission, the Health Department, or

1215   the Food and Drug Administration of the United States Department of Health and

1216   Human Services, concerning the sale or offering for sale of an unsafe, unhealthful

1217   or worthless hearing device or for engaging in conduct which has the tendency to

1218   mislead or deceive.

1219   28 PA Code § 25.215 (13)  provides: Using, causing or promoting the use of

1220   any advertising matter, promotional literature, testimonial, guarantee, warranty,

1221   label, brand, insignia or any other representation, however disseminated or

1222   published, that is misleading, deceiving, improbable or untruthful, such as a

1223   misrepresentation.

1224      28 PA Code § 25.215 (23) provides: Making a representation either directly

1225 or indirectly that a hearing aid or part thereof is new, unused or rebuilt when that is

1226 not true.

1227      (i)   In the marketing of a used hearing aid or a hearing aid which contains
1228      used parts, a registrant shall make full and non-deceptive disclosure of the
1229      fact in advertising and promotional literature relating to the product on the
1230      container, box or package in which the product is packed or enclosed. The
1231      required disclosure may be made by use of words such as "used," "second-
1232      hand," "repaired" or "rebuilt," whichever applies to the product involved,
1233      and it shall appear on a tag physically attached to a hearing aid.  (ii) A
1234      registrant may not misrepresent the identity of the rebuilder of a hearing aid.
1235      If the rebuilding of a hearing aid was done by other than the original
1236      manufacturer, a registrant shall disclose the fact wherever the original
1237      manufacturer is identified.

1238      The Food and Drug Administration (FDA) regulates the conditions for sale of

1239 specific medical devices, including hearing aid devices. These regulations are

1240 summarized below:

1241      • Prospective hearing aid users must obtain a medical clearance from a
1242        physician (preferably one who specializes in diseases of the ear) prior
1243        to being fit with amplification. The medical clearance must have
1244        occurred in the last six months. If the prospective user is over 18 years
1245        of age, they may waive this medical clearance and, instead, complete a
1246        medical waiver. The medical waiver must use language provided by
1247        the FDA.
1248      • Prospective hearing aid users under the age of 18 years of age obtain a
1249        medical clearance from a physician (preferably one who specializes in
1250        diseases of the ear) prior to being fit with amplification. The medical
1251        clearance must have occurred in the last six months. Neither the child
1252        or their parent or guardian may waive this medical clearance
1253        requirement.

1254
1255
1256
1257
- Hearing aid users must be provided with the User Instructional Brochure provided by the hearing aid manufacturer. Review of this brochure must take place orally or in the predominate method of communication used during the sale.

1258
1259
1260
1261
- Medical waivers and medical clearances must be retained by the dispenser for a minimum of three years. (Note: HIPAA requires patient medical records be retained for a minimum of six years after the last date of service).

1262
  21CFR § 801.421 (2014)

1263   Defendant Keystone and Defendant Phonak had an agreement that for so many

1264 hearing aid purchases, Defendant Phonak would give Defendant Keystone so many

1265 free hearing aids and accessories.  If Defendant Keystone would have returned any of

1266 the hearing aids to Defendant Phonak, it may have compromised how many free

1267 products it was entitled to.

1268   49 Pa. Code § 45.102 (d)  *Principles of Ethics II.*

1269
1270
1271
1272
1273
  (1)  A licensee shall hold paramount the welfare of persons served professionally.  (v)  A licensee shall take all reasonable precautions to avoid injuring a person in the delivery of professional services. (vi) A licensee shall evaluate services and products rendered to determine their effectiveness.

1274   A patient, who had bought a hearing aid from Defendant Keystone, has thirty

1275 days in which to return their hearing aid to Defendant Keystone for reimbursement.

1276 Defendant Keystone was required to return the hearing aid to Defendant Phonak for

1277 credit and contact the FIP, which was initially billed, for that service / product.

1278        Before the 30-day deadline, when a hearing aid was returned to Defendant

1279   Keystone, it was often not returned to Phonak; it was put back into stock.

1280        When a hearing aid was returned, regardless of when it was returned,

1281   Defendant Fowler would often put the hearing aid, without cleaning it, back into its

1282   stock for resale as a new product.

1283        Defendant Keystone would proceed to sell the used hearing aid as 'new' to

1284   an unsuspecting patient. The hearing aids are all identified by a different serial

1285   number which is then assigned to each patient's name so that warranties can be

1286   determined.  Defendant Fowler would often discount these "used" aids by varied

1287   amounts. The patients; however, were not informed that the hearing aids were

1288   previously worn or "used".  Patients were sometimes told they were given a "deal"

1289   on the aids, and often, the "listed" price was not disclosed to the patients, so they

1290   were unaware that the aids were discounted.

1291        The price billed to FIP would depend on what price Defendant Fowler

1292   indicated to be used, via typically on a sticky note on the patient chart. Nothing was

1293   consistent or "standard" practice when this occurred.  It was always whatever

1294   Defendant Fowler "noted" to be billed.  Notes on patient charts would state, "Bill at

1295   usual/normal price".  Hearing aids were often discounted simply because they were

1296   in 'stock' for a while and Defendant Fowler would want to get rid of them because

1297   newer models were available.

1298       Defendant Keystone would often bill the used hearing aid to the patient's FIP

1299   as a 'new' hearing aid without the discounted cost.

1300       On occasion Relator would take what she thought was a new hearing aid

1301   from the stock to sell to a patient, only to discover the hearing aid still had ear wax

1302   on it from its previous owner.

