The correct procedure for Defendant Keystone to follow should have been the following: when a new patient called Defendant Keystone to schedule a hearing test, Cheryl Henson, the secretary, should have asked them if they have seen their family doctor about their hearing problem. If they had not, she could have told them either that their FIP may not cover the test because they were not referred from their doctor or that they should contact their doctor, and get a referral for testing.

Defendant Keystone scheduled patients whether they had a referral or not because Defendant Fowler did not want the patient to be persuaded by their family physician to go elsewhere. Defendant Fowler was aware that the primary physicians may have had a different audiologist (other than Keystone) that they might want to refer their patients to. Also, a lot of primary physicians will refer patients to an ENT (ear, nose, and throat) doctor, instead of an audiologist, since the ENT doctor will rule out any options for surgery etc. that can improve some types of hearing loss. Some ENT practices also have an audiologist or hearing instrument specialist who works for them, so they may review hearing aids with the patients, and then the patient might purchase hearing aids from them and never go to Defendant Keystone's facility. If any of the above happened, Defendant Keystone would lose that patient and money.

1910    After Defendants Fowler and/or Price treated a patient, Defendant Keystone

1911    would start the billing process by entering services into 'Sycle.net' which would

1912    then populate over to the claim form.  This form includes several fields including

1913    *Rendering Provider*" which is the audiologist and *Referring Provider*" which is

1914    the family physician who referred the patient.

1915    When audiologist Defendants Fowler or Price were scheduled to see a

1916    patient, and that patient was not referred by a primary physician, the field "Referred

1917    By" would often be left blank, or the word "Other " would be chosen to be entered

1918    into this field.

1919    Defendant Keystone would instruct its secretary, Cheryl Henson, to research

1920    and then enter the patient's primary care physician and his/her NPI # number as the

1921    referring provider into Sycle.net; even though this primary physician had not

1922    referred this patient.

1923    Relator treated Patient DRA on March 5, 2008.  Cheryl Henson, Defendant

1924    Keystone's secretary, completed the top potion of the form.  The "Referred by" line

1925    is blank because this patient was not referred by their family doctor.  There was no

1926    referral listed in the patient's chart.

1927    On July 13, 2011, Defendant Fowler saw patient MHA and billed CPT 92557

1928    comprehensive audiological evaluation at $97.00 and was paid $31.79, and CPT

1929    92550 tympanogram / reflux and billed $70.00 and was paid $16.32.  Relator noted

that Sycle.net's appointment note states under referral as "other" and that patient purchased her hearing elsewhere and needed it fixed.

On August 28, 2011, Defendant Fowler saw patient CMB without the required referral for CPT 92557 comprehensive audiological exam, billed at $97.00 and paid $35.20, and CPT 99213 (code not allowed to be billed by an audiologist) an office visit which wasn't completed for $65.00. Relator checked patient's chart and noticed that there was no referral.

On June 25, 2013, Relator saw patient TB for only a hearing aid assessment (V5010) which does not require a referral. However, Defendant Keystone actually billed FIP for CPT 92557 a comprehensive audiological test at $97.00 with payment of $36.16; this required a referral. Although the patient called his doctor for a recommendation, neither Defendant Keystone nor its staff ever obtained the required official referral to Defendant Keystone's facility.

On May 29, 2014, Defendant Fowler saw patient DWA for a comprehensive hearing evaluation. On the patient's appointment summary in Sycle, it is noted that this patient was referred by "Other" and it listed the patient's wife, who was not a physician. Defendant Keystone billed FIP under code CPT 92557 for $97.00 and was reimbursed $28.86.

Defendant Keystone regularly presented fraudulent claims to FIP for services rendered by Defendants Fowler and/or Price and/or Relator. These claims were

1950    fraudulent because these patients were not referred, as required, for diagnostic

1951    testing. But for the fraudulent listing of the family doctor's NPI #, Medicare and

1952    other FIP would not have reimbursed Defendant Keystone for the services.

1953        Defendant Keystone has falsified referral authorization requests in order to

1954    obtain reimbursement. In some instances, Defendant Keystone has induced office

1955    staff, including but not limited to Relator, to request a referral from the family

1956    doctor *after* the patient was seen. This was done so that it would appear as if

1957    Defendant Keystone had a legitimate referral *before* it saw a patient. Defendant

1958    Fowler would often see a patient; bill the FIP and later direct Relator or the

1959    secretary to call the primary physician and ask the doctor to backdate the referral;

1960    days, weeks or months after the patient was treated. Several doctors agreed to

1961    fraudulently backdate the referral in violation of FIP rules. On other occasions,

1962    Defendant Keystone would change the date of service to a later date to be in

1963    compliance with the date of referral.

1964        On several occasions Relator discussed with Defendant Fowler her

1965    reservation about submitting claims that were not actually referred by the patient's

1966    primary physician in order to obtain FIP reimbursements; he responded by entering

1967    the referral information himself into the electronic billing system as well as

1968    submitting the claims for patients either he or Defendant Price treated.

1969     Defendant Keystone, has, on the referral requests, fabricated the reasons to

1970     the patient's family doctor as to why that patient required Defendant Keystone's

1971     particular services.  In doing so, Defendant Keystone has not only made false

1972     statements material to false or fraudulent claims, making it liable under the False

1973     Claims Act, but it has also wantonly disregarded patient privacy protections under

1974     HIPAA.

1975     Defendant Fowler would perform all or part of a tympanograms/reflex test,

1976     CPT code 92550, but he would not always print out the patient's results.  Instead he

1977     would instead hand-draw a 'tymp' in the chart (normal tymps when printed out look

1978     like an upside-down "V").  There were also times when Defendant Keystone billed

1979     for these tests when they were not medically necessary.  Defendant Fowler

1980     sometimes conducted these tests, *without always getting a referral and without*

1981     *marking in the patient's chart why the test was medically necessary*, because he

1982     knew Defendant Keystone would receive reimbursement, depending on the

1983     patient's FIP.

1984     HIPAA introduced two additional bases for criminal liability that expressly

1985     prohibit the kind of "scheme," "trick," and "artifice" entailed by Defendant

1986     Keystone's falsification of prior referral and/or authorizations:

1987     Under the title "*False statements relating to health care matters*," 18 U.S.C.
1988     § 1035(a) provides penalties including up to five years of prison for a person
1989     who "in any matter involving a health benefit program, knowingly and
1990     willfully – (1) falsifies, conceals or covers up by trick, scheme or device a

material fact; or (2) makes any materially false, fictitious, or fraudulent statement or representation, or makes any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry." Similarly, under the title "*Health Care Fraud*," 18 U.S.C. § 1347 provides for penalties including up to ten years of prison for any person who "knowingly and willfully executes, or attempts to execute, a scheme or artifice – (1) to defraud any health care benefit program; or (2) to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by ...Claims billed to insurance with primary care physician used as referring physician on the claim, when they were not referred for diagnostic testing.

Many claims Defendant Keystone submitted to FIP for diagnostic testing, were actually for tests that were routine in nature, conducted during regularly scheduled follow-up appointments, when the patient wanted to pursue new hearing aids, and/or for other hearing aid related issues. No referral was obtained for these diagnostic tests; a requirement pursuant to Audiology Guidelines, as well as Medicare Guidelines. Testing always needs to be medically necessary and a referral must be obtained prior to conducting diagnostic tests. The reason for performing the test should always be documented in the patient record, but it was often not known why the Defendant Keystone patients were first seen when referring to their charts for information.

Tests can be completed without a referral. You would just have to let the patient know that they will be financially responsible for the cost of the test. Relator has information on hundreds of patients that were treated at Defendant Keystone without a referral yet still billed to FIP.

2016    Upon information and belief, Defendant Price also failed to secure referrals

2017    before testing her patients and knew or should have known some of her services

2018    were not medically necessary.

2019    Defendants Keystone, Fowler and Price did act and/or conspired to

2020    intentionally and knowingly fail to meet the FIP conditions of participation and

2021    knowingly falsified or failed to supervise the falsification of the certification that

2022    they had met the conditions of participation (including each claim submitted), by

2023    knowingly submitting and causing the submission and/or failing to supervise the

2024    submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

2025    therefore caused the submission of claims that were false and not eligible for

2026    reimbursement to FIP.  By causing these claims that it knew were ineligible for

2027    reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

2028    Fowler and Price also made, used, or caused to be made or used, false records or

2029    statements material to false or fraudulent claims. Had FIP known that these claims

2030    were only approved for coverage as a result of such false and fraudulent statements,

2031    they would not have reimbursed for those claims. Defendant Keystone accepted

2032    payment for each false claim made with these faulty conditions, paid Defendants

2033    Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

2034    payments. Because FIP paid reimbursements for the resulting false claims, the FIP

2035    incurred and continues to incur significant and material damages due to Defendants'

2036 fraudulent actions. Upon information and belief said Defendants' fraudulent

2037 actions are continuing.

### c. FAILED TO HAVE COMPLETE PATIENT CHART / RECORDS

2038    28 Pa Code § 25.214 provides the following:

2039    A registrant shall, upon the consummation of a sale of a hearing aid,
2040    keep and maintain records in the registrant's office or place of business
2041    at all times. These records shall be kept for 7 years and shall include
2042    the following: (1) Results of all testing conducted under § 25.209
2043    (relating to facilities, procedures and instrumentation). The minimum
2044    acceptable test records shall be records of: (i) Pure tone tests including
2045    air and bone conduction with masking where appropriate, and the
2046    ambient noise level of the test area. (ii) Speech reception threshold
2047    expressed in decibels of hearing level. (iii) Most comfortable level
2048    expressed in decibels. (iv) Uncomfortable (tolerance) level expressed
2049    in decibels. (v) Word discrimination test results expressed in
2050    percentage indicating the test words used, presentation level, masking
2051    level (if applicable), and signal to noise ratio (if applicable). (2) A
2052    copy of the written receipt, disclosure agreement and money back
2053    guarantee required by § 25.210 (relating to receipt, disclosure
2054    agreement and money back guarantee to purchaser—purchaser
2055    protection). (3) The written physician's recommendation required by
2056    § 25.212 (relating to medical recommendations by examining
2057    physicians) or the waiver form required by § 25.211 (relating to
2058    medical recommendations; waiver forms).

2059    Medicare requires that all audiological diagnostic tests be documented with

2060 sufficient information so that Medicare contractors may determine that the services

2061 do qualify as an audiological diagnostic test. *Center for Medicare Service* Related

2062 Change Request # 6447, p. 6 (2010).

2063    The interpretation and report shall be written in the medical record by the

2064    audiologist, physician or non-physician practitioner who personally furnished any

2065    audiology service or by the physician who supervised the services.  Technicians

2066    shall not interpret audiology services, but may record objective test results of

2067    services that may furnish under physician supervision. Payment for the

2068    interpretation and report of the services is included in payment for all audiology

2069    services. *Center for Medicare Service* Related Change Request # 6447, p. 6 (2010).

2070    49 Pa. Code § 45.101 provides:

2071    (a) A licensee shall maintain a record for each person served which
2072    accurately, legibly and completely reflects the evaluation or treatment of that
2073    person. A record shall be prepared and retained irrespective of whether
2074    treatment is actually rendered or whether a fee is charged. The record shall
2075    include, at a minimum: (1) The name and address of the person served and, if
2076    that person is a minor, the name of the parent or guardian.  (2) The date of
2077    each visit by the person served.  (3) A description of the complaint,
2078    symptoms and diagnosis of the person served.  (4) A description of the
2079    treatment or service rendered at each visit and the identity of the licensee or
2080    assistant rendering it.  (5) The date of each entry into the record bearing on
2081    evaluation or treatment and the signature of the licensee. (b) A licensee shall
2082    retain records for a person served for a minimum of 7 years from the date of
2083    the last entry. A licensee shall retain and store the records in a safe location to
2084    maintain confidentiality.  (c) A licensee shall comply with a written, dated
2085    and signed transfer of records request from a person served, or from that
2086    person's parent or guardian if the person is a minor within a reasonable
2087    period of time upon receipt of the request. A legible copy of the record shall
2088    be provided either gratuitously or at a charge which reflects the licensee's
2089    cost of duplicating and forwarding the record.  (d) A licensee's failure to
2090    comply with this section will be considered unprofessional conduct under
2091    § 45.103 (relating to unprofessional conduct) and will subject the
2092    noncomplying licensee to disciplinary action under section 5(4) of the act (63
2093    P. S. § 1705(4)).   (e) This section does not apply to licensees acting within

2094      the scope of their employment under section 6(b)(2) of the act (63 P. S.
2095      § 1706(b)(2)).

2096      49 Pa. Code § 45.102 (d) *Principles of Ethics II.* (1) A licensee shall hold

2097 paramount the welfare of persons served professionally. (iv) A licensee shall

2098 provide appropriate access to the records of a person served professionally.