1303       The below patients, identities provided to the Attorney General, purchased a

1304   certain serial numbered hearing aid(s), returned them, and then the same serial

1305   number was then sold as 'new' to another patient.  No two hearing aids from the

1306   same manufacturer can have the same serial number; they are all identified by a

1307   different serial number so that warranties can be determined.  Defendant Fowler

1308   would discount some aids however much he wanted; although he would bill the FIP

1309   a different and usually an inflated amount:

1310       DJS, in the Hanover office, purchased two (2) Phonak Audeo Smart III's,

1311   with serial numbers: 1130X0GH3 and 1130XOGH4, on 08/22/2011.  He returned

1312   them on 11/01/2011.  These same hearing aids, with the same serial #s, were then

1313   sold to another patient, also in the Hanover office, on 01/19/2012, with a $200.00

1314   discount.

1315    A patient, in the Hanover office, purchased two (2) Phonak Audeo Smart

1316    III's, with serial numbers: 1112X0HFV and 1112X14AR, on 07/21/2011.  She

1317    returned them on 09/30/2011.  A male patient, in the Hanover office, purchased 2

1318    Audeo Smart III's, serial numbers: 1112X0HFV and 1137X0JJE, on 10/04/2011.

1319    He kept both aids, and was given a $1200.00 discount off the set.  SLM, in the

1320    Harrisburg office, purchased 1 Phonak Audeo Smart III, with serial number

1321    1112X14AR, on 12/07/2011.  She was given a $300.00 discount and she did keep

1322    the aid.

1323    GAC, in the Harrisburg office, purchased one (1) Phonak Cassia micro M, on

1324    05/18/11, with serial number: 1111X0DET. He returned the aid on 06/14/11.  On

1325    08/10/11, a female patient, also in the Harrisburg office, purchased two (2) Phonak

1326    Cassia micro M's, with serial numbers: 1111X0DET and 1111X0DER, with a

1327    $1200.00 discount off the pair, and she did keep the aids.

1328    A female patient, in the Hanover office, purchased two (2) Phonak Milo Plus

1329    micros on 08/20/12, with serial numbers: 1226X016U and 1226X016V.  She

1330    returned the aids on 09/11/12.  These same aids, with the same serial #s were then

1331    sold to a male patient, in the Harrisburg office, on 10/17/12, with a $1200.00

1332    discount off the pair.  He kept the aids.

1333    A male patient, in the Harrisburg office, purchased two (2) Phonak Audeo

1334    Smart IIIs with serial numbers: 1227X0FG3 and 1229X0NRY, on 09/26/12.  He

1335 returned them on 11/28/12. These same aids, with the same serial #s were then sold

1336 to a male patient, in the Hanover office, on 1/16/13. He was given a $600.00

1337 discount off the set, and did keep the aids.

1338      A male patient, in the Hanover office, purchased two (2) Bolero Q50's, with

1339 serial numbers: 1303X112E and 1303X112F, on 02/05/13. He returned them on

1340 02/19/13. These same aids, with same serial #s were then purchased by a female

1341 patient, also in the Harrisburg office, on 03/01/13. She was given a $200.00

1342 discount off the set, and did keep the aids.

1343      A male patient from the Hanover office, purchased two (2) Audeo Q50's, on

1344 05/14/13, with serial numbers: 1310H08GT and 1310H08GU. He returned them on

1345 06/20/13. The same aids, with same serial #s were then sold to a female patient, in

1346 the Harrisburg office, on 08/21/13. She also returned them, on 10/16/13. The same

1347 aids, same serial #s were then sold to female patient, in the Hanover office, on

1348 02/20/14. She was given a $600.00 discount, and did keep the aids.

1349      A female patient, from the Harrisburg office, purchased two (2) Phonak

1350 Audeo Q50s on 05/29/13, with serial numbers: 1315H0GPC and 1315H0GPD. She

1351 returned one aid, serial # 1315H0GPC, on 06/17/13. This same aid was then sold to

1352 a female patient, who was Relator's patient in the Hanover office. She cancelled her

1353 fitting scheduled on 08/19/13, so the aid was again put back into stock. This same

1354   aid, with serial # 1315H0GPC, was sold to another female patient, in the Hanover

1355   office, with a discount of $250.00, on 10/15/13.  She kept the aid.

1356        A male patient, in the Harrisburg office, purchased two (2) Phonak Audeo

1357   Q50s with serial numbers: 1310H08F0 and 1310H08F1, on 05/29/13.  He returned

1358   the aids on 07/24/13.  These same aids, with same serial #s were then sold to a

1359   female patient, in the Hanover office, on 08/05/13, with a $600.00 discount.  She

1360   kept the aids.

1361        A male patient, in the Hanover office, purchase two (2) Phonak Audeo

1362   Q30's, with serial numbers: 1333X11RX and 1333X11RY, on 09/17/13.  He

1363   returned them on 11/12/13.  The same aids, with same serial #s, were then

1364   purchased by another male patient, in the Hanover office, on 11/21/13.  Normally,

1365   these aids are sold at $1800.00 each, $3600.00 total.  They were sold to a male

1366   patient at $2000.00 each, totaling $4000.00.  He did keep the aids.

1367        Upon information and belief, Defendant Price knew that she was selling used

1368   hearing aids as 'new' to her patients without disclosing this fact to the patient and

1369   allowing her sales to be billed to the FIP as a new product and/or at an inflated cost.