2099      49 Pa. Code § 45.102(e) *Principle of Ethics III.* (1) A licensee shall

2100 maintain high standards of professional competence. (iv) A licensee shall maintain

2101 adequate records of professional services rendered.

2102      49 Pa. Code § 45.103 provides that as used in section 10(5) of the act (63 P.

2103 S. § 1710(5)), the term ''unprofessional conduct'' includes, but is not limited to, the

2104 following types of conduct: (17) Failing to comply with § 45.101 (relating to

2105 preparing, maintaining and retaining records).

2106      There were several times when Relator would be treating a patient and

2107 looked at their chart and either noticed that there were no documents, incomplete

2108 documents or incomplete treatment dates for this patient; that Defendant Fowler

2109 would not include any history of why the patient is present nor any information on

2110 if the patient was referred for this test; he would not include his clinical assessment

2111 or a recommendation; he would not include procedures executed and the diagnostic

2112 test results for each procedure; and that he would sometimes simply use that

2113    patient's previous hearing test and just mark over it any changes instead of doing all

2114    parts of the test and placing the results on a new form.

2115        When Medicare reimburses a provider for a service, that reimbursement

2116    includes the provider sending a patient's referring physician a copy of its medical

2117    interpretation notes and records.

2118        Although Defendant Keystone was reimbursed for its service it rarely

2119    provided the referring provider with its medical treatment records in part because

2120    there were no such complete records to send.

2121        Defendant Fowler would often give Relator sticky notes with information on

2122    the patient's treatment so that she could enter into Sycle.net instead of providing her

2123    with complete medical records.

2124        On August 28, 2011, Defendant Fowler allegedly saw patient CMB and

2125    billed for CPT 99213 (code audiologists are not allowed to bill) for an office visit.

2126    Defendant Fowler failed to put documentation in this patients chart detailing that he

2127    completed a comprehensive patient history; said documentation is required by FIP.

2128        On May 30, 2013, Defendant Fowler saw patient RAB for CPT 99212 (code

2129    audiologists are not allowed to use) for an office visit that he did not complete that

2130    he billed FIP $55.00 paid .94 with a patient co-pay of $40.00.  There was none of

2131    the required documentation in the patient's chart to make it eligible to be billed.

2132         On June 25, 2013, Relator saw patient TB. Defendant Keystone billed FIP

2133   for CPT 92557 a comprehensive audiological test at $97.00 with payment of

2134   $36.16, and CPT 99201 office visit (a code not allowed to be billed by an

2135   audiologist and not allowed to be conducted by Relator) at $65.00 and paid $11.78,

2136   plus Defendant Keystone also billed the patient TB, a $30.00 copay for that service

2137   that wasn't done. There was not documentation in the patient's charts that the

2138   above was completed.

2139         On July 30, 2013, Defendant Fowler treated patient DRA and billed the FIP

2140   for $152.00. This charge is broken down as $55.00 for office visit under CPT code

2141   99211 and $97.00 for a comprehensive audiological exam CPT 92557. This patient

2142   did not have the required comprehensive history notes in her chart to allow for

2143   billing of an "office visit" nor did this patient have the required notes in her chart to

2144   document that the comprehensive audiological exam was completed. Defendant

2145   Keystone's failure to have the required notes in this patient's file made it ineligible

2146   to bill the Federal Insurance Program for these services. However Defendant

2147   Keystone billed the Insurance Program for $152.00 for both services and received

2148   payment of $62.94.

2149         On May 29, 2014, Defendant Fowler saw patient DWA. The documentation

2150   in the chart shows that Defendant Keystone billed FIP for an office visit under CPT

2151   99201 (a code an audiologist is not allowed to bill under) for $65.00. Medicare

2152 denied payment based on this code. Defendant Keystone forwarded this bill to

2153 Highmark Blue Shield. Patient's chart fails to have documentation which shows a

2154 comprehensive history of the patient was taken. This lack of documentation should

2155 not have allowed Defendant Keystone to bill for an office visit.

2156      On May 19, 2010, Defendant Fowler saw patient EFA and billed FIP for

2157 $65.00, CPT 92506 (a code not allowed to be billed by an audiologist) as an

2158 evaluation of speech, language, voice or communication; lack of documentation in

2159 this patient's chart probably shows that Defendant Fowler did not conduct this

2160 exam which makes Defendant Keystone ineligible to bill the FIP for this service.

2161      Defendant Fowler would sometimes write Defendant Price's medical notes /

2162 report for her. Defendant Price also failed to have complete charts, notes and

2163 supporting documents on some of her patients to support the claims billed to FIP.

2164      Defendants Keystone, Fowler and Price did act and/or conspired to

2165 intentionally and knowingly fail to meet the FIP conditions of participation and

2166 knowingly falsified or failed to supervise the falsification of the certification that

2167 they had met the conditions of participation (including each claim submitted), by

2168 knowingly submitting and causing the submission and/or failing to supervise the

2169 submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

2170 therefore caused the submission of claims that were false and not eligible for

2171 reimbursement to FIP. By causing these claims that it knew were ineligible for

2172 reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

2173 Fowler and Price also made, used, or caused to be made or used, false records or

2174 statements material to false or fraudulent claims. Had FIP known that these claims

2175 were only approved for coverage as a result of such false and fraudulent statements,

2176 they would not have reimbursed for those claims. Defendant Keystone accepted

2177 payment for each false claim made with these faulty conditions, paid Defendants

2178 Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

2179 payments. Because FIP paid reimbursements for the resulting false claims, the FIP

2180 incurred and continues to incur significant and material damages due to Defendants'

2181 fraudulent actions. Upon information and belief said Defendants' fraudulent

2182 actions are continuing.

2183         *i.*     *Failed To Receive A Disclosure Agreement*

2184     Pennsylvania statute requires that each hearing aid customer must receive a

2185 disclosure agreement and a money back guarantee which is required by Act 153.

2186 The provider must also be required to retain copies of those documents in their

2187 records.

2188     28 Pa. Code§ 25.210 Receipt, disclosure agreement and money back

2189 guarantee to purchaser—purchaser protection provides:

2190     (a) Receipt. Upon the sale of a hearing aid, the registrant shall provide the
2191     purchaser a signed receipt. The receipt may be made out on more than one sheet

of paper and shall contain the following: (1) The date of sale. (2) The make, model and serial number or, if no serial number is applicable, an identification number of the hearing aid. (3) The address of the principal place of business of the registrant. (4) If the hearing aid is used or reconditioned, a statement which provides that information and which meets the requirements of § 25.215(23) (relating to denial, revocation or suspension of registrant's certificate). (5) The registrant's registration certificate number. (6) The terms of any guarantee or express warranty made to the purchaser with respect to the hearing aid. (7) A copy of the written forms as required by § 25.211 (relating to medical recommendations; waiver forms). (8) A statement on or attached to the receipt, in no smaller than 10 point type, as follows: ''The purchaser has been advised at the outset of his relationship with the hearing aid dealer that any examination or representation made by a registered hearing aid dealer and fitter in connection with the practice of fitting and selling of this hearing aid, is not an examination, diagnosis or prescription by a person licensed to practice medicine in this Commonwealth and therefore must not be regarded as medical opinion.'' (9) A statement on the face of the receipt, in no smaller than 10 point bold type, as follows: ''If your rights are violated, you may contact the State Bureau of Consumer Protection, the Pennsylvania Department of Health in Harrisburg, or your local district attorney.'' (b) Disclosure agreement and money back written guarantee. Before the provision of any service incidental to or connected with the potential sale of a hearing aid, the registrant shall provide a disclosure agreement and money back written guarantee to the prospective hearing aid user or authorized representative, and shall explain it in detail in accordance with subsection (c). This shall be in 10 point type or larger, and may be made out on more than one sheet of paper, but shall employ the following format or be on a form approved by the Department:

29 Pa. Code § 25.213 *Consumer Review* provides:

(a) Before signing a waiver form under § 25.211 (relating to medical recommendations; waiver forms) and before the sale of a hearing aid to or for the use of a prospective hearing aid user, the registrant shall: (1) Provide the prospective hearing aid user or authorized representative with a copy of the User Instructional Brochure for the hearing aid that has been or may be selected for the prospective user. (2) Review the content of the User Instructional Brochure with the prospective hearing aid user or authorized representative orally or in the predominant method of communication used during the sale. (3) Give the prospective hearing aid user or authorized representative an opportunity to read the User Instructional Brochure. (b) If goods or services having a sale price of

2230 $25 or more are sold or contracted to be sold to a purchaser as a result of or in
2231 connection with a contact with or call on the purchaser at the purchaser's
2232 residence, the purchaser may avoid the contract or sale by notifying the
2233 registrant of that decision, in writing, within 3 full business days following the
2234 day on which the contract or sale was made and by returning or holding
2235 available for return to the registrant, in its original condition, any merchandise
2236 received under the contract or sale. The notice of rescission is effective when
2237 deposited in the United States mail or when service is made in another manner
2238 which gives the registrant notice of rescission. These and additional provisions
2239 relating to the sale of goods in the purchaser's home, including specific items
2240 which shall be included on the purchase receipt, are made a part of this section
2241 by incorporation of section 7 of the Unfair Trade Practices and Consumer
2242 Protection Law (73 P. S. § 201-7).
2243
2244　　　Hearing Aid Disclosure Forms were often not signed in Defendant

2245 Keystone's patients' charts; a requirement pursuant to the Department of Health,

2246 Hearing Aid Program, for all professionals who dispense hearing aids. Copies of the

2247 Disclosure are also to be given to the patient, which was not done, simply because

2248 the Disclosure was not signed in the first place. There were many of Defendant

2249 Fowler's patient charts, where the Disclosure Form was missing or left blank.

2250 There were also occasions where Defendant Fowler would mail the Disclosure

2251 Form, with a copy, to the patient, requesting they sign it and mail it back in the

2252 prepaid envelope which was *after* the patient had received service.

2253　　　　Defendant Fowler would often not have a patient sign a disclosure agreement

2254 including but not limited to the following patients: CFB - 04/07/11; RMB -

2255 08/22/13; EGF - 05/04/12 or 05/18/12 (sale date and fit date); CWH - 09/08/11;

2256 BJL - 05/18/12; and WHM - 05/24/12 (disclosure not signed, but date that clearance

116

2257 was received (06/12/12), is entered on the disclosure, which was after his actual
2258 fitting date).

2259 Upon information and belief, Defendant Price also failed to have her patients
2260 sign a Disclosure Agreement and knew or should have known that Defendant
2261 Keystone was billing the FIP as if she had done so.

2262 Defendants Keystone, Fowler and Price did act and/or conspired to
2263 intentionally and knowingly fail to meet the FIP conditions of participation and
2264 knowingly falsified or failed to supervise the falsification of the certification that
2265 they had met the conditions of participation (including each claim submitted), by
2266 knowingly submitting and causing the submission and/or failing to supervise the
2267 submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price
2268 therefore caused the submission of claims that were false and not eligible for
2269 reimbursement to FIP. By causing these claims that it knew were ineligible for
2270 reimbursement to be submitted to and paid for by FIP, Defendants Keystone,
2271 Fowler and Price also made, used, or caused to be made or used, false records or
2272 statements material to false or fraudulent claims. Had FIP known that these claims
2273 were only approved for coverage as a result of such false and fraudulent statements,
2274 they would not have reimbursed for those claims. Defendant Keystone accepted
2275 payment for each false claim made with these faulty conditions, paid Defendants
2276 Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

2277 payments. Because FIP paid reimbursements for the resulting false claims, the FIP

2278 incurred and continues to incur significant and material damages due to Defendants'

2279 fraudulent actions.  Upon information and belief said Defendants' fraudulent

2280 actions are continuing.

ii.     *Failed To Secure Medical Waiver Signatures*

2281        The medical waiver is a form required by the Department of Health to be

2282 signed by the patient prior to the sale of hearing aids, if the patient has not been

2283 seen by a primary physician or ENT doctor, prior to buy the hearing aids.  This

2284 waiver provides that "it would be in your best interest to see your physician or an

2285 ENT doctor prior to wearing hearing aids, to be sure there isn't any medical reason

2286 that you shouldn't wear hearing aids."  28 Pa. Code § 25.211.  *Medical*

2287 *recommendations*; waiver forms provides the following:

2288        (a) Except when selling a replacement of a worn out or damaged
2289            hearing aid, when selling a hearing aid for the use of a prospective
2290            hearing aid user who is 19 years of age or older, a registrant shall
2291            either obtain for the prospective user a medical recommendation
2292            that complies with §  25.212 (relating to medical
2293            recommendations by examining physicians), or ensure that the
2294            prospective user or authorized representative signs a waiver form
2295            as provided under section 403 of the act (35 P. S. §  6700-403).
2296            The waiver form shall be prepared and used as follows:  (1) The
2297            waiver form shall be in 10 point type or larger.  (2)  The waiver
2298            shall be read to the prospective hearing aid user or authorized
2299            representative and explained in a manners that the individual is
2300            not encouraged to waive a medical examination and so that the
2301            individual will be thoroughly aware that signing the waiver will
2302            not be in the prospective hearing aid user's best interest.   (3) The
2303            waiver form shall read as follows:

2304 | I have been advised that my best interests would be served if I had a
2305 | medical examination by an otologist or otolaryngologist or any
2306 | licensed physician before my purchase of a hearing aid.