1370        Defendants Sonova, Phonak, Keystone, Fowler and Price did act and/or

1371   conspired to intentionally and knowingly fail to meet the FIP conditions of

1372   participation and/or healthcare rules and regulations and did knowingly falsified or

1373   failed to supervise the falsification of the certification that they had met the

1374   conditions of participation (including each claim submitted), by knowingly

1375   submitting and causing the submission and/or failing to supervise the submission of

1376   false and fraudulent claims, said Defendants therefore caused the submission of

1377   claims that were false and not eligible for reimbursement from Government

1378   Healthcare Programs. By causing these claims that they knew were ineligible for

1379   reimbursement to be submitted to and paid for by FIP, said Defendants also made,

1380   used, or caused to be made or used, false records or statements material to false or

1381   fraudulent claims. Had FIP known that these claims were only approved for

1382   coverage as a result of such false and fraudulent statements, they would not have

1383   reimbursed for those claims. Defendant Keystone accepted payment for each false

1384   claim made with these faulty conditions, paid Defendants Keystone and Price with

1385   this money, and it did not reimburse the FIP for these illegal payments. Because FIP

1386   paid reimbursements for the resulting false claims, they incurred and continue to

1387   incur significant damages due to Defendants' fraudulent actions.  Upon information

1388   and belief said Defendants' fraudulent actions are continuing.

c. *SELLING HEARING AIDS THAT WERE OBTAINED FOR FREE*

1389        Defendant Keystone would routinely order hearing aids in a bulk order from

1390   Defendant Phonak, usually purchased with an incentive such as "buy 10 get 2 free",

1391   or because Defendant Phonak would include free accessories with its

1392   purchases.  This information was not disclosed to the patients other than at times

1393   when it was advertised that "free accessories were offered with certain levels of

1394   technology purchased."  The free accessories were also sold to patients and billed to

1395   FIP in many instances as well; it always depended on what Defendant Fowler

1396   wanted.

1397          Upon information and belief, Defendant Price knew or should have known

1398   that Defendant Keystone was fraudulently billing the FIP for free hearing aids

1399   and/or accessories that she sold to her patients.

1400          Defendants Keystone, Fowler, Sonova, Phonak, and Price did act and/or

1401   conspired to intentionally and knowingly fail to meet the FIP conditions of

1402   participation and knowingly participated in a kickback scheme, falsified or failed to

1403   supervise the falsification of the certification that they had met the conditions of FIP

1404   participation (including each claim submitted), by knowingly submitting and

1405   causing the submission and/or failing to supervise the submission of false and

1406   fraudulent claims, Defendants therefore caused the submission of claims that were

1407   false and not eligible for reimbursement to FIP.  By causing these claims that they

1408   knew were ineligible for reimbursement to be submitted to and paid for by FIP,

1409   Defendants also made, used, or caused to be made or used, false records or

1410   statements material to false or fraudulent claims. Had FIP known that these claims

1411   were only approved for coverage as a result of such false and fraudulent statements,

1412   they would not have reimbursed for those claims. Defendant Keystone accepted

1413   payment for each false claim made with these faulty conditions, paid Defendants

1414   Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

1415   payments. Because FIP paid reimbursements for the resulting false claims, the FIP

1416   incurred and continues to incur significant and material damages due to Defendants'

1417   fraudulent actions.  Upon information and belief said Defendants' fraudulent

1418   actions are continuing.

### d.   FRAUDULENTLY BILLED FOR REPLACEMENT RECEIVERS

1419   Receivers are components that attach to BTE hearing aids and extend into the

1420   ear.  When a patient's receiver breaks, and the warranty had expired, they return it

1421   to Defendant Keystone and then buy another receiver.  Defendant Fowler would

1422   wait until he collected a bunch of broken receivers that were out of warranty, and

1423   then fraudulently return them to Phonak as being under warranty.  He would do this

1424   by searching his database and randomly pulling the serial number off hearing aids

1425   that he sold recently to other patients and that were still under warranty.  Phonak

1426   would then replace all the broken receivers for free.  When Defendant Keystone

1427   would receive these free receivers, it would proceed to sell them to different

1428   patients and fraudulently bill the FIP.

1429   Defendants Keystone and Fowler did act and/or conspired to intentionally

1430   and knowingly fail to meet the FIP conditions of participation and/or healthcare

1431   rules and regulations and did knowingly falsified or failed to supervise the

1432   falsification of the certification that they had met the conditions of participation

1433   (including each claim submitted), by knowingly submitting and causing the

1434   submission and/or failing to supervise the submission of false and fraudulent

1435   claims, said Defendants therefore caused the submission of claims that were false

1436   and not eligible for reimbursement from Government Healthcare Programs. By

1437   causing these claims that it knew were ineligible for reimbursement to be submitted

1438   to and paid for by FIP, said Defendants also made, used, or caused to be made or

1439   used, false records or statements material to false or fraudulent claims. Had FIP

1440   known that these claims were only approved for coverage as a result of such false

1441   and fraudulent statements, they would not have reimbursed for those claims.

1442   Defendant Keystone accepted payment for each false claim made with these faulty

1443   conditions, and it did not reimburse the FIP for these ineligible payments. Because

1444   FIP paid reimbursements for the resulting false claims, they incurred and continue

1445   to incur significant and material damages due to Defendants' fraudulent actions.

1446   Upon information and belief said Defendants' fraudulent actions are continuing.

### 3. Billing For Services That Were Not Actually Rendered

#### a. FITTING HEARING AIDS WITHOUT REQUIRED TESTS

1447      49 Pa. Code § 45.102 (2)(g) *Principle of Ethics V.*

1448      (1)  A licensee shall maintain objectivity in all matters concerning the
1449      welfare of a person served. Accordingly, a licensee who dispenses
1450      products to a person served shall observe the following standards:

77

1451           (v) A licensee shall evaluate products dispensed to a person served to
1452           determine their effectiveness.

1453       The Codes '92557' (Comprehensive Audiometry) or 'V5010' (Assessment

1454    for Hearing aid), were fraudulently billed to FIP, because Defendants Fowler and/or

1455    Price did not complete the tests. '92557' is not a complete test when bone

1456    conduction or speech reception is not done, or when a report was not completed to

1457    give to the referring physician. '92557 'should not be billed when patients are tested

1458    for hearing aid selection, V5010 should be used in these cases, but requires

1459    additional measures, such as MCL and UCL, to be completed and noted on the

1460    audiogram; which was usually not done.  V5010 is not a paid benefit of Medicare

1461    patients, so it is assumed that this is the reason the tests were often billed as '92557'

1462    instead.