2307 | (Registrant's Name) has fully and clearly informed me of the value of
2308 | such medical examination. After such explanation, I voluntarily sign
2309 | this waiver. I choose not to seek a medical examination before the
2310 | purchase of the hearing aid.

2311    Defendant Keystone would place a Waiver Form on the bottom of its

2312 Disclosure Statement. Defendant Keystone by and through Defendants Fowler and

2313 Price rarely had patients sign said Waiver and/or the Medical Clearance was not

2314 obtained, including but not limited to the following: CFB- 04/07/11, date on

2315 clearance : 04/12/11; ACG - 05/20/14, date on clearance: 06/06/14; CWH -

2316 09/01/11, date on clearance : 10/03/11; WHM - 05/29/12, date on clearance:

2317 06/12/12; and NLT - 05/27/14, date on clearance: 06/30/14.

2318    Upon information and belief, Defendant Price also failed to get patients to

2319 sign medical waivers and knew or should have known that it was required.

2320    Defendants Keystone, Fowler and Price did act and/or conspired to

2321 intentionally and knowingly fail to meet the FIP conditions of participation and

2322 knowingly falsified or failed to supervise the falsification of the certification that

2323 they had met the conditions of participation (including each claim submitted), by

2324 knowingly submitting and causing the submission and/or failing to supervise the

2325 submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

2326 therefore caused the submission of claims that were false and not eligible for

2327 reimbursement to FIP. By causing these claims that it knew were ineligible for

2328 reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

2329 Fowler and Price also made, used, or caused to be made or used, false records or

2330 statements material to false or fraudulent claims. Had FIP known that these claims

2331 were only approved for coverage as a result of such false and fraudulent statements,

2332 they would not have reimbursed for those claims. Defendant Keystone accepted

2333 payment for each false claim made with these faulty conditions, paid Defendants

2334 Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

2335 payments. Because FIP paid reimbursements for the resulting false claims, the FIP

2336 incurred and continues to incur significant and material damages due to Defendants'

2337 fraudulent actions. Upon information and belief said Defendants' fraudulent

2338 actions are continuing.

### 5. Services Performed By An Unqualified Employee

2339      28 Pa Code § 25.216 (6) provides that an provider may not employee a

2340 person to perform a function within the scope of the practice of hearing aid fitter

2341 who is not authorized by law to perform the function. The individuals who furnish

2342 audiology services in all settings must be qualified to furnish those services. The

2343 qualifications of the individual performing the services must be consistent with the

number, type, and complexity of the tests, the abilities of the individual and the patients' ability to interact to produce valid and reliable results. The Audiologist who supervises and bills for the service is responsible for assuring the qualification of the technician, if applicable and appropriate for the test.

FIP will not pay for an audiological test under its guidelines if the test was performed by a technician, even if under the direct supervision of a physician, if the test requires professional skills.

49 Pa. Code §45.102 (e)(2) *Ethical Proscriptions* are as follows:

(i) A licensee may not provide services or supervision which the licensee is not qualified to perform under the act, nor may the licensee permit services to be provided by a staff person who is not qualified pursuant to the requirements of the act. (ii) A licensee may not delegate to an unlicensed person any service requiring the professional competence of a licensed individual. (iii) A licensee may not offer clinical services by assistants, students or trainees for whom he does not provide appropriate supervision and assume full responsibility. (iv) A licensee may not require or suggest that anyone under his supervision engage in a practice that is a violation of this Code of Ethics.

49 Pa. Code § 45.103 provides the following: As used in section 10(5) of the act (63 P.S. § 1710(5)), the term ''unprofessional conduct'' includes, but is not limited to, the following types of conduct: (4) Delegating to a person duties that the … audiologist … knows, or has reason to know, the person is not competent or authorized to perform.

### a. RELATOR INSTRUCTED TO CONDUCT EXAMS

2368    The only test that Relator was legally allowed to perform for Defendant

2369    Keystone to be eligible for FIP reimbursement is an Assessment for Hearing Aid

2370    (V5010). Defendant Fowler knew that Relator was not qualified to perform CDL

2371    tests (Commercial Driver's License for truck drivers) or OSHA tests yet he would

2372    allow these tests to be scheduled as "hearing tests" on Relator's schedule. The

2373    paperwork for these tests clearly stated that the testing needed to be completed by

2374    an audiologist.

2375    Defendant Keystone by and through Defendant Fowler often instructed

2376    Relator to see patients in its locations and perform tests on them unsupervised; said

2377    tests of which she was not legally licensed or qualified to be able to do.

2378    Although a Hearing Aid Assessment performed by Relator would have been

2379    eligible for reimbursement, Defendant Keystone never credentialed Relator with the

2380    FIP as a provider.

2381    Defendant Keystone, by and through direction by Defendant Fowler

2382    submitted claims, under Defendant Fowler's NPI # number, for reimbursement to

2383    FIP for eligible and ineligible services Relator performed. Defendant Keystone, by

2384    and through Defendant Fowler, knew these services were ineligible for

2385    reimbursement and/or that it was not able to bill for her services under Defendant

2386    Fowler's NPI #.

2387 On July 9, 2012, Patient WA was seen by Relator unsupervised. Defendant

2388 Keystone billed for the below services and or products under Defendant Fowler's

2389 NPI # number because Defendant Keystone failed to register Relator with the FIPs.

2390 Defendant Keystone billed FIP the quoted bundled price of $4,200.00 and was paid

2391 $1000.00 for a hearing aid services V5257 LT-RT, then it unbundled the price and

2392 also billed for CPT 92595 electroacoustic evaluation for hearing aid for $60.00,

2393 CPT 92626 for evaluation of auditory rehabilitation status at $65.00 was paid

2394 $40.00, V5160 dispensing fee $450.00, and CPT 92593 hearing aid check for

2395 $40.00. On June 29, 2012 billed V5010 assessment for hearing aid at $90.00, and

2396 CPT 92591 hearing aid examination and selection at $90.00.

2397 On June 25, 2013, Relator saw patient TB for only a hearing aid assessment

2398 (V5010) however Defendant Keystone billed FIP for CPT 92557 a comprehensive

2399 audiological test at $97.00 with payment of $36.16, CPT 99201 office visit (a code

2400 not allowed to be billed by an audiologist and wasn't conducted by Relator) at

2401 $65.00 and paid $11.78, plus Defendant Keystone also billed the patient TB a

2402 $30.00 copay for that service that wasn't done. Defendant Keystone also billed

2403 V5261 a binaural BTE hearing aids at $4,200.00 and was paid $1,000.00.

2404 Defendant Keystone billed all the above services / products under Defendant

2405 Fowler's NPI number because Relator was not a registered / credential provider.

2406    Defendants Keystone and Fowler did act and/or conspired to intentionally

2407    and knowingly fail to meet the FIP conditions of participation and knowingly

2408    falsified or failed to supervise the falsification of the certification that they had met

2409    the conditions of participation (including each claim submitted), by knowingly

2410    submitting and causing the submission and/or failing to supervise the submission of

2411    false and fraudulent claims, Defendants Keystone, Fowler, and Price therefore

2412    caused the submission of claims that were false and not eligible for reimbursement

2413    to FIP.  By causing these claims that it knew were ineligible for reimbursement to

2414    be submitted to and paid for by FIP, Defendants Keystone, Fowler and Price also

2415    made, used, or caused to be made or used, false records or statements material to

2416    false or fraudulent claims. Had FIP known that these claims were only approved for

2417    coverage as a result of such false and fraudulent statements, they would not have

2418    reimbursed for those claims. Defendant Keystone accepted payment for each false

2419    claim made with these faulty conditions, paid Defendants Fowler and Price, and it

2420    failed to reimburse the FIP for these illegal / ineligible payments. Because FIP paid

2421    reimbursements for the resulting false claims, the FIP incurred and continues to

2422    incur significant and material damages due to Defendants' fraudulent actions.

2423    Upon information and belief said Defendants' fraudulent actions are continuing.

## *b. SECRETARY HENSON WAS INELIGIBLE TO TREAT PATIENTS*

2424   Cheryl Henson, Defendant Keystone's secretary in the Hanover office, often

2425 provided services for patients that were often charged to the patient when

2426 completed. The PA Hearing Aid Regulations state that these services cannot be

2427 provided by non-qualified individuals. A person has to be a licensed fitter or an

2428 apprentice fitter to work with hearing aids. These services are normally

2429 documented in the patient chart notes, in Ms. Henson's handwriting, but not usually

2430 initialed or signed. This occurred frequently in the Hanover office when "walk-in"

2431 patients presented with a problem. Ms. Henson would provide services such as

2432 cleaning the aids, replacing the ear-mold tubing, replacing slim tubes and tips,

2433 replacing receivers, replacing mic covers/filters, and used the suction machine to

2434 remove wax that was occluded in the hearing aids.

2435   The services listed above that Ms. Henson provided when the patient had

2436 initially bought the hearing aid were sometimes paid by a FIP under Defendant

2437 Fowler's NPI #. Defendant Keystone knew that in order to receive reimbursement

2438 that only licensed staff could perform those services. Patients who were provided

2439 services by Ms. Henson include, but not limited to the following: JPB- tube change;

2440 FJD- 10/04/12 receiver changed, 01/29/14 cleaned aid and new retention wire;

2441 CFB- 09/21/10 changed tip, 11/30/10 changed tube and tip; WHM- 09/07/10 re-

2442 glued tube to mold; and MLT- 06/11/14 tube change.

2443    Defendants Keystone and Fowler did act and/or conspired to intentionally

2444 and knowingly fail to meet the FIP conditions of participation and knowingly

2445 falsified or failed to supervise the falsification of the certification that they had met

2446 the conditions of participation (including each claim submitted), by knowingly

2447 submitting and causing the submission and/or failing to supervise the submission of

2448 false and fraudulent claims, Defendants Keystone, Fowler, and Price therefore

2449 caused the submission of claims that were false and not eligible for reimbursement

2450 to FIP.  By causing these claims that it knew were ineligible for reimbursement to

2451 be submitted to and paid for by FIP, said Defendants also made, used, or caused to

2452 be made or used, false records or statements material to false or fraudulent claims.

2453 Had FIP known that these claims were only approved for coverage as a result of

2454 such false and fraudulent statements, they would not have reimbursed for those

2455 claims. Defendant Keystone accepted payment for each false claim made with these

2456 faulty conditions and it failed to reimburse the FIP for these illegal / ineligible

2457 payments.  Because FIP paid reimbursements for the resulting false claims, the FIP

2458 incurred and continues to incur significant and material damages due to Defendants'

2459 fraudulent actions.  Upon information and belief said Defendants' fraudulent

2460 actions are continuing.

### 6. **Billing For Services That Were Performed By Employees Who Were Never Credentialed For Participation In The FIP**

2461    Defendant Keystone employed two audiologists; himself and Defendant

2462    Price, as well as a licensed hearing aid fitter; Relator. Each could have been

2463    eligible to bill FIP for services they provided; however, only Defendant Fowler was

2464    a registered FIP provider.

2465    Defendant Price and Relator should have enrolled in Medicare as a group

2466    member because they provided healthcare only as the employee of Defendant

2467    Keystone. As a group member they would have reassigned all their benefits to

2468    Defendant Keystone; however Defendant never registered Defendant Keystone as a

2469    group.

2470    From 2011, through in or around September of 2014, although Defendant

2471    Price had her own NPI # number, she had not enrolled as a Medicare or as any other

2472    FIP provider, under Defendant Keystone, despite Medical Regulations stating that

2473    audiologists must be enrolled and use their NPI # on claims for services they render

2474    in an office setting on or after October 1, 2008. *Centers for Medicare & Medicaid*

2475    *Services, Medicare Claims Processing Manual, Pub. 100-04*, at ch. 12 sections 30-3

2476    (A)(2).

2477    Between on or around July 1, 2014 through on or around August 1, 2014,

2478    Defendant Fowler went on a month long vacation, during that time all patients were

2479      seen by Defendant Price or Relator. Relator would then be required and directed,

2480      by Defendant Fowler, to bill the FIP for these patients' treatment under Defendant

2481      Fowler's NPI # number.

2482      In or around September of 2014, Defendant Fowler told Relator to stop

2483      billing FIP for any of Defendant Price's patients until Defendant Keystone registers

2484      her as a FIP provider.