1463       Defendant Keystone would bill the FIP at code 'V5010' which is an

1464    assessment for hearing which includes completing MCL and UCL; however,

1465    Defendants Fowler and/or Price would not actually perform said assessment.  The

1466    code 'V5010' was often billed solely based on known or anticipated payment from

1467    the FIP.  It was not a matter of checking the audiogram to see if it was completed

1468    prior to billing, V5010 was added to services charged, when there was a known

1469    payment from particular FIPs or when it was anticipated that payment would/may

1470    be made by the FIP.  Examples are, including but not limited, the following patients

1471   treated by Defendant Keystone: DRA- 07/30/13- 92557; EA - 06/29/12- V5010;

1472   WA - 06/29/12- V5010; CEB - 11/04/13- V5010; JPB - 09/27/11, 9/13/12,

1473   08/20/13- three separate claims with 92557; RMB - 08/13/13- 92557; BB -

1474   08/10/11- V5010; GJB - 04/22/10- V5010; RCBL - 05/27/10- V5010; EB -

1475   01/31/12- V5010; FAB - 09/11/12- V5010; JLB - 08/23/10- V5010; DEB -

1476   04/06/10- V5010; EJB - 07/15/10- V5010; and ALB - 08/28/13- V5010; Relator

1477   also has information on violations occurring on approximately seventy (70) other

1478   patients.

1479         Upon information and belief, Defendant Price also failed to conduct the

1480   proper tests and/or complete the tests properly on her patients and knew that

1481   Defendant Keystone was fraudulently billing the FIP as if the tests were completed.

1482         Defendants Keystone, Fowler and Price did act and/or conspired to

1483   intentionally and knowingly fail to meet the FIP conditions of participation and

1484   knowingly falsified or failed to supervise the falsification of the certification that

1485   they had met the conditions of participation (including each claim submitted), by

1486   knowingly submitting and causing the submission and/or failing to supervise the

1487   submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

1488   therefore caused the submission of claims that were false and not eligible for

1489   reimbursement to FIP.  By causing these claims that they knew were ineligible for

1490   reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

1491   Fowler and Price also made, used, or caused to be made or used, false records or

1492   statements material to false or fraudulent claims. Had FIP known that these claims

1493   were only approved for coverage as a result of such false and fraudulent statements,

1494   they would not have reimbursed for those claims. Defendant Keystone accepted

1495   payment for each false claim made with these faulty conditions, paid Defendants

1496   Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

1497   payments. Because FIP paid reimbursements for the resulting false claims, the FIP

1498   incurred and continues to incur significant and material damages due to Defendants'

1499   fraudulent actions.  Upon information and belief said Defendants' fraudulent

1500   actions are continuing.

b.  *FAILED TO USE REAL EAR PROBE TEST*

1501   Defendants Fowler, and upon information and belief, Defendant Price would

1502   fail to use "Real Ear Probe Testing" when seeing their patients.

1503   Real Ear Probe Testing is a test to determine which setting is best for a

1504   hearing aid to amplify speech across different frequency ranges. This test takes 5-10

1505   minutes.  This test is done to verify that the settings in the hearing aid are accurate

1506   while the hearing aid is being worn by the patient.  Almost every place that

1507   dispenses hearing aids does this.  Defendant Keystone did have the equipment to do

1508   this, but Defendant Fowler never used it.

1509      A patient confronted Relator and asked why Defendant Keystone did not

1510   conduct a real–ear probe.  Relator repeatedly questioned Defendant Fowler about

1511   using it, because it was never set up nor was Relator ever trained to use it.

1512   Defendant Fowler stated "Just tell the patient that it's done in the software"; which

1513   is not the case.  He also stated to Relator: "I've got the equipment, I just don't use

1514   it".

1515      There are some things in the software designed to maximize the fitting, but it

1516   is not equivalent to the real ear probe testing that should be done for everyone who

1517   is fit with hearing aids.

1518      According to many audiology articles and courses Relator has taken, Real

1519   Ear Probe Testing is something that is required to be conducted.  When this isn't

1520   done, the settings in the hearing aid are based off of the patients hearing test results,

1521   which are obtained using only headphones.

1522      Real Ear Probe Testing is performed by setting the tip of the hearing aid in

1523   the ear canal, closer to the eardrum while the patient is wearing the hearing aids.  It

1524   is done so that the patient is not hearing certain things too loud, and so that they are

1525   hearing at comfortable levels.  Hearing aids can be adjusted for certain issues, but

1526   doing this test is the best way to get the patient's hearing optimal, without the need

1527   to make several adjustments over a period of every few weeks to have their aids

1528   adjusted for things that are bothersome to them.

1529   Upon information and belief, Defendant Fowler knowingly failed to do this

1530   "once and usually done" test so that Defendant Keystone could instead bill FIP for

1531   each date the patient would now have to come in afterwards to have their hearing

1532   aid(s) adjusted.

1533   Upon information and belief, Defendant Price also failed to conduct Real Ear

1534   Probe Testing on her patients as required and knew that Defendant Keystone was

1535   billing the FIP as if she had conducted this Probe.

1536   Defendants Keystone, Fowler and Price did act and/or conspired to

1537   intentionally and knowingly fail to meet the FIP conditions of participation and

1538   knowingly falsified or failed to supervise the falsification of the certification that

1539   they had met the conditions of participation (including each claim submitted), by

1540   knowingly submitting and causing the submission and/or failing to supervise the

1541   submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

1542   therefore caused the submission of claims that were false and not eligible for

1543   reimbursement to FIP.  By causing these claims that they knew were ineligible for

1544   reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

1545   Fowler and Price also made, used, or caused to be made or used, false records or

1546    statements material to false or fraudulent claims. Had FIP known that these claims

1547    were only approved for coverage as a result of such false and fraudulent statements,

1548    they would not have reimbursed for those claims. Defendant Keystone accepted

1549    payment for each false claim made with these faulty conditions, paid Defendants

1550    Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

1551    payments. Because FIP paid reimbursements for the resulting false claims, the FIP

1552    incurred and continues to incur significant and material damages due to Defendants'

1553    fraudulent actions.  Upon information and belief said Defendants' fraudulent

1554    actions are continuing.