2485      49 Pa. Code § 45.203 provides the following:

2486      (a) A business entity may provide services which require licensure, if the
2487      following conditions are met: (3) The business entity provides the Board
2488      with a list of the licensees employed by the entity. The list shall be updated
2489      upon changes in licensed personnel. (b) A licensee may practice as an
2490      employee of a business entity which has met the conditions in subsection (a).
2491      The Board will not issue nor renew the license of an individual engaging in
2492      the practice of a licensed activity through a business entity which does not
2493      have a certification on file.

2494      It is not known if Defendant Keystone by and through Defendant Fowler

2495      provided any FIP or any Government Agency with the name of its employee,

2496      Defendant Price, who was a licensed audiologist. This would make it appear to the

2497      FIP as if Defendant Fowler was the only audiologist in the Defendant Keystone's

2498      practice.

2499    It is not known if Defendant Price registered under her medical license as

2500    working for Defendant Keystone. (Defendant Price failed to register with Medicare

2501    and most other FIP)

2502    Defendant Keystone by and through Defendants Fowler and Price knew that

2503    Defendant Price was not a federal insurance credentialed provider yet they allowed

2504    Defendant Price to treat patients and bill the FIP under Defendant Fowler's NPI #

2505    number.

2506    Defendant Fowler would require Relator to change Defendant Price's NPI #

2507    to Defendant Fowler's NPI # when billing the FIP for Defendant Price's services.

2508    When Relator questioned Defendant Fowler about billing services rendered by

2509    Defendant Price under his NPI # number, Defendant Fowler began entering his

2510    NPI# himself as well as submitting claims in through the electronic billing system.

2511    Defendant Keystone submitted claims to the FIP for patients using the wrong

2512    NPI # entered in the "rendering provider" field on the claim. All claims that were

2513    billed to FIP from Defendant Keystone had Defendant Fowler's NPI # as the

2514    rendering provider, no matter who saw the patient. When claims were created in

2515    Sycle.net, the rendering provider could be changed prior to submitting the claim,

2516    which is how it was implemented to be done, pursuant Defendant Fowler.

2517     Patients seen by *Relator* which were billed by Defendant Keystone under

2518     Defendant Fowler's NPI # number include but are not limited to the following:

2519     RCBL- 05/27/10; DLP - 07/07/10; SAP- 07/15/10; JAH - 07/21/10; AJM -

2520     01/14/11; FBR - 02/09/11; MJL - 03/02/11; JEM - 03/16/11; PPK - 03/28/11;

2521     MSSp- 05/23/11; WJK - 06/06/11 and 09/19/11 (two separate claims); BAE -

2522     07/29/11, 08/19/11; DJS - 08/22/11; RM - 09/07/11; AJS - 09/07/11; RuL -

2523     10/05/11; CHC - 11/09/11, 11/15/11; RH - 12/16/11; DJM - 01/04/12, 01/09/12;

2524     BM - 02/01/12; MEL - 03/02/12, 03/12/12; BDW - 03/28/12, 04/02/12; RGLe -

2525     04/18/12; CWM - 04/18/12; KPK - 05/24/12, 05/25/12; EA - 06/29/12, 07/09/12;

2526     WA - 06/29/12, 07/09/12; DMS - 07/25/12, 08/06/12; JWB - 09/24/12, 10/3/12,

2527     10/24/12; DL - 09/28/12; JS - 10/03/12; RL - 12/03/12, 12/17/12; MGH - 01/09/13;

2528     LL - 02/27/13; WGH - 03/18/13, 03/25/13, 04/02/13; NJM - 05/23/13; TB -

2529     06/25/13; ALB - 08/28/13; CEB - 11/04/13; and WTE - 11/04/13, 11/06/13.

2530     Patients seen by *Defendant Price* which were billed by Defendant Keystone

2531     under Defendant Fowler's NPI number include but are not limited to the following:

2532     LR - 05/16/11; WNM - 06/06/11; KM - 06/14/11; JW - 07/05/11; DD - 07/11/11;

2533     HF - 09/12/11; ESS - 11/01/11, 11/15/11; MM -11/15/11; RJR - 11/22/11; JMR -

2534     11/29/11; VF - 12/19/11; SF - 12/20/11; TL - 12/20/11; AKT - 01/30/12; CS -

2535     02/07/12; KY - 04/03/12, 04/10/12; DB - 04/23/12; RD - 05/28/12, 05/16/12,

2536     05/30/12; RTh - 07/24/12, 08/02/12; DK - 09/04/12; BK - 10/16/12; HR - 11/21/12;

2537  GWS - 12/17/12; DMM - 12/19/12, 12/26/12; JHM - 04/01/13; TM - 05/21/13,

2538  05/24/13; BRS and two brothers - 05/21/13 and 09/03/14 (two separate claims);

2539  AAK - 07/08/13; MF - 01/28/14; TEM - 02/10/14; BR - 02/10/14; HFZ - 02/11/14;

2540  REF - 02/17/14; RLK - 03/03/14; DMJ - 03/03/14; JDP - 03/17/14; BJC - 06/02/14;

2541  JHM - 06/03/14; HK - 06/25/14; RJM - 07/22/14; EAC - 08/19/14; and GAC -

2542  08/25/14.

2543  When Relator took over the insurance billing from Defendant Keystone's

2544  employee Vivian Wenerick, she reviewed Ms. Wenerick's notes in Sycle.  One note

2545  stated next to a FIP "MUST BILL UNDER TONY".   When Relator was personally

2546  trained by Ms. Wenerick, Relator's notes indicate:  "Provider: Anthony Fowler

2547  (always)."

2548  Upon information and belief, Defendant Price knew or should have known

2549  that Defendant Keystone was billing her services under Defendant Fowler's NPI #

2550  number instead of her own.

2551  Defendants Keystone, Fowler and Price did act and/or conspired to

2552  intentionally and knowingly fail to meet the FIP conditions of participation and

2553  knowingly falsified or failed to supervise the falsification of the certification that

2554  they had met the conditions of participation (including each claim submitted), by

2555  knowingly submitting and causing the submission and/or failing to supervise the

131

2556    submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

2557    therefore caused the submission of claims that were false and not eligible for

2558    reimbursement to FIP. By causing these claims that it knew were ineligible for

2559    reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

2560    Fowler and Price also made, used, or caused to be made or used, false records or

2561    statements material to false or fraudulent claims. Had FIP known that these claims

2562    were only approved for coverage as a result of such false and fraudulent statements,

2563    they would not have reimbursed for those claims. Defendant Keystone accepted

2564    payment for each false claim made with these faulty conditions, paid Defendants

2565    Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

2566    payments. Because FIP paid reimbursements for the resulting false claims, the FIP

2567    incurred and continues to incur significant and material damages due to Defendants'

2568    fraudulent actions. Upon information and belief said Defendants' fraudulent

2569    actions are continuing.

### 7. **Billing For Unbundled Services That Were Already Billed For In A Bundled Price.**

2570    Federal Regulations prohibit unbundling for the sake of increasing

2571    reimbursement.

2572    A patient's hearing aid service can be bundled into one CPT code (one price

2573    or amount to be billed to the insurance company). Services included in the bundled

2574    price could include the hearing aid device, initial recommendation, fitting,

2575    verification, orientation, ongoing counseling, electroacoustic measures, repairs and

2576    modifications, reprogramming, and documentation, accessories, batteries, walk in

2577    office visits, auditory rehabilitation, warranties, and educational sessions.

2578        An audiologist has the option of either bundling the services initially under

2579    one price or billing the FIP for each service under its own unique code.

2580        'Unbundling' is defined as the breaking of a code into the sum of its parts to

2581    increase reimbursement. The best example is the unbundling of the vestibular code

2582    family. If you break it into pieces in an attempt to increase reimbursement, but do

2583    not document why you left out some of these other procedures, you could be

2584    unbundling. This could be flagged and considered a false claim. If you are going to

2585    only perform two to three of the four-bundle, you need to bill it out with the '-59'

2586    modifier, this way FIP knows this is distinct procedural services; documentation

2587    should support why you did not do all four pieces or why it was medically

2588    necessary to leave out a part of this testing.

2589        Relator noticed on several occasions that there were so little notes in

2590    Defendant Fowler's patient's charts that she could not substantiate if all the

2591    procedures were done in either the bundled and / or unbundled package.

2592 Defendant Keystone, by and though Defendant Fowler, would routinely
2593 instruct Relator to bill the FIP for hearing aid services at a bundled price but then
2594 also bill for the same services using un-bundled service codes.

2595 If services were billed and not paid by FIP they were written off. Patients
2596 who did not have insurance coverage would only pay the "bundled" amount quoted
2597 for the hearing aids and were not charged for any additional services.

2598 Patients were not offered a choice between a bundled price and an unbundled
2599 price; as should have been done. All hearing aid prices quoted to patients at
2600 Defendant Keystone were a bundled amount, which includes the services that were
2601 also billed.

2602 On April 16, 2013, patient BMA purchased hearing aids from Defendant
2603 Fowler. He billed the FIP a bundled price of $4,700.00 (V5261) which included the
2604 hearing aid and the follow up services. The FIP paid Defendant $2,500 for this
2605 bundle. However a few weeks later on April 30, 2013, Defendant Fowler saw the
2606 patient for a follow up visit and billed the FIP $90.00 under CPT 92593 and the FIP
2607 paid Defendant Keystone $72.00 and on May 14, 2013 treated patient again for a
2608 follow up visit and billed the FIP $90.00 under CPT 92593 and the FIP paid
2609 Defendant Keystone $72.00, and again on June 4, 2013 treated this patient as a

2610  follow up and billed the FIP $90.00 under CPT 92593 and the FIP paid Defendant

2611  Keystone $72.00.

2612       On July 9, 2012, Patient EA was seen by Relator for a hearing aid services

2613  V5257 LT-RT. Defendant Keystone billed FIP the quoted bundled price of

2614  $4,200.00 and was paid $1000.00, then it unbundled the price and also billed for

2615  CPT 92595 electroacoustic evaluation for hearing aid for $60.00, CPT 92626 for

2616  evaluation of auditory rehabilitation status at $65.00 was paid $40.00, V5160

2617  dispensing fee $450.00, and CPT 92593 hearing aid check for $40.00. On June 29,

2618  2012 billed V5010 assessment for hearing aid at $90.00, and CPT 92591 hearing

2619  aid examination and selection at $90.00.

2620       On July 9, 2012, Patient WA was seen by Relator for a hearing aid services

2621  V5257 LT-RT. Defendant Keystone billed FIP the quoted bundled price of

2622  $4,200.00 and was paid $1000.00, then it unbundled the price and also billed for

2623  CPT 92595 electroacoustic evaluation for hearing aid for $60.00, CPT 92626 for

2624  evaluation of auditory rehabilitation status at $65.00 was paid $40.00, V5160

2625  dispensing fee $450.00, and CPT 92593 hearing aid check for $40.00. On June 29,

2626  2012 billed V5010 assessment for hearing aid at $90.00, and CPT 92591 hearing

2627  aid examination and selection at $90.00.

2628    Upon information and belief, Defendant Price knew or should have known

2629    that even though she quoted a bundled price to her patients, Defendant Keystone

2630    was billing the FIP the bundled and the unbundled price for the same services.

2631    Defendants Keystone, Fowler and Price did act and/or conspired to

2632    intentionally and knowingly fail to meet the FIP conditions of participation and

2633    knowingly falsified or failed to supervise the falsification of the certification that

2634    they had met the conditions of participation (including each claim submitted), by

2635    knowingly submitting and causing the submission and/or failing to supervise the

2636    submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

2637    therefore caused the submission of claims that were false and not eligible for

2638    reimbursement to FIP.  By causing these claims that it knew were ineligible for

2639    reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

2640    Fowler and Price also made, used, or caused to be made or used, false records or

2641    statements material to false or fraudulent claims. Had FIP known that these claims

2642    were only approved for coverage as a result of such false and fraudulent statements,

2643    they would not have reimbursed for those claims. Defendant Keystone accepted

2644    payment for each false claim made with these faulty conditions, paid Defendants

2645    Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

2646    payments. Because FIP paid reimbursements for the resulting false claims, the FIP

2647    incurred and continues to incur significant and material damages due to Defendants'

2648 fraudulent actions. Upon information and belief said Defendants' fraudulent

2649 actions are continuing.

## H. SLIDING SCALE PRICES

2650    Audiologist Board of Ethics stated that it is a violation of ethics to provide

2651 professional courtesies or complimentary care for referrals or otherwise discounting

2652 care not based on documented need.