### c.  FAILED TO CONDUCT A COMPREHENSIVE OFFICE EXAM

1555    An audiologist may not select a code for a patient for the sole purpose of

1556    obtaining reimbursement.

1557    The CPT Codes for an 'office visit' Evaluation & Management ("E/M")

1558    services range from Level I, for the least complicated low severity services to Level

1559    V, for complex services for cases of high severity; the Federal Healthcare Programs

1560    reimburse the higher levels of E/M services at a significantly higher rate.

1561    Defendants Fowler and Defendant Price were aware of, or should have been

1562    aware of, the conditions for repayment under all of the Federal Insurance Programs

1563    referred to in the preceding paragraphs.

1564        Medicare Part B permits providers to use either of two Evaluation and

1565    Management ("E/M") Documentation Guidelines. CPT Codes are used to report

1566    E/M services. While providers must insure that the Guidelines' requirements for the

1567    individual CPT Codes are met when selecting the appropriate CPT Code, medical

1568    necessity for the service must also be met. According to Medicare, it is not

1569    medically necessary or appropriate to bill a higher level of E/M 'office visit' service

1570    when a lower level of service is all that is medically necessary. Documentation in

1571    the medical record must support the level of service chosen.

1572        Medical Necessity of E/M services is generally expressed in two ways, by the

1573    frequency of services and the intensity of service – which corresponds to the CPT

1574    level. The provider's documentation of E/M services reported to Medicare must

1575    demonstrate that both the frequency and the intensity of the E/M service were

1576    appropriate considering the nature of the patient's complaint and condition.

1577    Medicare's determination of medical necessity is separate from its determination

1578    that the E/M service was rendered as billed.

1579        Medicare judges the provision of the service based on CPT E/M Code

1580    definitions and the CMS E/M Service Documentation Guidelines.

1581        The CPT Codes that govern E/M services are as follows: for new patients,

1582    99201 to 99205; and for established patients, 99211-99215. Each level reflects an

1583    increased level of acuity of the patient's presenting complaint; the number of

1584    physical systems evaluated and managed during the encounter; the acuity and/or

1585    duration of the problems evaluated and managed; and the complexity of

1586    documented comorbidities that have clearly influenced the physician's work. The

1587    CPT Codes thus reflect an increasing level of complexity of "medical decision

1588    making."

1589        CPT Code 99212 is defined as an office or other outpatient visit for the

1590    evaluation and management of an established patient which requires at least two (2)

1591    of these three (3) key components: a problem focused history; a problem focused

1592    examination; or straightforward medical decision making. Usually the presenting

1593    problems are self-limiting or minor. Physicians typically spend ten (10) minutes

1594    face-to-face with the patient and/or family.

1595        CPT Code 99213 is defined as an office or other outpatient visit for the

1596    evaluation and management of an established patient which requires at least two (2)

1597    of these three (3) key components: an expanded problem focused history; an

1598    expanded problem focused examination; medical decision making of low

1599    complexity. Usually the presenting problems are self-limiting or minor. Physicians

1600    typically spend fifteen (15) minutes face-to-face with the patient and/or family.

1601        CPT Code 99214 is defined as an office or other outpatient visit for the

1602    evaluation and management of an established patient, which requires at least two

1603    (2) of these three (3) key components: a detailed history; a detailed examination;

1604   and medical decision making of moderate complexity. Counselling and/or

1605   coordination of care with other providers or agencies are provided consistent with

1606   the nature of the problem(s) and the patient's and/or family's needs. Usually, the

1607   presenting problems are of moderate to high severity. Physicians typically spend

1608   twenty-five (25) minutes face-to-face with the patient or family. An office visit

1609   qualifying for CPT Code 99215 is identical, except that it involves medical

1610   decision-making of high complexity and typically involves a forty (40) minute

1611   patient visit.

1612        Medicare makes clear that in order to bill the highest levels of visit codes, the

1613   visit must include a comprehensive history that includes a review of all of the

1614   systems and a review of a complete past family and social history, whether taken at

1615   that visit or a prior visit.

1616        To bill a FIP for an office visit, a comprehensive patient history intake must

1617   be conducted by an audiologist.  This intake includes items such as patient

1618   medications, past surgeries, etc. This information would then be stored in the

1619   patient's chart.   Audiologists are only allowed to bill for this service under CPT

1620   99211. They are not allowed to bill under CPT 99201, 99202, 99211, or 99212

1621   because only physicians (not audiologists) can bill under those codes.  Although

1622   allowed, it is very rare that an audiologist would bill a FIP under the CPT 99211

1623   because usually it is not necessary for treatment and the referring provider would

1624   already have this information. This code is never allowed to be billed when the

1625   appointment is related to hearing aid fitting and/or services.

1626       Medicare will not reimburse an audiologist for a comprehensive office visit

1627   "E/M"; however, other FIPs may reimburse. Defendant Keystone would bill the

1628   FIP, sometimes under CPT Code 99211, the code audiologists are allowed to use,

1629   and other times under a code only physicians may use; depending upon what code

1630   that FIP was known to reimburse for.

1631       On July 30, 2013, Defendant Fowler treated patient DRA and billed the FIP

1632   for $152.00. This charge is broken down as $55.00 for office visit under CPT Code

1633   99211 and $97.00 for a comprehensive audiological exam CPT Code 92557. This

1634   patient did not have the required notes in her chart to allow for billing of an "office

1635   visit." Relator alleges that Defendant Fowler failed to conduct the office visit

1636   intake that he later billed the FIP for. This patient's chart notes also document that

1637   Defendant Fowler failed to conduct a comprehensive audiological exam. He only

1638   conducted a simple screening over the top of a previous test that Relator conducted

1639   on this patient on March 5, 2008. He failed to conduct the rest of the test which he

1640   billed the FIP for. Defendant Keystone billed FIP $152.00 for both services and

1641   received payment of $62.94.