2653 *www.asha.org/Practices/ethics/Representation-of-Services/*

2654    A sliding fee scale may be used when the person served meets specific

2655 guidelines that are similarly available for all qualifies individuals within a practice.

2656 If a patient was below the poverty threshold Defendant Keystone was required to

2657 secure a statement to show that it gave this patient a waiver as to cost and/or co-pay.

2658    Defendant Keystone by and through Defendant Fowler would discount

2659 product and service prices to patients if they were referred by another physician in

2660 the building.

2661    Defendant Keystone had a "sliding scale" for hearing aid prices. Certain

2662 patients were given discounts varying between $200.00 to over $2000.00 at times,

2663 for no needed documented reason.

2664    There was a set price for all hearing aids, which was required to be

2665 implemented by employees at Defendant Keystone, but this did not apply when

2666 Defendant Fowler saw patients. Only when Defendant Keystone newspaper ads

2667 offered a $500.00 discount off of a set of aids, could Defendant Keystone

2668 employees discount them.

2669     When the price was an issue for patients, other employees who sold hearing

2670 aids, were required to fit the patient with a lower level of technology/less expensive

2671 hearing aid, and could not offer these huge discounts. When patients were referred

2672 to Defendant Keystone, from a patient who was previously sold aids at a discounted

2673 price, then those patients would often be given the same discount, due to conflicts

2674 with "varied prices" quoted for the same product.

2675     The following patients were given varied discounts from Defendant Fowler,

2676 without documented need including but not limited to the following: CFB -

2677 04/07/11, $400.00 discount; RMB - 08/13/13, $600.00 discount; AJB - 08/10/11,

2678 $300.00 discount; EB - 01/31/12, $800.00 discount; MFB - 04/02/12, $600.00

2679 discount; MC - 06/10/14, $700.00 discount; RC - 06/12/12, $400.00 discount; JD -

2680 12/03/13, $1100.00 discount; HH - 10/16/12 or 10/17/12, $800.00 discount; BSH -

2681 01/17/12, $300.00 discount; KMM - 02/02/12 or 02/15/12, $800.00 discount; DBM

2682 - 06/28/12, $300.00 discount; PWP - 12/07/11, $2800.00 discount; JR - 04/05/12,

2683 $600.00 discount; MSR - 09/19/12, $1200.00 discount; CDR - 09/25/13, $600.00

2684 discount; KNS - 02/27/12, $300.00 discount; TBS - 04/03/14, $1200.00 discount;

2685 and JW - 06/28/12, $1200.00 discount.

2686         Defendants Keystone and Fowler did act and/or conspired to intentionally

2687 and knowingly fail to meet the FIP conditions of participation and knowingly

2688 falsified or failed to supervise the falsification of the certification that they had met

2689 the conditions of participation (including each claim submitted), by knowingly

2690 submitting and causing the submission and/or failing to supervise the submission of

2691 false and fraudulent claims, said Defendants therefore caused the submission of

2692 claims that were false and not eligible for reimbursement to FIP. By causing these

2693 claims that it knew were ineligible for reimbursement to be submitted to and paid

2694 for by FIP, said Defendants also made, used, or caused to be made or used, false

2695 records or statements material to false or fraudulent claims. Had FIP known that

2696 these claims were only approved for coverage as a result of such false and

2697 fraudulent statements, they would not have reimbursed for those claims. Defendant

2698 Keystone accepted payment for each false claim made with these faulty conditions,

2699 paid said Defendants and it failed to reimburse the FIP for these illegal / ineligible

2700 payments. Because FIP paid reimbursements for the resulting false claims, the FIP

2701 incurred and continues to incur significant and material damages due to Defendants'

2702 fraudulent actions. Upon information and belief said Defendants' fraudulent

2703 actions are continuing.

## I. WAIVING CO-PAYS

2704         Because of the significant economic burden imposed on Government

2705   Programs, waiver of patient cost-sharing obligations has been prohibited. The Anti-

2706   Kickback Act, 42 U.S.C. § 1320a-7b(b), makes it illegal to offer, pay, solicit or

2707   receive anything of value as an inducement to generate business payable by

2708   Medicare or Medicaid. When providers, practitioners, or suppliers routinely waive

2709   cost-sharing obligations for Government Program beneficiaries, they may be

2710   unlawfully inducing those beneficiaries to purchase their services. An exception

2711   exists that allows occasional waivers for patients in financial hardship; however,

2712   this exception is inapplicable to Defendant Keystone by and through Defendant

2713   Fowler's systematic and indiscriminate granting of waivers.

2714         The Office of Inspector General, U.S. Department of Health & Human

2715   Services ("HHS-OIG") has long expressed concern that providers who routinely

2716   waive Medicare copayments or deductibles for reasons unrelated to individualized,

2717   good-faith assessments of financial hardship may be held liable under the Anti-

2718   Kickback Act. *See, e.g., Special Fraud Alert*, 59 Fed. Reg. § 65, 374 (Dec. 19,

2719   1994). Such waivers may constitute prohibited remuneration to induce self-referrals

2720   as well as inducements to beneficiaries. OIG's guidance counsels against routine

2721   copayment waivers such as those employed by Defendant Keystone by and through

2722   Defendant Fowler.

2723         Defendant Keystone would routinely not charge the patient and write-off

2724 copays if the patient was favored, complained about the co-pay, or if it was a small

2725 amount such as Gateway FIP's copay was only $2.00; Defendant Fowler would fail

2726 instruct his staff to collect this copay.

2727         Defendant Keystone did not have a written policy in place that established

2728 guidelines for determining a patient's indigence.

2729         Upon information and belief, Defendant Price knew that the secretary was

2730 not always collecting the required co-pay on patients she provided service to.

2731         Defendants Keystone, Fowler and Price did act and/or conspired to

2732 intentionally and knowingly fail to meet the FIP conditions of participation and

2733 knowingly falsified or failed to supervise the falsification of the certification that

2734 they had met the conditions of participation (including each claim submitted), by

2735 knowingly submitting and causing the submission and/or failing to supervise the

2736 submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

2737 therefore caused the submission of claims that were false and not eligible for

2738 reimbursement to FIP. By causing these claims that it knew were ineligible for

2739 reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

2740 Fowler and Price also made, used, or caused to be made or used, false records or

2741 statements material to false or fraudulent claims. Had FIP known that these claims

2742 were only approved for coverage as a result of such false and fraudulent statements,

2743 they would not have reimbursed for those claims. Defendant Keystone accepted

2744 payment for each false claim made with these faulty conditions, paid Defendants

2745 Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

2746 payments. Because FIP paid reimbursements for the resulting false claims, the FIP

2747 incurred and continues to incur significant and material damages due to Defendants'

2748 fraudulent actions. Upon information and belief said Defendants' fraudulent

2749 actions are continuing.

## J. DOUBLE BILLING

2750 Diagnosis code 92557 is contained within V5010. V5010 is an audiogram as

2751 you would find for '57', but V5010 goes further to include additional measures that

2752 are necessary for the assessment of hearing aid selection. They are similar but not

2753 the same and they may not be billed on the same date of service because that would

2754 be double billing for the audiogram.

2755 When 92557 and V5010 are billed on the same date, it is considered "double-

2756 billing", as code 92557 is contained in V5010. V5010 also includes MCL and UCL

2757 levels, which were not implemented to be done or documented on the audiogram.

2758 V5010 was billed based solely on known or anticipated payment from FIP;

2759 Defendant Keystone often billed the FIP 92557 and V5010 on the same date of

2760 service for a particular patient.

2761        Audiologist professional services are included in the billing of the diagnostic

2762    test and should not be payed twice. The E/M office visit code was often billed by

2763    Defendant Keystone to the FIP in addition to codes for diagnostic tests that already

2764    encompassed the office visit code; therefore, it was considered double billing.

2765        Examples of Defendant Keystone double billing the FIP for patient treatment

2766    are including but not limited to the following: BB- 08/10/11; EB - 01/31/12; JLB -

2767    08/23/10; DEB - 04/06/10; VIC - 07/26/12; LVC - 05/24/11; WC - 09/20/10,

2768    10/27/10; ENC - 02/15/11; MPD - 03/01/11; RD - 05/08/12, 05/16/12 (both dates

2769    on same claim); MMD - 10/16/13; HF - 04/15/10; BDF - 09/13/10; CG - 04/12/10;

2770    EFG - 03/23/11; RCJ - 02/03/11; DAJ - 02/15/11; KPK - 05/24/12; TCL - 06/15/10;

2771    DKL - 05/19/10; RGLa - 05/13/10; MM - 11/15/11; NEM - 08/19/10; KMM -

2772    02/02/12; BR - 02/10/14; ALR - 05/27/10; MSR - 09/19/12; RJR - 11/22/11; CJS -

2773    03/22/11; RDS - 01/17/12; FS - 07/31/12; AKT- 01/30/12; JW - 06/28/12; SDW -

2774    03/21/11; and MLW- 05/27/10.

2775        Upon info and belief, Defendant Price allowed the above codes to be

2776    fraudulently billed to the FIP.

2777        Defendants Keystone, Fowler and Price did act and/or conspired to

2778    intentionally and knowingly fail to meet the FIP conditions of participation and

2779    knowingly falsified or failed to supervise the falsification of the certification that

2780 they had met the conditions of participation (including each claim submitted), by

2781 knowingly submitting and causing the submission and/or failing to supervise the

2782 submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

2783 therefore caused the submission of claims that were false and not eligible for

2784 reimbursement to FIP.  By causing these claims that it knew were ineligible for

2785 reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

2786 Fowler and Price also made, used, or caused to be made or used, false records or

2787 statements material to false or fraudulent claims. Had FIP known that these claims

2788 were only approved for coverage as a result of such false and fraudulent statements,

2789 they would not have reimbursed for those claims. Defendant Keystone accepted

2790 payment for each false claim made with these faulty conditions, paid Defendants

2791 Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

2792 payments. Because FIP paid reimbursements for the resulting false claims, the FIP

2793 incurred and continues to incur significant and material damages due to Defendants'

2794 fraudulent actions.  Upon information and belief said Defendants' fraudulent

2795 actions are continuing.

## K. KICKBACKS / REBATES

2796         Defendant Sonova directed Defendant Phonak in all its marketing and sales

2797 incentives to customers including Defendant Keystone.

2798         Acceptance of gifts of any value by an audiologist from a company that

2799 manufacturers or supplies products that he professionally uses or recommends, may

2800 compromise, or give the appearance of compromising, the audiologist's ability to

2801 make ethical decisions, and should be avoided. A special problem is the Quid Pro

2802 Quo arrangement, which is receiving or accepting rewards in exchange for a

2803 purchase, referral, or recommendation of the product.

2804         Under section 1128A(a)(5) of the Social Security Act (the Act), enacted as

2805 part of Health Insurance Portability and Accountability Act of 1996 (HIPAA), a

2806 person who offers or transfers to a Medicare or Medicaid beneficiary any

2807 remuneration that the person knows or should know is likely to influence the

2808 beneficiary's selection of a particular provider, practitioner, or supplier of Medicare

2809 or Medicaid payable items or services may be liable for civil money penalties

2810 (CMPs) of up to $10,000 for each wrongful act.

2811         For purposes of section 1128A(a)(5) of the Act, the statute defines

2812 "remuneration" to include, without limitation, ... and transfers of items or services

2813 for free or for other than fair market value. (See section 1128A(i)(6) of the Act.)

2814 The statute and implementing regulations contain a limited number of exceptions.

2815     (See section 1128A(i)(6) of the Act; 42 CFR 1003.101.)  The Office of Inspector

2816     General (OIG) is responsible for enforcing section 1128A(a)(5) through

2817     administrative remedies.

2818         <u>First</u>, the OIG has interpreted the prohibition to permit Medicare or Medicaid
2819         providers to offer beneficiaries inexpensive gifts (other than cash or cash
2820         equivalents) or services without violating the statute. For enforcement
2821         purposes, inexpensive gifts or services are those that have a retail value of no
2822         more than $10 individually, and no more than $50 in the aggregate annually
2823         per patient. <u>Second</u>, providers may offer beneficiaries more expensive items
2824         or services that fit within one of the five statutory exceptions: waivers of
2825         cost-sharing amounts based on financial need; properly disclosed copayment
2826         differentials in health plans; incentives to promote the delivery of certain
2827         preventive care services; any practice permitted under the federal anti-
2828         kickback statute pursuant to 42 CFR § 1001.952; or waivers of hospital
2829         outpatient copayments in excess of the minimum copayment amounts.

2830

2831         There are ethical guidelines that are accepted by the Board of Directors of the

2832     Academy of Dispensing Audiologists and the American Academy of Audiologists.

2833     One such guideline is that any gifts accepted by the audiologist should primary

2834     benefit the patient should not be of substantial value.  Gifts of minimal value

2835     ($100.00 or less) related to the audiologist's work (pens, earlights, notepads, etc.)