1642       On May 29, 2014, Defendant Fowler saw patient DWA. Defendant Keystone

1643    billed FIP for an office visit under CPT Code 99201 (a code an audiologist is not

1644    allowed to bill under) for $65.00. Medicare denied payment based on this code.

1645    Defendant Keystone forwarded this bill to Highmark Blue Shield. Patient's chart

1646    fails to have documentation which shows a comprehensive history of the patient

1647    was taken. This lack of documentation should not have allowed Defendant

1648    Keystone to bill for an office visit.

1649       On May 19, 2010, Defendant Fowler saw patient EFA and billed FIP for

1650    $65.00, CPT 92506 (a code not allowed to be billed by an audiologist) as an

1651    evaluation of speech, language, voice or communication. Defendant Fowler did not

1652    conduct this exam and Defendant Keystone only billed under this code because it

1653    knew that otherwise this FIP would not pay it for an office visit.

1654       On December 14, 2010, Defendant Fowler saw patient DMA and billed FIP

1655    for CPT Code 92506 U9 at $65.00 and was paid $47.25 (a code not allowed to be

1656    billed by an audiologist) as an evaluation of speech, language, voice or

1657    communication. Defendant Fowler did not conduct this exam and Defendant

1658    Keystone only billed under this code because it knew that otherwise this particular

1659    FIP would not pay it for an office visit.

1660    On August 28, 2011, Defendant Fowler allegedly saw patient CMB and

1661    billed for CPT Code 99213 (code audiologists are not allowed to bill) for an office

1662    visit that he did not document that he completed a comprehensive patient history as

1663    required.

1664    On May 30, 2013, Defendant Fowler saw patient RAB for CPT 99212 (code

1665    audiologists are not allowed to use) for a comprehensive office visit that he did not

1666    complete yet he billed FIP $55.00 and was paid .94 with a patient co-pay of $40.00.

1667    There was none of the required documentation in the patient's chart to make it

1668    eligible to be billed.

1669    On June 29, 2012, Patient EA was seen by Relator.  Defendant Keystone

1670    fraudulently billed the FIP Code V5010 assessment for hearing aid at $90.00 even

1671    though this was an incomplete test due to the fact that Relator did not conduct the

1672    MCL or UCL or loudness gross functions.  She failed to do so because Defendant

1673    Fowler directed her to not conduct that part of the test and the form he would give

1674    Relator to complete did not have a space indicated for that part of the test.

1675    Defendant Keystone billed this code depending on what the FIP would reimburse.

1676    On June 29, 2012, Patient WA was seen by Relator unsupervised.  Defendant

1677    Keystone billed FIP V5010 assessment for hearing aid at $90.00 even though this

1678    was never a completed test for failure to conduct the MCL or UCL or loudness

1679   gross functions because Defendant Fowler directed Relator not to conduct that part

1680   of the test and the form he would give Relator to complete did not have a space

1681   indicated for the part of the test.

1682       On June 25, 2013, Relator saw patient TB for only a hearing aid assessment

1683   (V5010) however Defendant Keystone billed FIP for CPT 92557 a comprehensive

1684   audiological test at $97.00 with payment of $36.16, CPT 99201 office visit (a code

1685   not allowed to be billed by an audiologist and wasn't conducted by Relator) at

1686   $65.00 and paid $11.78, plus Defendant Keystone also billed the patient TB a

1687   $30.00 copay for that service that wasn't done.  Defendant Keystone also billed

1688   V5261 a binaural BTE hearing aids at $4,200.00 and was paid $1,000.00.

1689   Defendant Keystone billed all the above services / products under Defendant

1690   Fowler's NPI number because Relator was not a registered / credential provider.

1691       Relator questioned Defendant Fowler about not completing the requirements

1692   of the test and he said "it was not required."

1693       49 Pa. Code § 45.102 (2)(c)  *Principle of Ethics I.*

1694       (1)  Because speech-language pathologists, audiologists and teachers of the
1695   hearing-impaired provide nonmedical and nonsurgical services, medical
1696   diagnosis and medical treatment by these persons are specifically to be
1697   considered unethical and illegal. (ii) A licensee who performs examinations
1698   and treatments shall use evaluation instruments, techniques and procedures
1699   commonly recognized by their profession and compatible with their
1700   education, expertise and professional competence.

1701    Relator identified a long-standing practice of improper coding and billing FIP

1702    for office visits. The issues that the Relator identified included: (1) billing for E/M

1703    services (office visits) at levels that were not supported by the documentation in the

1704    medical record; and (2) billing for E/M services that were included within the

1705    reimbursement for the administration of services and thus were not separately

1706    billable.

1707    Defendant Keystone would bill for a certain code if it knew if that particular

1708    FIP would pay for that service without questions. Often there would be no

1709    documentation in the chart as to show why certain tests were done.

1710    The False Claims Act, 31 U.S.C. § 3729 addresses filing claims for

1711    incomplete procedures.  A common example for audiologists is filing a claim for

1712    CPT code 92557, comprehensive audiometry, which includes bilateral testing of

1713    pure tone air and bone conduction, speech reception thresholds, word recognition

1714    testing. If bone conduction is not performed and (92557) is filed, this is a False

1715    Claim. In this example, air conduction (92552), speech reception thresholds (92555)

1716    and word recognition testing (92556) should be filed.