2836     are acceptable.  Incentives or rewards based upon product purchases must not be

2837     accepted.  This would include cash, gifts, merchandise, equipment or credit towards

2838     such items.  No "strings" should be attached to any accepted gift. *Ethical Practice*

2839     *Guidelines on financial Incentives from Hearing Instrument Manufacturers,*

2840     American Academy of Audiology (1988).

2841      49 Pa. Code § 45.102 (2)(f) *Principle of Ethics IV* provides: (2) Ethical

2842      proscriptions are as follows: (iii) A licensee may not use professional or

2843      commercial affiliations in a way that would mislead persons served or limit the

2844      services available to them.

2845      49 Pa. Code§ 45.102 (2)(g) *Principle of Ethics V* provides: (1) A licensee

2846      shall maintain objectivity in all matters concerning the welfare of a person served.

2847      Accordingly, a licensee who dispenses products to a person served shall observe the

2848      following standards: (2) An ethical proscription is as follows: a licensee may not

2849      participate in activities that constitute conflicts of professional interest.

2850      In or around , Defendant Keystone began selling Defendant Phonak hearing

2851      aids exclusively at all of its locations. By doing so, Defendant Keystone received

2852      from Defendants Sonova and Phonak, free product accessories and free hearing aids

2853      and as well huge discounts off its purchases of Phonak hearing aids.

2854      Relator alleges that Defendant Keystone by and through Defendant Fowler

2855      sold Defendant Phonak products exclusively because Defendant Fowler was

2856      influenced by the incentive of cash savings.

2857      The financial inducements paid by Defendant Phonak to Defendant Fowler

2858      and paid by Defendant Fowler to Defendant Price as described herein have caused

2859      said Defendants Fowler and Price certifications of FIP compliance to be false.

2860    On March 1, 2006, Defendant Keystone offered Relator 8% commission on

2861    all hearing aid sales which increased to 10% in or about June 2006.

2862    Relator expressed to Defendant Fowler several times that she felt

2863    uncomfortable only selling one brand of hearing aids to her patients. On April 10,

2864    2014, Relator emailed Defendant Fowler and expressed concern stating "I wouldn't

2865    want any of them to think that was recommended for them was based on anything

2866    other than what would benefit them." Defendant Fowler told Relator "if patients

2867    ask for another brand try to talk them into Phonak".

2868    Defendant Keystone also paid Defendant Price commission on hearing aids

2869    that she sold.

2870    Defendants Keystone, Sonova, Phonak, Fowler, and Price were aware that

2871    compliance with the Anti-Kickback Statute and the Stark Law was a condition of

2872    payment by FIP.

2873    Defendants Sonova and Phonak knowingly caused Defendant Keystone by

2874    and through Defendant Fowler to enter into arrangements that violated the Anti-

2875    Kickback Statute and the Stark Law.

2876    Defendants Sonova and Phonak knew that Defendant Keystone by and

2877    through Defendants Fowler Price were making claims for payment to Medicare and

2878    other FIP in violation of the Anti-Kickback Statute and Stark Law.

2879        Notwithstanding the Anti-Kickback Statute and the Stark Law, it has been an

2880    integral part of Defendants Sonova and Phonak's illegal marketing strategy for

2881    them to induce Defendant Fowler to purchase hearing aids by regularly providing

2882    Defendant Keystone and Defendant Fowler with large numbers of free hearing aids

2883    and accessories in order to effectively lower the cost of the equipment.

2884        During the period of Relator's Complaint, each free hearing aid Defendant

2885    Keystone received from Defendant Phonak was generally worth between $2,000.00

2886    - $2,600.00; although Defendant Keystone would often bill the FIP a higher amount

2887    depending on known and/or anticipated reimbursement.

2888        Defendants Sonova and Phonak were aware that its kickbacks made to

2889    Defendants Keystone and Fowler were unlawful and for the purposes of carrying

2890    out their unlawful scheme (which caused false or fraudulent claims for payment for

2891    purchases of hearing aid and for medical care relating to the administration of the

2892    hearing aid to be presented to the federal government and caused the making or use

2893    of false records or statements material to those false or fraudulent claims).

2894        Said kickbacks caused Defendants Keystone, Fowler and Price to prescribe

2895    Defendants Sonova and Phonak hearing aids; Defendant Keystone's staff to fill out

2896    and submit prior authorization requests for Defendants Sonova and Phonak hearing

2897    aids; and caused patients to direct Defendant Keystone by and through Defendants

2898 Fowler and Price to sell them Phonak hearing aids; as a result of this, claims for

2899 reimbursement were submitted to FIP.

2900        Federal Insurance Programs do not cover claims for hearing aids and

2901 supporting services when there is a kickback involved in the underlying transaction

2902 — including claims that were submitted for payment of a hearing aid as a result of a

2903 kickback given to a health care professional to prescribe and/or sell that brand of

2904 hearing aid exclusively.

2905        Claims submitted to FIP where a kickback is involved in the underlying

2906 transaction are false within the meaning of the Federal False Claims Act and State

2907 analogues.

2908        In order to enroll in and bill Medicare, providers must sign CMS Form 855,

2909 which states:

> 2910 I agree to abide by the Medicare laws, regulations and program instructions
> 2911 that apply to this provider. … I understand that payment of a claim by
> 2912 Medicare is conditioned upon the claim and the underlying transaction
> 2913 complying with such laws, regulations, and program instructions (including,
> 2914 but not limited to, the Federal anti-kickback statute and the Stark law), and
> 2915 on the provider's compliance with all applicable conditions of participation in
> 2916 Medicare and program instructions (including, but not limited to, the Federal
> 2917 anti-kickback statute and the Stark law), and on the provider's compliance
> 2918 with all applicable conditions of participation in Medicare.

2919

2920        Claims that were submitted to FIP by Defendant Keystone as a result, in part

2921 or in whole, based on kickbacks provided by Defendants Sonova and Phonak were

2922 therefore false within the meaning of the Federal False Claims Act and State
2923 analogues.

2924 Defendants Sonova and Phonak kickbacks to Defendant Keystone caused the
2925 submission of claims that were false and not eligible for reimbursement to
2926 Government Programs.

2927 Defendants Sonova and Phonak offers of special pricing for unit
2928 commitments to Defendant Keystone were made knowingly and with the
2929 knowledge that this would cause the submission of false claims to Government
2930 Programs by Defendant Keystone.

2931 Government Programs paid Defendant Keystone reimbursements for those
2932 false claims, and as a result have incurred and continue to incur significant damages
2933 due to Defendants Sonova and Phonak illegal payment of kickbacks.

2934 By causing these claims that it knew were ineligible for reimbursement to be
2935 submitted to and paid for by Government Programs, Defendants also made, used, or
2936 caused to be made or used, false records or statements material to false or
2937 fraudulent claims, as described above.

2938 By giving illegal kickbacks, Defendants Sonova and Phonak causes and/or
2939 induced Defendant Keystone who sought reimbursement for hearing aids from
2940 federal government-funded health insurance and assistance programs to file false
2941 and/or fraudulent certifications, either express or implied regarding compliance

2942    with the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51 et seq., the

2943    Medicare/Medicaid Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7a & 7b(b) and the

2944    Stark Law, 42 U.S.C. § 1395NN.

2945        As of the year 2014, the Affordable Care Act requires device companies to

2946    publically report nearly all gifts or payments they make to physicians beginning in

2947    2013. The Social Security Act requires CMS to collect information from applicable

2948    manufacturers and group purchasing organizations (GPOs) in order to report

2949    information about their financial relationships with physicians and hospitals. 'Open

2950    Payments' is the federally run program that collects the information about these

2951    financial relationships and makes it available to you.

2952        Upon information and belief, Defendant Phonak has not registered its free

2953    products or discounts that it gives to Defendant Keystone.

2954        Upon information and belief, Defendant Price sold her patients hearing aids

2955    and accessories that were provided to Defendant Keystone through a fraudulent

2956    kickback scheme.

2957        All the Defendants knowingly and repeatedly made statement in order to

2958    receive money from the Federal Government, the statements were false, Defendants

2959    knew they were false, Defendant Keystone received reimbursement from FIP for

2960    these false statements, and Defendant Keystone paid Defendants Fowler and Price

2961    and did not return the money to the Federal Insurance Program.

## L. DISREGARDED SAFETY AND HYGIENIC PROTOCOL

2962    49 Pa. Code § 45.103 provides the following:  As used in section 10(5) of the

2963    act (63 P. S. § 1710(5)), the term "unprofessional conduct" includes, but is not

2964    limited to, the following types of conduct:

2965    (5)  Committing an act of gross negligence, gross malpractice or gross
2966    incompetence, or repeated acts of negligence, malpractice or
2967    incompetence. … (9)  Committing an act involving moral turpitude,
2968    dishonesty or corruption when the act directly or indirectly affects the
2969    health, welfare or safety of citizens of this Commonwealth. If the act
2970    constitutes a crime, conviction in a criminal proceeding is not a
2971    condition precedent to disciplinary action by the Board.

2972    Defendant Keystone by and through Defendant Fowler would deliberately

2973    disregard safety and hygienic protocol for patients being tested.  Defendant Fowler

2974    would repeatedly use the suctioning machine without disinfecting and/or sterilizing

2975    the machine's tips, he would fail to change the otoscope tip between patients use,

2976    fail to wipe down counters, fail to wash his hands between patients, and failed to

2977    disinfect the headphones used for testing.

2978    Because of Defendant Fowler's inaction he committed gross incompetence

2979    and/or negligence and/or malpractice all of which would have made him ineligible

2980    to perform these tests on patients therefore he would not have been eligible to

2981    submit through Defendant Keystone insurance claims for reimbursement for this

2982    test from the Federal Government.

2983    Defendants Keystone and Fowler did act and/or conspired to intentionally

2984    and knowingly fail to meet the FIP conditions of participation and/or healthcare

2985    rules and regulations and did knowingly falsified or failed to supervise the

2986    falsification of the certification that they had met the conditions of participation

2987    (including each claim submitted), by knowingly submitting and causing the

2988    submission and/or failing to supervise the submission of false and fraudulent

2989    claims, said Defendants therefore caused the submission of claims that were false

2990    and not eligible for reimbursement from Government Healthcare Programs. By

2991    causing these claims that it knew were ineligible for reimbursement to be submitted

2992    to and paid for by FIP, said Defendants also made, used, or caused to be made or

2993    used, false records or statements material to false or fraudulent claims. Had FIP

2994    known that these claims were only approved for coverage as a result of such false

2995    and fraudulent statements, they would not have reimbursed for those claims.

2996    Defendant Keystone accepted payment for each false claim made with these faulty

2997    conditions, and it did not reimburse the FIP for these illegal payments. Because FIP

2998    paid reimbursements for the resulting false claims, they incurred and continue to

2999    incur significant damages due to Defendants' fraudulent actions.  Upon information

3000    and belief said Defendants' fraudulent actions are continuing.

## M. FAILED TO SECURE BUSINESS ASSOCIATE CONTRACTS

3001    HIPAA requires that an audiologist practice that has an association with an

3002    outside vendor, that may have access to patient names, have a signed Business

3003    Associate Contract in place.

3004    Defendant Keystone failed to have Defendants Phonak and/or Sonova sign a

3005    Business Associates Contract.

3006    Upon information and belief, Defendant Keystone failed to have any of its

3007    outside vendors, including but not limited to, an ear-mold lab and/or a hearing aid

3008    lab, sign a Business Associate Contract.

3009    Defendant Keystone contracted with 'The Green Clean' that would clean

3010    Defendant Keystone's Hanover office; upon information and belief, Defendant

3011    Keystone failed to have 'The Green Clean' sign a Business Associate Contract.

3012    Defendants Keystone and Fowler did act and/or conspired to intentionally

3013    and knowingly fail to meet the FIP conditions of participation and/or healthcare

3014    rules and regulations and did knowingly falsified or failed to supervise the

3015    falsification of the certification that they had met the conditions of participation

3016    (including each claim submitted), by knowingly submitting and causing the

3017    submission and/or failing to supervise the submission of false and fraudulent

3018    claims, said Defendants therefore caused the submission of claims that were false

3019  and not eligible for reimbursement from Government Healthcare Programs. By

3020  causing these claims that it knew were ineligible for reimbursement to be submitted

3021  to and paid for by FIP, said Defendants also made, used, or caused to be made or

3022  used, false records or statements material to false or fraudulent claims. Had FIP

3023  known that these claims were only approved for coverage as a result of such false

3024  and fraudulent statements, they would not have reimbursed for those claims.

3025  Defendant Keystone accepted payment for each false claim made with these faulty

3026  conditions, and it did not reimburse the FIP for these illegal payments. Because FIP

3027  paid reimbursements for the resulting false claims, they incurred and continue to

3028  incur significant damages due to Defendants' fraudulent actions.  Upon information

3029  and belief said Defendants' fraudulent actions are continuing.