1717    Defendant Keystone by and through Defendants Fowler and/or Price billed

1718    for Code '92579' a visual reinforcement audiometry ("VRA") at the incorrect code

1719    of '92557' which certifies that the audiologist performed an air and bone

1720    conduction measurement, speech thresholds, and speech discrimination; the pure-

1721   tone information may have been obtained using play techniques.  Defendant

1722   Keystone by and through Defendants Fowler and/or Price would not actually

1723   conduct the speech awareness threshold.

1724        Upon information and belief, Defendant Price also failed to actually perform

1725   a comprehensive office exam and knew or should have known that Defendant

1726   Keystone was billing the FIP as if she had completed this exam.

1727        Defendants Keystone, Fowler and Price did act and/or conspired to

1728   intentionally and knowingly fail to meet the FIP conditions of participation and

1729   knowingly falsified or failed to supervise the falsification of the certification that

1730   they had met the conditions of participation (including each claim submitted), by

1731   knowingly submitting and causing the submission and/or failing to supervise the

1732   submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

1733   therefore caused the submission of claims that were false and not eligible for

1734   reimbursement to FIP.  By causing these claims that they knew were ineligible for

1735   reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

1736   Fowler and Price also made, used, or caused to be made or used, false records or

1737   statements material to false or fraudulent claims. Had FIP known that these claims

1738   were only approved for coverage as a result of such false and fraudulent statements,

1739   they would not have reimbursed for those claims. Defendant Keystone accepted

1740   payment for each false claim made with these faulty conditions, paid Defendants

1741   Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

1742   payments. Because FIP paid reimbursements for the resulting false claims, the FIP

1743   incurred and continues to incur significant and material damages due to Defendants'

1744   fraudulent actions.  Upon information and belief said Defendants' fraudulent

1745   actions are continuing.

### 4.  Billing For Services Not Medically Necessary

1746   Both State and Federal Healthcare Programs determine reimbursements to

1747   providers based on the medical necessity of procedures and services.  Medical

1748   necessity must be determined prior to the performance of each medical service and

1749   must be clearly documented in a referring physician's order. *It cannot be*

1750   *determined retroactively.*

1751   Federal Regulations define a "prior determination of medical necessity" to

1752   mean "an individual decision by a Medicare contractor, before a physician's service

1753   is furnished, as to whether or not the physician's service is covered" by the federal

1754   healthcare program. 42 C.F.R. § 410.20.

1755   Federal Insurance Programs will only pay for services considered

1756   "reasonable and necessary" which includes audiology diagnostic services.  If the

1757   service is not medically necessary, FIP will not reimburse the provider.

1758   Pursuant to the CMS Manual System, Pub 100-02 Medicare Benefit Policy,

1759   Transmittal 84, Change Request 5717, dated February 28, 2009, "audiological tests

1760    may be ordered for a Medicare beneficiary when the reason for the test is not for the

1761    purpose of fitting or modifying a hearing aid."

1762          The payment for audiological diagnostic tests is determined by the reason the

1763    tests were performed, rather than by the diagnosis or the patient's condition.

1764          Payment by FIP for an audiological diagnostic test is not allowed when (1)

1765    The type and severity of the current hearing, tinnitus or balance status needed to

1766    determine the appropriate medical or surgical treatment is known to the physician

1767    before the test; or (2) The test was ordered for the specific purpose of fitting or

1768    modifying a hearing aid.

1769          Payment of audiological diagnostic tests is allowed for other reasons and is

1770    not limited, for example, by:  Any information resulting from the test including, for

1771    example: Confirmation of a prior diagnosis; Post-evaluation diagnoses; or

1772    Treatment provided after diagnosis, including hearing aids, or The type of

1773    evaluation or treatment the physician anticipates before the diagnostic test.

### a. SCHEDULED YEARLY EXAMS / SENT REMINDERS

1774          The use of reminder cards to solicit a patient for annual or routine hearing

1775    testing could be construed as a solicitation of a Medicare referral. Moreover, billing

1776    FIP for annual or routine hearing tests even with a physician order but without true

1777    medical necessity is inappropriate and fraudulent, according to CMS.

1778        Re-evaluation is appropriate at a schedule dictated by the ordering primary

1779   physician when the information provided by the diagnostic test is required, for

1780   example, to determine changes in hearing, to evaluate the appropriate medical or

1781   surgical treatment or evaluate the results of treatment. For example, re-evaluation

1782   may be appropriate, even when the evaluation was recent, in cases where the

1783   hearing loss, balance or tinnitus may be progressive or fluctuating, the patient or

1784   caregiver complains of new symptoms, or treatment (such as medication or surgery)

1785   may have changed the patient's audiological condition with or without awareness by

1786   the patient.

1787        Medicare FIP allows for coverage of medically reasonable and necessary

1788   testing initiated by the ordering family doctor.  Billing FIP for annual or routine

1789   hearing tests with a physician order but without true medical necessity is

1790   inappropriate and fraudulent.

1791        The use of reminder cards to solicit a patient for annual or routine hearing

1792   testing could be construed as a solicitation of a Medicare referral. The Medicare

1793   Anti-Kickback Statute could be applied in instances where you attempt to solicit a

1794   Medicare order for Medicare reimbursed services. The initiation of the hearing test

1795   through the use of a reminder card could be considered a solicitation. Violations of

1796   the Anti-Kickback Statute Section 1128B(b) of the Social Security Act (42 U.S.C.

1797   1320a-7b(b)), previously codified at sections 1877 and 1909 of the Act, provides

1798   criminal penalties for individuals or entities that knowingly and willfully offer, pay,

1799   solicit or receive remuneration in order to induce business reimbursed under the

1800   Medicare or State health care programs. The offense is classified as a felony, and is

1801   punishable by fines of up to $25,000 and imprisonment for up to 5 years.

1802         Defendant Keystone by and through Defendant Fowler would treat "Skills"

1803   patients, who came from group homes and would be mentally retarded or disabled.