## N. FAILED TO RETURN MONEY TO FEDERAL INSURANCE PROGRAMS

3030  Audiologists are aware of the changes as a result of the Affordable Care Act

3031  (ACA) of 2010, also known as the health care reform bill. Overpayments must be

3032  returned to the Medicare contractor or Medicaid agency within 60 days after

3033  discovery, or the claim will be considered a False Claim and stiff penalties will

3034  apply.

3035  Defendant Keystone was required to reimburse the FIP for payment when

3036  hearing aids were returned to its office for credit; however, if the insurance had paid

3037    for fitting or dispensing, then that amount was not refunded, only whatever was

3038    paid towards the hearing aids (the insurance companies weren't aware that the aid

3039    cost billed was a "bundled" amount that normally included fitting and dispensing).

3040         Defendant Keystone never repaid the FIP for payments it received from

3041    submitting to the FIP numerous and varied fraudulent claims that are listed

3042    throughout this Complaint.

3043         Upon information and belief, Defendant Price never reimbursed the FIP for

3044    payments that Defendant Keystone received from the FIP on claims for services

3045    that she provided and knew were fraudulently billed to the FIP.

3046         Defendants Keystone, Fowler and Price did act and/or conspired to

3047    intentionally and knowingly fail to meet the FIP conditions of participation and

3048    knowingly falsified or failed to supervise the falsification of the certification that

3049    they had met the conditions of participation (including each claim submitted), by

3050    knowingly submitting and causing the submission and/or failing to supervise the

3051    submission of false and fraudulent claims, Defendants Keystone, Fowler, and Price

3052    therefore caused the submission of claims that were false and not eligible for

3053    reimbursement to FIP.  By causing these claims that it knew were ineligible for

3054    reimbursement to be submitted to and paid for by FIP, Defendants Keystone,

3055    Fowler and Price also made, used, or caused to be made or used, false records or

3056    statements material to false or fraudulent claims. Had FIP known that these claims

3057 were only approved for coverage as a result of such false and fraudulent statements,

3058 they would not have reimbursed for those claims. Defendant Keystone accepted

3059 payment for each false claim made with these faulty conditions, paid Defendants

3060 Fowler and Price, and it failed to reimburse the FIP for these illegal / ineligible

3061 payments. Because FIP paid reimbursements for the resulting false claims, the FIP

3062 incurred and continues to incur significant and material damages due to Defendants'

3063 fraudulent actions.  Upon information and belief said Defendants' fraudulent

3064 actions are continuing.

## O. TERMINATION

3065     Defendant has a duty under the False Claims Act, 31 U.S.C. § 3730(h), to

3066 refrain from taking retaliatory actions against employees who take lawful actions in

3067 furtherance of a False Claims Act action, including investigation for, testimony for,

3068 or assistance in an FCA action.

3069     Relator took lawful actions in furtherance of a False Claims Act action, and

3070 other related laws including but not limited to investigation for, testimony for, or

3071 assistance in an action filed under this section and, as such, engaged in protected

3072 activity under the False Claims Act and other laws.  In or around June 2014, Relator

3073 started to submit complaints, on the actions listed throughout this Complaint, with

3074 several Pennsylvania State Government Agencies; which Defendants Keystone and

3075 Fowler discovered and acted upon.

3076       In or about September 2014, Defendant terminated Relator's employment.

3077       Relator was discriminated against in the terms and conditions of his
3078 employment by Defendant, by and through its officers, agents, and employees
3079 because of lawful acts done by her in the furtherance of an action under the False
3080 Claims Act.

3081       The actions of Defendant damaged and will continue to damage Relator in
3082 violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

3083       Pursuant to 31 U.S.C. § 3730(h), Relator is entitled to litigation costs and
3084 reasonable attorneys' fees incurred in the vindication of her reputation and the
3085 pursuit of her retaliation claims.

3086       Throughout Relator's employment with Defendant Keystone, she constantly
3087 expressed her concern to her boss Defendant Fowler about all the above mentioned
3088 violations.   He always acted like he did not care that violations were occurring and
3089 stated: "If he was caught he would just pay the fine."

3090       On April 10, 2014, Relator emailed Defendant Fowler and once again
3091 expressed her concern and displeasure on how he expected her to bill insurances
3092 and enter codes depending on which insurance paid what amount for the service.
3093 Excerpts are as follows

- "I just want to be able to enjoy those busy days without the added stress of anything related to billing whatsoever."

- "… but I feel it wouldn't have to be so stressful if things were just done properly/correctly, instead of just putting in services, not knowing what will be denied and why its denied. I feel like you don't even care whether or not is done right, that if you get paid ok, and if billed incorrectly or denied for a certain reason, then fine. You don't seem to be concerned with billing correctly or for someone to take the time to know the ins and outs of billing to achieve a better payment for the services that YOU provide."

- "…I didn't offer to help with billing so that it would be an endless game of wondering who pays what …"

- "I feel like you rush through things when you are billing … double bill codes and don't remember to check dates …"

- "You know we should have some kind of disinfectant/infection control process implemented, don't you? … Yes, I am a germ freak, so it grosses me out knowing that nothing is ever wiped down each day….I don't know how you do it."

- "…when I see a patient that is normally your patient, and there are no notes whatsoever as to what issues they've been having , what adjustments you've made, nothing in notes …..it drives me crazy"
- "Ok …so it's nice that you can discount aids patients, but do you realize just how often you do it?  Do you know what you've discounted already this year? OMG ….. it's close to $10,000!!!!"

Defendant Fowler replied to Relator by email on April 10, 2014 excerpts are as follows:

- "Basically you've presented a very strong argument, yourself, for why you should not be working for me."
- "All factors mentioned in your message have been present for many years…"
- "The fact is I'm very familiar with what an Audiologist is allowed to bill for, legally."
- "You kind of answered the cleaning issue yourself with your statement about "germ freak".  It's your hang up and shouldn't impact me."
- "The fact that you took the day off today and spent the time looking up how much I discounted hearing aids is mind-boggling.  This is none of your business.  You've also spent time looking at what we've grossed

3131 over certain periods of time. …when situations have arisen where a

3132 patient comes and there is a dilemma caused by this … we've moved

3133 through it fine. Once again, a situation that causes you stress, but no

3134 one else. And it was all caused by you looking into things that are

3135 none of your business."

3136 • "… I will not be making any significant changes in the business. …I

3137 don't answer to anyone with regard to the business,,, that's why I

3138 started it. "

3139 Relator sent a reply email to Defendant Fowlers email later that night stating

3140 the following: "And if you're familiar with what is allowed to be billed, then I

3141 won't question/comment on anything different. I was again suggesting to know the

3142 "ins and outs" of billing, in case we ever get audited, which would affect all our

3143 jobs, if there's a lot of things not being done correctly."

3144 Defendant Fowler replied by email stating the following: "Audits…the sure-

3145 fire way to get audited is to bill unusual services and use modifiers in audiology."

3146 In or around September 2014, Defendant Fowler hired someone new to

3147 assume the duties of entering information into Sycle and to bill through Emdeon to

3148 the FIP.

3149    Defendant Fowler asked Relator to train this new hire on how to enter

3150    information into the system and how to bill the FIP.  Relator refused stating she did

3151    not think the current billing procedures were correct and did not want to train the

3152    new hire on false procedures.

3153    Although Relator refused to train the new hire on billing procedures,

3154    Defendant Fowler scheduled the training to proceed.  Relator felt forced to take a

3155    sick day.

3156    On or about September 24, 2014, Relator was terminated by Defendant

3157    Fowler from her position with Defendant Keystone.

# VII.  CAUSES OF ACTIONS

### COUNT ONE - 31 U.S.C. § 3729(a)(1)
**Violations of Federal False Claims Act - Presentation of False Claim**
*(1) Defendant submitted a claim to the Government;*
*(2) claim was false; and (3) the Defendant "knew" the claim was false*

3158    Relator re-alleges and incorporates by reference the allegations contained in

3159    all of the foregoing paragraphs as if fully set forth herein.

3160    This is a claim for triple damages, civil penalties, cost and attorney fees and

3161    other damages and costs this Court deems proper under the Federal False Claims

3162    Act, 31 U.S.C. §§ 3729, et seq. as amended.  By virtue of the acts described above,

3163    Defendants knowingly presented or caused to be presented to the United States

3164     Government Insurance Programs false or fraudulent claims for the payment or

3165     approval, and continues to cause to be submitted false or fraudulent claims for

3166     payment or approval, directly or indirectly, to officers, employees or agents of the

3167     United States of medical services and equipment.

3168     United States, unaware of the falsity of the claims and/or statements caused

3169     to be made by Defendants and in reliance on the accuracy thereof, paid said

3170     Defendant Keystone for claims that would otherwise not have been allowed.

3171     The amounts of the false or fraudulent claims caused by the Defendants to be

3172     submitted to the United States were material. By reason of Defendants wrongful

3173     conduct, the United States has suffered substantial losses in an amount to be proved

3174     at trial, and therefore is entitled to multiple damages under the False Claims Act.

3175     WHEREFORE, Relator on behalf of herself and on behalf of the United

3176     States of America demands and prays that judgment be entered in its favor and

3177     against each Defendant jointly and severally.

### COUNT TWO - Act, 31 U.S.C. § 3729(A)(1)(G)

**Reverse False Claims**
***(False Record to Avoid an Obligation to Refund)***

3178     Relator re-alleges and incorporates by reference the allegations contained in

3179     the foregoing paragraphs of this Complaint.

3180    This is a claim for damages and costs the Court deems proper, triple

3181    damages, civil penalties, cost and attorney fees under the Federal False Claims Act,

3182    31 U.S.C. §§ 3729, et seq. as amended.

3183    Defendants knowingly caused to be made or used false records or false

3184    statements to conceal, avoid, or decrease an obligation to pay or transmit money or

3185    property to the United States and knowingly concealed and improperly avoided or

3186    decreased an obligation to pay or transmit money or property to the Government.

3187    By virtue of the false records or false statements caused to be made by Defendants,

3188    the United States paid Defendant Keystone.  Defendant Keystone failed to

3189    reimburse the Federal Government for these payments and caused the Federal

3190    Health Care Programs to suffer material damages.

3191    WHEREFORE, Relator on behalf of herself and on behalf of the United

3192    States of America demands and prays that judgment be entered in its favor and

3193    against each Defendant jointly and severally.

### COUNT THREE - 31 U.S.C. § 3729(a)(2)
### Violations of Federal False Claims Act – Making or
### Using False Record or Statement
*(1) Defendant created a record and used the record to get the Government to pay its claim; (2) record was false; and (3) Defendant "knew" the record was false*

3194    Relator re-alleges and incorporates by reference the allegations contained in

3195    all of the foregoing paragraphs as if fully set forth herein.

3196 This is a claim for damages the Court deems proper, triple damages, civil

3197 penalties, cost and attorney fees under the Federal False Claims Act, 31 U.S.C. §§

3198 3729, et seq. as amended.

3199 By virtue of the acts described above, Defendants knowingly made or caused

3200 to be made or used false records or statements to get false or fraudulent claims for

3201 payment or approval by the United States Government Insurance Programs and

3202 continues to make, use or cause false records and statements to be made or used to

3203 get false or fraudulent claims for Defendant Keystone to be paid or approved by the

3204 United States.

3205 Plaintiff United States, unaware of the falsity of the records and/or statements

3206 caused to be made and used by Defendant Keystone and in reliance on the accuracy

3207 thereof, paid and approved and continues to pay and approve, Defendant Keystone

3208 for claims that were ineligible for reimbursement and would not have been paid or

3209 approved if any part of the truth were known.

3210 The amount of the false or fraudulent claims caused by the Defendants to be

3211 submitted to the United States were material. By reason of Defendants wrongful

3212 conduct, the United States has suffered substantial losses in an amount to be proved

3213 at trial, and therefore is entitled to multiple damages under the False Claims Act.

3214    WHEREFORE, Relator on behalf of herself and on behalf of the United

3215    States of America demands and prays that judgment be entered in its favor and

3216    against each Defendant jointly and severally.

### COUNT FOUR - 31 U.S.C. § 3729(a)(3)
**Violations of Federal False Claims Act – Conspiracy**
*(1) The Defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States, and (2) One or more conspirators performed any act to affect the object of the conspiracy.*

3217    Relator re-alleges and incorporates by reference the allegations contained in

3218    all of the foregoing paragraphs as if fully set forth herein.

3219    This is a claim for damages the Court deems proper, triple damages, civil

3220    penalties, cost and attorney fees under the Federal False Claims Act, 31 U.S.C. §§

3221    3729, et seq. as amended.