1804   Defendant Keystone would bill the FIP for the testing of these patients when it was

1805   not noted to be medically necessary and would be billed office visits, when it was

1806   not warranted because no patient history was taken, and there were hardly ever any

1807   notes in the charts.  For many of the patients, Defendant Fowler would indicate on

1808   their charts that they were to be tested "yearly", even though he is not allowed to

1809   refer them back to himself on a yearly basis.

1810         An audiologist may not treat a patient in a nursing home when he knows that

1811   the patient is not likely to have significant communication benefit from speech or

1812   language therapy even if the person may be reimbursed by Medicare; it is unknown

1813   at this time if Defendant Fowler and/or Defendant Price documented the medical

1814   necessity of the nursing home patients they serviced.

1815         Defendant Keystone would send reminder cards to patients to schedule their

1816   yearly appointments and or recruit patients through some advertising, including but

1817  not limited to the following patients: BIC - 01/25/12, Defendant Fowler

1818  recommended she be tested; ARC - 04/15/14, Defendant Fowler told her to get new

1819  aids before she turns twenty-one (21), so insurance will pay; GAD - 01/17/13,

1820  01/24/14 (two separate claims for yearly exam); MD - 01/12/12, 01/17/13, 01/24/14

1821  (three separate claims); MMD - 10/16/13, came in from Defendant Keystone

1822  advertisement mailing; BLH -  06/11/14; JMR - 11/29/11, received Defendant

1823  Keystone letter about demo; RJR -11/22/11, received mailing from Defendant

1824  Keystone; and PDS - 04/14/11, came in from Defendant Keystone newspaper ad.

1825       Upon information and belief, Defendant Price knew that some of the patients

1826  she treated made the appointments only because they received a yearly reminder

1827  and/or mailing, which makes that patient's treatment ineligible for payment from

1828  FIP and knew Defendant Keystone still billed the FIP for these visits.

1829       Defendants Keystone, Fowler and Price did act and/or conspired to

1830  intentionally and knowingly fail to meet the FIP conditions of participation and

1831  knowingly falsified or failed to supervise the falsification of the certification that

1832  they had met the conditions of participation (including each claim submitted), by

1833  knowingly submitting and causing the submission and/or failing to supervise the

1834  submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

1835  therefore caused the submission of claims that were false and not eligible for

1836  reimbursement to FIP.  By causing these claims that they knew were ineligible for

97

1837   reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

1838   Fowler and Price also made, used, or caused to be made or used, false records or

1839   statements material to false or fraudulent claims. Had FIP known that these claims

1840   were only approved for coverage as a result of such false and fraudulent statements,

1841   they would not have reimbursed for those claims. Defendant Keystone accepted

1842   payment for each false claim made with these faulty conditions, paid Defendants

1843   Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

1844   payments. Because FIP paid reimbursements for the resulting false claims, the FIP

1845   incurred and continues to incur significant and material damages due to Defendants'

1846   fraudulent actions.  Upon information and belief said Defendants' fraudulent

1847   actions are continuing.

### b.  FAILURE TO SECURE REFERRALS OR CLEARANCES

1848        28 Pa Code § 25.212 provides: (a)  Whenever a medical examination is

1849   performed under the Act or Federal Requirements, before fitting and selling a

1850   hearing aid the registrant shall ensure that a medical recommendation has been

1851   signed by the examining physician, within 180 days *before the sale*, on a form

1852   which includes the following statement or its equivalent:

1853

1854

1855

1856

1857

1858

1859

1860

1861

> I have medically evaluated the hearing ability of
>
> ——————
>
> (Patient's Name)
>
> and a hearing aid may be beneficial to this person.
>
> ——————
>
> (Signature of Physician)

1862      Medicare pays for audiological diagnostic tests under the benefit of "other

1863 diagnostic tests." The test may be order by a primary physician for any beneficiary

1864 when there is suspicion of impairment of the auditory systems. *CMS Manual System*

1865 *Pub*. 100-02 Medicare Benefit Policy #5717 (2008).

1866      To be reimbursable, audiology medical services for eligible patients

1867 ordinarily must be furnished by a physician (family doctor) or, if by a non-

1868 physician, "under [an] appropriate level of supervision by a physician." 42 C.F.R. §

1869 410.32. One limitation is that the physician 'family doctor' must order the service;

1870 diagnostic audiology services performed by an audiologist without a primary

1871 physician order are not covered. *Medicare Benefit Policy Manual, Pub. 100-02 at*

1872 *ch. 15 § 80.3(B).*

1873       Medicare does, however, cover diagnostic audiology services "personally

1874   furnished by a qualified audiologist" even without primary physician supervision—

1875   albeit with some limitations. *Centers for Medicare & Medicaid Services, Medicare*

1876   *Benefit Policy Manual*, Pub. 100-02, at ch. 15, § 80.3(A); see Doc. 102 at ¶ 29; 42

1877   C.F.R. § 410.32(b)(2)(ii). One limitation is that a primary care physician must order

1878   the service; diagnostic audiology services "performed by an audiologist without a

1879   physician order … are not covered." *Medicare Benefit Policy Manual*, supra, at ch.

1880   15, § 80.3(B).

1881       An audiologist may request a referral from a primary physician on behalf of

1882   the patient only if this request is *before* the audiologist treats the patient.

1883       49 Pa. Code § 45.102 (d)(2)  *Ethical Proscriptions are as follows*:  (i) A

1884   licensee may not exploit a person in the delivery or payment for professional

1885   services, as provided for under the Act. Exploitation of services includes accepting

1886   persons for treatment or by continuing treatment when benefits cannot reasonably

1887   be expected.

1888       49 Pa. Code § 45.102(e) *Principle of Ethics III* provides (1)  A licensee shall

1889   maintain high standards of professional competence, (iii) A licensee shall identify

1890   competent, dependable referral sources for a person served.