3222    Defendants entered into conspiracies between each other for the purpose of

3223    defrauding the United States.

3224    By the foregoing acts and omissions, Defendants took actions in furtherance

3225    of its conspiracies, including but not limited to the discount and/or free price of its

3226    hearing aids to its co-conspirators Defendants Keystone and Fowler, in exchange

3227    for being the exclusive seller of hearing aids in any of the Defendant Keystone

3228    office locations; thereby, increasing the number of Defendant Phonak hearing aids

3229    submitted to the United States for payment.

3230    By the foregoing acts and omissions, Defendants entered into these unlawful

3231    marketing conspiracies to defraud the United States by causing false and fraudulent

3232    claims to be paid and approved in violation of the False Claims Act.

3233    At all times relevant to this Complaint, Defendants acted with the requisite

3234    knowledge.

3235    By virtue of the acts described above, Defendants knowingly engaged in

3236    kickback schemes for the purpose of inducing, and did induce, the presentation of

3237    false or fraudulent claims to the United States Government for the payment of

3238    medical services as described above.

3239    As detailed above, Defendants knowingly conspired and may still be

3240    conspiring to commit acts in violations of these laws. Defendants committed overt

3241    acts in furtherance of the conspiracy as described above.

3242    The United States, unaware of the conspiracy, statements or claims made by

3243    the defendants or the kickbacks involved, paid Defendant Keystone for claims that

3244    would otherwise not have been allowed.

3245    WHEREFORE, as a direct and proximate consequence of Defendants

3246    conspiratorial conduct, the United States has suffered substantial losses in an

3247    amount to be proved at trial. Relator on behalf of herself and on behalf of the

3248    United States of America demands and prays that judgment be entered in its favor

3249    and against each Defendant jointly and severally.

## COUNT FIVE - 41 U.S.C. §§ 52-53
### Violations of Anti-Kickback Act

3250    Relator re-alleges and incorporates by reference the allegations contained in

3251    all of the foregoing paragraphs as if fully set forth herein.

3252    As a direct and proximate consequence of Defendants conduct, the United

3253    States has suffered substantial losses in an amount to be proved at trial and

3254    Plaintiffs are entitled to damages, fines, costs attorney fees and other damages and

3255    costs the Court deems proper.

3256    By engaging in the conduct described in the foregoing paragraphs,

3257    Defendants violated the Anti-Kickback Act.

3258    Defendants knowingly caused Defendant Keystone to present claims to the

3259    United States government and to Federal Insurance Programs that were the product

3260    of the payment of the above described kickbacks.  The payment of a kickback to

3261    induce a prescription for a hearing aid constitutes a "thing of value … for the

3262    purpose of improperly obtaining or rewarding favorable treatment;" which was

3263    designed to and in fact did increase level of business in violation of the Anti-

3264    kickback Act.

3265    Defendants did not report these free products and/or discounts to Medicare,

3266    Medicaid and other government funded programs.  Thus Defendant facilitated and

3267    caused Defendant Keystone by and through Defendants Fowler to falsely certify,

3268    either expressly or impliedly, that it had complied with the aforesaid laws and was

3269    qualified to participate in the FIP and, in particular, qualified to receive

3270    reimbursements thereunder.

3271         As a result of the conduct set forth in this cause of action, the Federal

3272    Government suffered harm as a result of paying and reimbursing for hearing aids

3273    which, had the government known such hearing aids were prescribed as a result of a

3274    kickback, the Government would not otherwise have paid for and /or reimbursed.

3275         WHEREFORE, Relator on behalf of herself and on behalf of the United

3276    States of America demands and prays that judgment be entered in its favor and

3277    against each Defendant jointly and severally.

### COUNT SIX - 42 U.S.C. §§ 1320a-7a
### Violations of the Anti-Kickback Statute

3278         Relator re-alleges and incorporates by reference the allegations contained in

3279    all of the foregoing paragraphs as if fully set forth herein.

3280         As a direct and proximate consequence of Defendants' conduct, the United

3281    States has suffered substantial losses in an amount to be proved at trial and

3282    Plaintiffs are entitled to damages, fines, costs attorney fees and other damages and

3283    costs the Court deems proper and Defendants should be fined up to $50,000 per

3284    kickback violation, imprisonment of up to five (5) years, or both; exclusion of the

3285    provider from participation in Federal Health care programs; and other damages

3286    and/or costs as the court deems.

3287    By engaging in the conduct described in the foregoing paragraphs,

3288    Defendants violated the Anti-Kickback Statute.

3289    Defendants knowingly caused Defendant Keystone to present claims to the

3290    United States government and to Federal Insurance Programs that were the product

3291    of the payment of the above described kickbacks; which constitute remuneration to

3292    increase the level of business in violation of said Statute.

3293    Defendants did not report these free products and/or discounts to Medicare,

3294    Medicaid and other government funded programs.  Thus Defendants facilitated and

3295    caused Defendant Keystone by and through Defendants Fowler and Price to falsely

3296    certify, either expressly or impliedly, that it had complied with the aforesaid laws

3297    and was qualified to participate in the Government Insurance Programs and, in

3298    particular, qualified to receive reimbursements thereunder.

3299    As a result of the conduct set forth in this cause of action, the Federal

3300    Government suffered harm as a result of paying and reimbursing for hearing aids

3301    which, had the Federal Government known such hearing aids were prescribed as a

3302    result of a kickback, the Federal Government would not otherwise have paid for and

3303    /or reimbursed.

3304    WHEREFORE, Relator on behalf of herself and on behalf of the United

3305    States of America demands and prays that judgment be entered in its favor and

3306    against each Defendant jointly and severally.

## COUNT SEVEN
## 42 U.S.C. § 1395nn and further implemented at 42 C.F.R. §§ 411.350 et seq.
## Violation of the Stark Law

3307      Relator re-alleges and incorporates by reference the allegations contained in

3308      all of the foregoing paragraphs as if fully set forth herein.

3309      Defendants Sonova and Phonak had compensation arrangement with

3310      Defendant Fowler and knowingly caused Defendant Fowler and Defendant Price to

3311      refer Defendants Sonova and Phonak hearing aids for which payment otherwise

3312      may be made in violation of the Stark Law and for which Defendants are liable for

3313      a penalty of $15,000 for each such claim.

3314      Defendants Sonova and Phonak knowingly entered into improper

3315      arrangements or schemes with Defendants Fowler and for which Defendants are

3316      liable for a civil penalty of $100,000 for each such arrangement or scheme.

3317      Defendant Keystone did not report these free products and/or discounts to

3318      Medicare, Medicaid and other FIP.  Thus Defendants Sonova and Phonak facilitated

3319      and caused Defendant Keystone by and through Defendants Fowler and Price to

3320      falsely certify, either expressly or impliedly, that it had complied with the aforesaid

3321      laws and was qualified to participate in the Government Insurance Programs and, in

3322      particular, qualified to receive reimbursements thereunder.

3323      As a result of the conduct set forth in this cause of action, the Federal

3324      Government suffered harm as a result of paying and reimbursing for hearing aids

3325     which, had the Government known such hearing aids were prescribed as a result of

3326     a kickback, the Government would not otherwise have paid for and /or reimbursed.

3327     WHEREFORE, Relator on behalf of herself and on behalf of the United

3328     States of America demands and prays that judgment be entered in its favor and

3329     against each Defendant jointly and severally for all damages and costs the Court

3330     deems proper, to deny payment for the designated health services, refund of

3331     amounts collected from improperly submitted claims, and a civil monetary penalty

3332     of up to $15,000 for each improper claim submitted. Physicians who violate the

3333     statute may also be subject to additional fines per prohibited referral. In addition,

3334     providers that enter into an arrangement that they know or should know

3335     circumvents the referral restriction law may be subject to a civil monetary penalty

3336     of up to $100,000 per arrangement.

### COUNT EIGHT - 42 U.S.C. § 1320a-7a
### Civil Monetary Penalties Law

3337     Relator re-alleges and incorporates by reference the allegations contained in

3338     all of the foregoing paragraphs as if fully set forth herein.

3339     For all of the Defendants' actions listed throughout this Complaint, said

3340     Defendants did violate this Law.

3341     WHEREFORE, Relator on behalf of herself and on behalf of the United

3342     States of America demands and prays that judgment be entered in its favor and

3343   against each Defendant jointly and severally a penalty of $10,000 - $50,000.00 per

3344   violation and up to three times the amount unlawfully claimed, exclusion from

3345   participation in Federal health care programs; and award Plaintiffs other damages

3346   and costs it deems proper.

**COUNT NINE - 62 P.S. § 1401 et seq.**
**Pennsylvania Fraud and Abuse Control Act**

3347      Relator re-alleges and incorporates by reference the allegations contained in

3348   all of the foregoing paragraphs as if fully set forth herein.

3349      For all of the Defendants' actions listed throughout this Complaint,

3350   Defendants did violate this Act.

3351      WHEREFORE, Relator on behalf of herself and on behalf of the United

3352   States of America demands and prays that judgment be entered in its favor and

3353   against each Defendant jointly and severally to pay a maximum penalty of $25,000

3354   and up to 10 years' imprisonment, be required to repay the excess benefits or

3355   payments they received plus interest, preclusion of a provider from participating in

3356   the medical assistance program for a period of five (5) years from the date of

3357   conviction plus award Plaintiffs other damages and costs it deems proper.

## COUNT TEN - 18 U.S.C. § 287
## Criminal False Claims Act,

3358       Relator re-alleges and incorporates by reference the allegations contained in

3359   all of the foregoing paragraphs as if fully set forth herein.

3360       Whoever makes or presents to any person or officer in the civil, military, or

3361   naval service of the United States, or to any department or agency thereof, any

3362   claim upon or against the United States, or any department or agency thereof,

3363   knowing such claim to be false, fictitious, or fraudulent, "fined not more than

3364   $10,000 or imprisoned not more than five years, or both".

3365       Although this is a criminal statue, Relator is entitled to a percentage of the

3366   monetary recovery through fines etc., under the Alternative Remedies provision of

3367   the FCA.

3368       WHEREFORE, Relator on behalf of herself and on behalf of the United

3369   States of America demands and prays that judgment be entered in its favor and

3370   against each Defendant jointly and severally.

## COUNT ELEVEN - 31 U.S.C. § 3730(h)
### FCA Wrongful Discharge

3371       Relator re-alleges and incorporates by reference the allegations contained in

3372   all of the foregoing paragraphs as if fully set forth herein.

3373       Relator was terminated from her employment with Defendant Keystone

3374   because of her lawful acts of initiating, investigating, and reporting the misconduct

3375   of the Defendants to employees of the State Regulatory Agency.

3376       Relator was discriminated against in the terms and conditions of her

3377   employment by Defendants Keystone and Fowler, by and through its officers,

3378   agents, and employees because of lawful acts done by him in the furtherance of an

3379   action under the False Claims Act.

3380       The actions of Defendant damaged and will continue to damage Relator in

3381   violation of the FCA; 31 U.S.C. § 3730(h)

3382       WHEREFORE, Relator demands and prays that judgment be entered in its

3383   favor and against Defendants Keystone and Fowler jointly and severally to pay

3384   Relator two times the amount of her back pay and benefits, plus interest on the back

3385   pay and benefits from the date of discharge to the date of reinstatement; interest,

3386   compensation for special damages, punitive damages including litigation cost, and

3387   reasonable attorney fees, and other damages and costs this Court deems proper

3388   pursuant to 31 USC §3730(h) .

3389

## VIII.  **REQUEST FOR TRIAL BY JURY**

3390    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby

3391    demands a trial by jury.


Dated this 28th day of August 2015.

Sincerely,

KOPE & ASSOCIATES, LLC.

Rebecca A. Lyttle, Esq.
PA ID. # 201399
3900 Market St.
Camp Hill PA 17011
717-761-7573
(F) 717-761-7572
rlyttle@kopelaw.com
*Counsel for the Relator*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Complaint was served by Federal Express, this 28th day of August, 2015, to:

**Attorney General of the United States**
***False Claims Act Division***
**950 Pennsylvania Avenue, N.W.**
**Washington, D.C. 20530-001**

I HEREBY CERTIFY that a copy of the foregoing Complaint was served by Hand Delivery, this 28th day of August, 2015, to:

**United States Attorney's Office for the Middle District of Pennsylvania**
**The Civil False Claims Act Division**
**Harrisburg Federal Building and Courthouse**
**228 Walnut Street, Suite 220**
**P.O. Box 11754**
**Harrisburg, PA 17108-1754**

Sincerely,

KOPE & ASSOCIATES, LLC.

Rebecca A. Lyttle, Esq.
PA ID. # 201399
3900 Market St.
Camp Hill PA 17011
717-761-7573
(F) 717-761-7572
rlyttle@kopelaw.com
*Counsel for the Relator*